**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Matthew W. Arrow (Bar No. 338273)
matthew.arrow@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:    (310) 819-3481

John Rizio-Hamilton (*pro hac vice*
forthcoming)
johnr@blbglaw.com
1251 Avenue of the Americas
New York, NY 10020
Tel:    (212) 554-1400
Fax:    (212) 554-1444

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNION ASSET MANAGEMENT HOLDING AG, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> THE WALT DISNEY COMPANY, ET AL., <br><br> Defendants. | Case No. 2:25-cv-11668 <br><br> **COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................2

II.   JURISDICTION AND VENUE .............................................7

III.  THE EXCHANGE ACT PARTIES ......................................8

IV.   BACKGROUND ................................................................10

    A.   Disney's History and the Importance of Disney+ .............10

        1.   Traditional Disney Revenue Streams and Iger's Tenure as CEO ..............................................10

        2.   Rise of Streaming and the Rollout of Disney+ ........11

    B.   Chapek Was Tapped to Succeed Iger with a Stock Price Loaded Compensation Structure and Contract Renewal Requirements ..........15

    C.   COVID Hits ..................................................................15

V.    SUMMARY OF THE FRAUD ...........................................17

    A.   Defendants Lay the Foundation for their Scheme to Defraud Disney's Investors ..................20

        1.   Chapek Creates DMED to Seize Full Control over Disney+ ...........................................20

        2.   Defendants Set Unattainable Disney+ Paid Subscriber Targets at Investor Day 2020 ..................22

    B.   Defendants Repeatedly Touted Positive Information About Subscriber Growth, Disney+ Content Growth and DTC Operating Losses, International Expansion, the DMED Reorganization, Disney+ Churn, and Ultimately Disney+ Profitability ..................24

        1.   Defendants Repeatedly Touted Paid Subscriber and Subscriber Growth, Assuring Investors that Disney+ Growth Was "On Track" ..................24

        2.   Defendants Touted Aggressive Disney+ Content Spend as Fueling Growth While Downplaying DTC Operating Losses ..................28

        3.   Defendants Touted Disney+ International Expansion as a Sustainable Way to Increase Subscriber Growth and Drive Engagement ..................33

        4.   Chapek Repeatedly Assured Investors That There Was "Very Strong Buy-In" at Disney for the DMED Reorganization ..................35

5.    Defendants Repeatedly Assured Investors that the Company Was "Pleased" With "Low" and Declining Churn ................................................................... 36

6.    Defendants Assured Investors that Disney+ Was "Well Situated" to Achieve Long-Term Profitability ........................ 37

C.    The Scheme Succeeded ................................................ 39

1.    Investors Expected Disney+ to Achieve Long-Term Profitability Through Sustainable Subscriber Growth and the Stock Price Soared ................................................ 39

a.    Defendants Set Aggressive Subscriber Targets to Redirect Investor Focus on Disney+ ........................ 39

b.    Defendants Misled Investors Into Believing Disney+ Growth Targets Were on Track ...................... 40

2.    Chapek's Contract was Renewed .................................. 45

3.    McCarthy Made Millions on Stock Sales ................................ 46

D.    Unknown to Investors at the Time, the "Success" of Disney+ was an Illusion Propped Up by Misleading Half-Truths and Financially Disastrous Growth-At-Any-Cost Tactics ........................ 47

1.    Foundational Artifices ................................................ 47

a.    Executive Defendants Create DMED ............................ 47

b.    Defendants Set Unattainable Subscriber Targets ........... 51

2.    Unsustainable Growth-At-Any-Cost Artifices ....................... 53

a.    Defendants Steered Films to Disney+ Through DMED to Boost Subscriber Growth at the Expense of Profitability ................................................ 53

b.    Disney Chased Subscriber Growth Through Unsustainable Content Spend ................................ 55

c.    Disney Chased "Low Quality" Subscriber Growth with Steep Discounts and Aggressive Promotions ......... 60

d.    Disney Chased Subscriber Growth in Unprofitable International Markets ................................ 66

3.    Half-Truth and Coverup Artifices ............................... 71

a.    Chapek and McCarthy Assured Investors that Disney+ Growth Was On Track ................................ 71

b.    Defendants Used Accounting Gimmicks to Conceal Runaway Costs ................................ 75

c.      Defendants Concealed Significant Subscriber Churn ........................................................79

4.      Internal Data Contradicted Defendants' Public Statements ...................................................83

5.      Internal Strife Mounted as Executives Warned Chapek ..........84

E.      The Truth Emerges .................................................85

1.      November 10, 2021: Disney Revealed a Significant Slowdown in Disney+ Subscriber Growth and that Disney+ Losses Would Continue Longer Than Previously Disclosed ..........................................86

2.      November 8, 2022: Disney Reported a Staggering $1.47 Billion Operating Loss in its Streaming Segment ...................88

3.      November 20, 2022: Chapek is Fired and Replaced as CEO by Iger ....................................................89

4.      May 10, 2023: Iger Acknowledged Disney Needed to Completely Change Course, Unwind the Disney+ Business Model, and Take an Impairment Charge of $1.5 Billion ...............................................90

VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS .........................................92

A.      DMED Reorganization ..............................................93

B.      Paid Subscribers and Subscriber Growth .........................95

C.      Disney+ Content .................................................103

D.      DTC Operating Losses ............................................108

E.      International Growth ............................................113

F.      Disney+ Churn ...................................................115

G.      Disney+ Profitability ..........................................119

VII.    DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF CONDUCT ...................................................122

A.      DMED Formation and Company Reorganization .......................123

B.      Setting Unattainable Subscriber Targets ........................124

C.      Steering Films to Disney+ ......................................125

D.      Chasing Subscriber Growth Through Unsustainable Spending ........127

E.      Chasing Low Quality Subscriber Growth ..........................128

F.      Chasing Subscriber Growth in Unprofitable International Markets ...........................................................129

G.      Assuring Investors Disney+ Growth was On Track .........................130

H.      Accounting Manipulations to Conceal Runaway Costs...................131

I.      Concealing Subscriber Churn.......................................................133

VIII.  SUMMARY ALLEGATIONS OF SCIENTER .........................................134

A.      Internal Data Contradicted Defendants' Public Statements.............134

B.      The Fraud Involved Disney's Core Operations ...............................140

C.      Temporal Proximity Between Misstatements and the Corrective Disclosures Supports Scienter............................................................145

D.      Terminations and Resignations Support Scienter ............................147

E.      Defendants' Compensation and Longevity with Disney Were Tied to the Fraud ............................................................................149

F.      Suspicious Stock Sales Support Scienter .........................................154

G.      Internal Warnings and Inappropriate Tone at the Top.....................155

H.      Corporate Scienter ..........................................................................160

IX.    ADDITIONAL LOSS CAUSATION ALLEGATIONS ...........................160

A.      November 10, 2021: Defendants Disclose A Slowdown in Disney+ Subscriber Growth ...........................................................161

B.      November 8, 2022: Defendants Reveal Devastating Financial Results ...........................................................................................163

C.      May 10, 2023: Investors Learn the Full Extent of The Scheme .......163

X.     INAPPLICABILITY OF STATUTORY SAFE HARBOR........................165

XI.    PRESUMPTION OF RELIANCE ...........................................................166

XII.   PLAINTIFFS' CLAIMS ARE TIMELY .................................................167

XIII.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT .....................168

COUNT I..........................................................................................................168

Violations of Section 10(b) of the Exchange Act and SEC Rule(s) 10b-5(a) – (c) (Against All Defendants) ...........................................168

COUNT II.........................................................................................................170

Violations of Section 20A of the Exchange Act (Against McCarthy)........170

COUNT III ...................................................................................................172

    Violations of §20(a) of the Exchange Act Against All Defendants ...........172

XIV.  PRAYER FOR RELIEF ........................................................................174

XV.  JURY DEMAND .....................................................................................174

Plaintiffs (defined below) by and through their undersigned counsel ("Counsel"), brings this Action under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, against Defendants The Walt Disney Company ("Disney" or the "Company"); former Chief Executive Officer ("CEO") Robert Chapek ("Chapek"); former Chief Financial Officer ("CFO") Christine M. McCarthy ("McCarthy"); and former Chairman of the Disney Media and Entertainment Distribution ("DMED") segment Kareem Daniel ("Daniel") (collectively, "Defendants").[1]

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief are based upon Counsel's investigation, which included review and analysis of, *inter alia*: (1) Disney's statements to investors, including those made in SEC filings, in press releases, at investor conferences, and on earnings calls; (2) news articles and media reports concerning Disney; (3) analyst reports issued about Disney; (4) economic analyses of securities movement and pricing data; (5) interviews of former employees of Disney; and (6) court filings in *Local 272 Labor-Management Pension Fund, et al. v. The Walt Disney Company, et al.*, No. 2:23-cv-03661-CBM-AS (C.D. Cal.) (the "Disney Securities Class Action"), including the Corrected Consolidated Complaint for Violations of the Federal Securities Laws (the "Class Complaint").[2] Plaintiffs' investigation into the

---

[1] All emphasis added throughout unless otherwise noted.

[2] As part of its investigation, Counsel and/or its investigators interviewed various former Disney employees. The Complaint also refers to the former employee ("FE") witness accounts included in the Class Complaint. FE numbers 1-7 in this Complaint correspond to the FEs numbered 1 through 7 in the Class Complaint. FE numbers 8-16 refer to the FE witness accounts interviewed by Counsel and/or its investigators. Lead Counsel in the Disney Securities Class Action has confirmed that the Class Plaintiffs stand by the witness accounts pled in the Class Complaint and that, based

factual allegations contained in this Complaint is ongoing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth in this Complaint after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.      This Action is related to the pending Disney Securities Class Action, which asserts many of the same allegations and claims included herein. As with the Disney Securities Class Action, this Action arises from a multi-year scheme by Defendants—Disney and senior executives Chapek, McCarthy, and Daniel—to deceive the market about the performance, profitability, and long-term viability of Disney's flagship streaming service, Disney+.

2.      In November 2019, Disney launched Disney+, a subscription-based streaming platform that emulated Netflix by offering a large library of movies and shows for subscribers to "stream" over the internet. Disney's then-CEO, Bob Iger, touted the streaming service as "an entirely new growth strategy" and told investors that the Company expected Disney+ would have 60 million to 90 million subscribers by the end of fiscal 2024.

3.      Within months, however, Disney's leadership changed. In February 2020, Disney's longtime CEO Bob Iger stepped down, and Disney's Board announced Bob Chapek as the new CEO.

4.      Barely weeks later, the COVID-19 pandemic shut down Disney's core businesses. As the *New York Times* reported, Disney "was almost perfectly exposed to the pandemic." Disney's in-person experiences, which "helped Disney become the biggest media company in the world," were "impossible to protect from the

---

on the Class Plaintiffs' personal knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the factual contentions contained in the witness accounts contained in the Class Complaint have evidentiary support.

pandemic." The Company was forced to close its theme parks, halt film and tv production, and suspend cruises and theatrical shows. Consequently, Disney's stock price plummeted more than 40%, from $133 per share on the day Chapek became CEO to a low of $79 per share weeks later.

5.    Amid the global shutdown and collapse of Disney's traditional revenue streams, Disney+ emerged as the Company's lone bright spot. As *NBC News* reported, "'[t]he shutdowns hammer[ed] every pillar of the business,' . . . 'except for streaming,'" which "enjoy[ed] a spike as confined families watch[ed] more." Investors and analysts quickly took notice and shifted their focus to Disney+ and treated its growth as the primary driver of Disney's valuation. Despite Disney's ongoing pandemic-related hardships, Disney's stock price began to climb in lockstep with Disney+'s subscriber growth.

6.    Chapek immediately understood the significance of this shift. His new—and unusually short—CEO contract required Board approval for renewal and tied his compensation to Disney's stock performance. Thus, Disney+'s success became inextricably linked to Chapek's own success. Analysts agreed, noting that "the more investors focus on streaming the better it is for the stock," and encouraged Chapek to "put his first stamp on [Disney] by doing exactly what long-term holders crave: pushing faster to streaming." With this in mind, Chapek went "all in" on Disney+ and devised a scheme that would keep Wall Street's focus on Disney+ and keep Disney's stock inflated.

7.    Together Chapek, McCarthy, and Daniel, devised and executed a scheme to convince the market that Disney+ was rapidly growing subscribers, keeping costs under control, and remaining firmly on track to profitability. The reality, of which Defendants were keenly aware, was far different: Disney+ was a house of cards, as subscriber growth came largely from unprofitable international markets and low-quality subscribers; costs ballooned but were hidden through accounting manipulations; and churn quietly worsened even as Defendants publicly

claimed the opposite.

8.    The scheme began during Disney's Investor Day on December 10, 2020, when Defendants unveiled eye-catching new subscriber and profitability projections that put Disney on track to overtake its primary streaming rival, Netflix. Chapek and McCarthy told investors that Disney+ would reach ***230 million to 260 million subscribers*** by fiscal 2024, nearly ***quadrupling*** Disney+'s prior target of 60 million to 90 million subscribers. This announcement laid the foundation for the scheme, and investors responded as Defendants had hoped. Disney's stock price exploded to a new high, rising 14% the next day, and reaching all-time highs within weeks. Analysts were "blown away" by Disney's new subscriber targets and highlighted that "Disney is almost certain to be a clear winner in streaming along with Netflix."

9.    To further lay the foundation for their scheme, Defendants reorganized the entire Company and created DMED, a new unit consolidating control over Disney+ and all of Disney's media and entertainment operations. By centralizing authority in DMED, Defendants seized full control over content, budgets, and strategic decisions, allowing them to execute their plan.

10.    To carry out the scheme and keep Disney's stock artificially inflated, Defendants needed to convince investors that their stated subscriber and profitability targets were achievable. To accomplish this, Defendants (i) repeatedly touted paid subscriber growth and unequivocally assured investors each quarter that Disney+ was on track to meet its 230 to 260 million subscriber target; (ii) repeatedly promoted aggressive content spending as fueling subscriber growth while downplaying the mounting operating losses; (iii) touted Disney+'s international expansion as a sustainable path to increase subscribers, despite the high costs and low profitability in many markets; (iv) assured investors that there was "very strong buy-in" for the DMED reorganization; (v) assured investors that churn was low or declining; and (vi) assured investors that Disney+ was well positioned to achieve long-term

profitability. By employing these unsustainable growth-at-any-cost artifices and concealing the runaway costs and devastating financial effects, Defendants created the illusion of a rapidly growing subscriber base that was on its way to profitability.

11.    In carrying out this scheme, Defendants made a series of materially false and misleading statements about Disney+. As a well-placed former Disney executive explained, the 230 million to 260 million subscriber target was "batshit crazy," and nobody who he knew at Disney understood the basis for the numbers. Equally false and misleading was Defendant McCarthy's statements to investors that "increasing [Disney+'s] overall long-term content expense for Disney+" would drive the 230 million to 260 million subscriber mark and profitability by fiscal 2024. In reality, Disney was ***not*** producing content based on consumer preference, internal engagement data, or any other measure of growth, and Defendants knew that the content that was produced for Disney+ was ***not*** driving subscriber growth. Additionally, while Chapek told investors that "we're extraordinarily pleased by low churn," and "our churn has declined," in reality churn had ***not*** declined and high subscriber churn ***was*** a constant problem and a direct result of Defendants' growth-at-any-cost scheme that drew low-quality subscribers.

12.    Market participants credited Defendants' assurances, and the scheme produced exactly what Chapek, Daniel, and McCarthy intended. Quarter after quarter, they convinced investors that Disney+ was generating sustainable subscriber growth and that it was on track to profitability in the near-term. Over the course of the Relevant Period (defined below) before the truth emerged, Disney's stock climbed to a high of more than $200 per share. Analysts praised Disney's performance and even characterized Disney's profitability timeline as "conservative." Also, as a result of Disney's seemingly great performance, the Board renewed Chapek's CEO contract and increased his annual equity award to $20 million. The Board expressly credited "Chapek's work navigating the Company through the unprecedented challenges of the pandemic and growing the Company's

streaming business."

13.    The illusion began to collapse just five months after the Board renewed Chapek's contract, with the truth coming out through a series of partial disclosures. First, in November 2021, Disney revealed a slowdown in Disney+ subscriber growth and that Disney+ losses would continue longer than previously disclosed. This news caused Disney's stock price to drop $12.34 per share, or 7.1%. Then, on November 8, 2022, Disney was forced to disclose devastating financial results for Q4 2022, revealing an operating loss of ***$1.47 billion***, a loss that was the direct result of Defendants' growth-at-any-cost scheme that had finally caught up with Disney. Given Defendants' repeated reassurances, analysts reacted with astonishment to this news, reporting, "Rarely have we ever been so incorrect in our forecasting of Disney profits." Disney's stock price plummeted, dropping by $13.15 per share, or 13.2%. Not long after, on November 20, 2022, Disney unexpectedly announced Chapek's termination and his immediate replacement as CEO with Iger. The next day, Daniel—Chapek's "top lieutenant"—was fired, and McCarthy departed a few months later.

14.    Finally, the full truth was revealed on May 10, 2023, when Iger announced that he would be unwinding the Executive Defendants' (defined below) growth-at-any-cost scheme. On this news, Disney's stock price once again dropped $8.83 per share, or 8.7%. Soon after he took control, Iger quickly reversed the very tactics that had fueled the scheme. He withdrew Chapek's subscriber target and announced that Disney would be shifting its focus away from subscription growth in order to "rationalize" the business and focus on profitability. Iger also announced that, moving forward, Disney would end the aggressive promotions that had generated "low-quality" subscriber spikes and instead prioritize "grow[ing] quality sub[scribers]." He also made clear that Disney+ would withdraw from unprofitable international markets. Iger further undertook sweeping cost reforms, cutting billions from Chapek's unsustainable annual content budget and vowing to "spend[] less on

what we make, and mak[e] less." As part of that overhaul, Disney removed over fifty original Disney+ titles—the same content Chapek had repeatedly promoted to investors—which resulted in billions in impairment losses.

15.     These drastic corrections left Disney+ projecting only modest subscriber growth, reflecting a vast departure from the Netflix-sized scale Chapek had repeatedly promised to investors. As one analyst observed, "'No other company we've considered has seen that kind of decline. ***How did previous management not see this coming?***'"

16.     Disney's stock price—which climbed to a high of nearly $200 per share during the scheme—fell to $92.31 per share when the truth was finally revealed on May 10, 2023, saddling Plaintiffs with losses. Plaintiffs bring this case to remedy the Defendants' violations of the federal securities laws.

## II.    JURISDICTION AND VENUE

17.     The claims asserted herein arise under Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, and Rule 10b-5 (17 C.F.R. § 240.10b-5), promulgated thereunder by the SEC.

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). At all relevant times, Disney's principal executive offices have been located in this District, and it conducted substantial business in this District. In addition, many of the acts alleged herein occurred in this District.

20.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone and internet communications, and the facilities of the national securities exchanges and

markets.

## III.    THE EXCHANGE ACT PARTIES

21.    Plaintiff Union Asset Management Holding AG ("Union") is the parent holding company of the Union Investment Group. Union Investment Group, based in Frankfurt am Main, Germany, was founded in 1956, and is one of Germany's leading asset managers for retail and institutional clients. Union purchased or acquired Disney common stock during the period of December 10, 2020 through May 10, 2023 (the "Relevant Period") and suffered substantial losses as a result of the conduct complained of herein.

22.    Plaintiff GIC Private Limited ("GIC"), incorporated in 1981 under the Singapore Companies Act and wholly owned by the Government of Singapore, is headquartered in Singapore and has ten offices worldwide, including one in New York. GIC purchased or acquired Disney common stock during the Relevant Period and suffered substantial losses as a result of the conduct complained of herein.

23.    Plaintiffs Union and GIC are collectively referred herein as "Plaintiffs."

24.    Defendant Disney is a multinational media and entertainment conglomerate with assets and affiliates including film and television studios, programming networks, streaming platforms, and entertainment parks and travel experiences. Disney's corporate headquarters and principal place of business are in Burbank, California. Disney's common stock trades on the New York Stock Exchange under the ticker symbol "DIS."

25.    Defendant Chapek was Disney's CEO from February 2020 until his termination on November 20, 2022. Defendant Chapek also became a Director of the Company and was on the Board's Executive Committee until November 2022. Defendant Chapek previously was in a variety of roles since joining Disney in 1993, including as Chairman of Disney Parks, Experiences, and Products, Chairman of Walt Disney Parks and Resorts, President of Disney Consumer Products, and President of Distribution for Walt Disney Studios.

26.     Defendant McCarthy was Disney's Chief Financial Officer from 2015 until her resignation in June 2023. Defendant McCarthy had previously been in a variety of roles since joining the Company in 2000, including Executive Vice President, Corporate Real Estate and Alliances, and as Treasurer of the Walt Disney Company.

27.     Defendant Daniel was selected by Defendant Chapek to be Chairman of the newly created DMED group. Defendant Daniel occupied this role from October 2020 until his termination on November 21, 2022. Defendant Daniel acted as Defendant Chapek's "right-hand man" and was charged with overseeing Disney's streaming services and television networks, in addition to profit and loss management, and all distribution, operation, sales, advertising, data and technology functions for all Disney content. Prior to this role, Defendant Daniel held various leadership positions at Disney since 2007, including Director of Corporate Strategy, Vice President of Distribution Strategy at Walt Disney Studios, and Executive Vice President of Global Business Operations at Walt Disney Imagineering.

28.     Defendants Chapek, McCarthy, and Daniel are collectively referred herein as the "Executive Defendants." The Executive Defendants, because of their positions within Disney, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Executive Defendants was provided with copies of the Company's reports, presentations, and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

29.    Furthermore, the Executive Defendants knew of and/or participated in the fraudulent scheme to defraud investors. The Executive Defendants knew and/or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public. The Executive Defendants knew and/or recklessly disregarded that their affirmative representations were materially false and misleading.

## IV.    BACKGROUND

### A.    Disney's History and the Importance of Disney+

#### 1.    Traditional Disney Revenue Streams and Iger's Tenure as CEO

30.    Over the past century, Disney has grown to be one of the largest entertainment and media companies in the world. Disney's operations span nearly every corner of the entertainment industry. Media is and has always been central to Disney's business. The Company produces and distributes television programming through major networks including ABC, Disney Channel, ESPN, FX, Fox, and National Geographic. It also develops and releases films through various studios, including Walt Disney Pictures, 20th Century Studios, Marvel, Lucasfilm, Pixar, and Searchlight Pictures.

31.    In addition to media, Disney owns and operates twelve theme parks and resorts worldwide and a fleet of international cruise ships. Disney also licenses its well-known characters for use in consumer products, operates divisions dedicated to theatrical productions, home entertainment, and music distribution, stages live events, and provides post-production services through subsidiaries such as Industrial Light & Magic and Skywalker Sound.

32.    Although Disney now operates direct-to-consumer ("DTC") streaming services, such as Disney+, ESPN+, Hulu, and Star+, its traditional model relied on selling and licensing film and television content to third-party broadcast networks and subscription video-on-demand services ("SVOD").

33.    Mr. Iger became Disney's CEO in 2005 and guided the Company through one of the most successful 15-year runs in corporate history. Beyond just preserving Disney's already world-famous media apparatus and characters, Iger expanded Disney's reach immensely by overseeing the acquisitions of Pixar, Marvel Entertainment, Lucasfilm, and 21st Century Fox. Iger also grew the Company into an entertainment and hospitality giant with the launch of cruise ships and the opening of Shanghai Disney Resort.

34.    By the time Iger stepped down as CEO in February 2020, Disney was operating four successful segments: (1) Media Networks, which included Disney's television production and distribution; (2) Studio Entertainment, which included movie production and distribution; (3) Parks, Experiences, and Products, which included Disney theme parks, cruise lines, and merchandise; and (4) DTC and International, which included streaming platforms like Disney+, ESPN+, and Hulu.

35.    Disney's market value increased more than fourfold over the course of Iger's first tenure as CEO. When Iger took over as CEO in October 2005, Disney stock was trading at roughly $20 per share. When Iger stepped down in February 2020, Disney shares were trading at a little over $128 per share.

### 2.    Rise of Streaming and the Rollout of Disney+

36.    Prior to 2007, consumers primarily accessed media content, including Disney, through traditional broadcast television, such as The Disney Channel, and home video technologies such as VHS or DVD. This model could largely be categorized as the "legacy media" model.

37.    This model began to shift dramatically in 2007 with the launch of Netflix's SVOD service. Netflix's introduction of a subscription-based streaming service allowed viewers access to a vast library of shows and movies on demand rather than at set broadcast times. This convenience quickly reshaped the media landscape, prompting the entry of competitors including Hulu (2007), Amazon Video (2008), and HBO Go (2010). Nevertheless, Netflix maintained its dominance,

1    reaching more than 200 million subscribers in 2020.[3]

2        38.    The streaming revolution was bolstered by the big-data revolution.

3    Advances in computer technology and widespread internet use made it possible for

4    online-based companies to collect and analyze vast amounts of user information by

5    tracking their users' online activities. Streaming companies have thus been able to

6    grow even more by leveraging this "big data" to personalize their services and

7    improve customer retention. The insights these companies gained by tracking their

8    users' data allowed them to anticipate audience preferences, guide creative

9    decisions, and market content with precision. This data could also be sold to third

10   parties for marketing purposes.

11       39.    In short, the traditional media landscape was completely upended over

12   the course of less than a decade. Legacy media companies like Disney had to either

13   get into the streaming game themselves or become relics of a bygone era.

14       40.    As late as 2017, Disney's media business was still heavily reliant on

15   distributing Disney content through traditional cable television and other legacy

16   media. Disney's only foray into streaming was by licensing Disney content to SVOD

17   companies like Netflix.

18       41.    On August 8, 2017, then-CEO Iger announced that Disney would end

19   its licensing agreement with Netflix and launch its own streaming service, Disney+,

20   in 2019. The Company described the platform as the "exclusive home in the U.S. for

21   subscription-video-on-demand viewing of the newest live action and animated

22   movies from Disney and Pixar," and announced plans to make "significant

23   investment in an annual slate of original movies, TV shows, short-form content and

24   other Disney-branded exclusives for the service."[4] Iger characterized this strategic

25

26   [3]  *Netflix hits 200M subscribers*, ASSOCIATED PRESS (Jan. 19, 2021),
     https://www.nbcnews.com/media/netflix-hits-200m-subscribers-rcna229.

27
28   [4] *The Walt Disney Company To Acquire Majority Ownership Of BAMTech*, The Walt
     Disney Company, Aug. 8, 2017.

shift as "an entirely new growth strategy for the Company, one that takes advantage of the incredible opportunity that changing technology provides us to leverage the strength of our great brands."

42. News outlets described Disney+ as a "make-or-break attempt" by Iger "to reposition Disney for growth" amid declining traditional cable businesses and competition from "the tech giants that are aggressively moving into Hollywood." Other outlets further emphasized that Iger had "staked his legacy on the success of Disney plus." In short, Disney+ was the Company's "answer to the growing audience for streaming content and a declining base of subscribers for its linear TV channels."

43. Leading up to the launch, Iger told investors that "[b]uilding our direct-to-consumer business remains one of our top priorities." Iger promised investors that Disney+ would have between 60 million to 90 million subscribers worldwide by 2024. Defendant McCarthy echoed these points, stating that the "direct to consumer strategy and the successful launch of Disney+ are top priorities for our company." She added that "[w]e will be aggressive in our efforts and we believe we can succeed," expressing confidence in achieving 60 million to 90 million subscribers by 2024.

44. Iger pledged that Disney+ would "launch big" and "launch hot." Disney executed "a synergy campaign of a magnitude that [was] unprecedented in the history of the Walt Disney Company." The *New York Times* described it as a "kingdom-wide advertising offensive," with every Disney-affiliated entity promoting the platform. Disney+ was advertised on corporate sibling television networks like ABC and ESPN, wrapped around Disney World's theme park buses and trams, previewed on Disney cruise ships, highlighted through in-store "pep rallies" at hundreds of Disney's retail stores, displayed on info-channels in over 22,000 Disney-owned hotel rooms, and shared extensively across the Company's social media accounts, which collectively boasted over a billion followers.

45. In April 2019, the Company announced that Disney+ would launch in

November. Disney again reiterated the 60 million to 90 million subscribers target by 2024. Disney also released guidance predicting the streaming service would be profitable by 2024. Disney's stock price increased another 9.6% to $127.76.

46.     Disney+ launched on November 12, 2019 to a roaring start. The platform surpassed 10 million subscribers on its first day, exceeding analyst projections of 10-18 million subscribers for the first year. The Company also reported that the Disney+ app was downloaded over 3.2 million times within the first 24 hours.

47.     The Disney+ launch had a significant impact on Disney's stock value. Disney's market capitalization increased by $18 billion, and the Company's share price rose 7.5%. As one J.P. Morgan analyst observed on November 13, 2019, the acquisition of 10 million subscribers on launch day "surpassed our expectations," and "Disney's early success in transitioning its business to a digital platform will likely award the stock a higher multiple as it increases conviction in its longer-term success and path to profitability."

48.     On February 4, 2020, Iger announced a strong first quarter "highlighted by the launch of Disney+, which has exceeded even our greatest expectations." Iger added that Disney+ amassed 26.5 million subscribers and reiterated the Company's initial target of 60 million to 90 million subscribers by the end of fiscal year 2024.

49.     Analysts praised these results. UBS Investment Bank noted that Disney+ was "[h]alf way to the target in 3 months." Wells Fargo Securities stated that these results "put a lot of fears to bed, while most importantly showcasing the strong runway ahead for Disney+." Credit Suisse described Disney+'s performance as "quite impressive," and noted that it "beat[] high expectations." In response to the strong subscriber numbers, Disney's stock price increased by nearly $7 in a single day.

**B.    Chapek Was Tapped to Succeed Iger with a Stock Price Loaded Compensation Structure and Contract Renewal Requirements**

50.    In a move that surprised many within the industry and on Wall Street, Disney's Board of Directors announced on February 25, 2020 that Iger was stepping down as CEO, to be replaced by Defendant Chapek, effective immediately. As one Goldman Sachs analyst put it, "[t]he timing of this announcement is surprising, in our opinion. Our original expectation was that DIS would announce a CEO successor at the end of calendar 2020." Similarly, Credit Suisse noted that "investors will be just as surprised as we have found Disney [management] to be regarding this sudden shift to Mr. Chapek as CEO."

51.    Chapek's contract and compensation agreement was also unusual. Chapek's initial contract was set to expire at the end of 2022. Moreover, approximately 90% of Chapek's compensation was variable, or at risk, based on Company and stock price performance. In other words, the vast majority of Chapek's compensation—and whether he would even retain his position as CEO—was tied directly to the value of Disney's common stock.

52.    In short, "the board wanted a probation period for Mr. Chapek," and he entered the role under immense pressure to elevate the Company's stock price, sustain Disney's momentum, and prove himself a worthy successor to Iger.

**C.    COVID Hits**

53.    Less than a month after Chapek was named CEO, the World Health Organization officially declared the COVID-19 outbreak a global pandemic, leading to worldwide lockdowns. The COVID-19 pandemic forced Disney to halt film production, delay theatrical releases, and close its theme parks, resorts and cruise lines. It further forced the Company to virtually eliminate live sports, a key programming source for Disney's TV networks such as ESPN and ABC.

54.    As the *New York Times* reported in April 2020, Disney was "perfectly exposed to the pandemic," because "[n]o big media company is more dependent on

1  its customers' social and physical proximity than Disney, with its theme parks and
2  cruise lines." Consequently, "few [companies were] hit harder by the pandemic [than
3  Disney]."

4        55.    For example, Disney's largest division—the Parks, Experiences, and
5  Consumer Products segment, which included all of Disney's international theme
6  parks, cruise lines, and hotels—brought in more than $26 billion in 2019. By March
7  2020, those revenue streams dried up when Disney was forced to close its theme
8  parks and retail stores and suspend its cruise ship sailings and guided tours. As a
9  result, Disney reported a 10% drop in this segment, with revenue falling to $5.54
10 billion.

11       56.    Disney's second largest division—Media Networks, which included
12 ESPN, ABC, and Disney Channel—had brought in more than $24 billion in 2019.
13 By March 2020, with live-sports effectively off the air, Disney's ESPN cable channel
14 resorted to showing reruns of old games and broadcasting athletes playing video
15 games. Similarly, Disney's third largest group—Studio Entertainment—had
16 generated $10 billion in revenue in 2019. By March 2020, this segment, which had
17 "expected to bring in most of its revenue from movie openings in theaters," saw a
18 loss of revenue due to theatre and stage play closures.

19       57.    The Company's losses mounted quickly and resulted in catastrophic
20 economic repercussions for Disney. By the end of March 2020, the Company had
21 resorted to borrowing $6 billion by selling debt securities, which the *New York Times*
22 reported as "a sign" of Disney's "desperate plight." By April 2020, the Company
23 was losing "as much as $30 million or more a day."

24       58.    On May 5, 2020, Disney released its Second Quarter Earnings Report—
25 the "first outing in front of Wall Street for Bob Chapek" as CEO—announcing
26 dismal results. The losses forced Disney to forgo payment of its semi-annual cash
27 dividend, cut capital spending, cut executive salaries, and furlough thousands of
28 employees. As the pandemic continued into the second half of 2020, Disney

continued to face financial losses. In August 2020, Disney reported its first quarterly loss in 19 years. Later that year, in November 2020, it recorded its first annual loss in over four decades.

59.    This was dire news for Chapek. Both his compensation and any chance of having his lucrative contract renewed depended on the stock price's performance. In the early months of the pandemic, however, Disney's stock price tanked more than 40%, falling as low as $79 per share less than a month after he was announced as CEO, when the stock was trading for $133 per share.

60.    Likewise, Defendant McCarthy's compensation was heavily dependent on Disney's stock price, and thus heavily impacted by the pandemic. Up to 84% of McCarthy's compensation was variable and at risk as the pandemic was driving Disney's stock price down.

61.    Amidst the global pandemic that had "exacted a heavy toll on Disney" and cost the Company an estimated $1 billion, Disney executives were forced to "face analysts looking for answers on how they plan[ned] to navigate out of the unprecedented global crisis." Throughout this period, Disney+ became a "lone bright spot" and the "key to the future of [Disney]."

## V.    SUMMARY OF THE FRAUD

62.    Despite the punishing impact of the pandemic on Disney's operations (and the stock price to boot), the pandemic did offer one important silver lining: booming Disney+ subscriber growth. Consumers turned to streaming services such as Disney+ as the global economy ground to a halt. By the fall of 2020, Disney+ had surpassed 70 million subscribers, eclipsing its initial five-year goal in just nine months of operation.

63.    Wall Street took notice. As the *New York Times* later reported, "Wall

Street had [become] obsessed with subscriber gains, and Disney+ had delivered."[5] By August 2020, with subscriber growth topping 70 million, the Company's stock price had climbed back up to $115 per share. As Evercore ISI reported, "the more investors focus on streaming the better it is for the stock." Wall Street was delivering a clear message to Disney's executives: Disney's stock price depended on the continued growth of Disney+.

64.    Disney held its Q3 2020 earnings call on August 4, 2020 and issued a Press Release the same day. Chapek focused investors' attention on the success of Disney+, stating that "[d]espite the ongoing challenges of the pandemic, we've continued to build the incredible success of Disney+ as we grow our global direct-to-consumer business."

65.    Investors responded accordingly. The day after the earnings call, Disney's stock price rose to $123 per share. BMO remarked "CEO Chapek put his first stamp on DIS by doing exactly what long-term holders crave: pushing faster to streaming." MoffettNathanson analyst Michael Nathanson added that "[d]espite long-term worries," "Disney has accomplished what their peers have not: They have built a big enough life raft to get the Street's attention . . . that attention helps override poor free cash flow [and] an unusually un-Disney-like stretched balance sheet." In raising their price target for Disney, Credit Suisse analysts wrote that, "with new CEO Mr. Bob Chapek now indicating an 'innovative and bold' further pivot to streaming, we expect Disney shares to be even more aggressively positioned as a streaming growth story."

66.    In a prescient note, Bernstein analyst Todd Juenger described the Disney+ growth as "a chance to replay the [2019] playbook . . . Announce a new

---

[5] James B. Stewart and Brooks Barnes, *The Palace Coup at the Magic Kingdom*, N.Y. TIMES (Sept. 8, 2024), https://www.nytimes.com/2024/09/08/business/media/disney-bob-iger-chapek.html.

[DTC offering]. Hold an investor day. Announce 5-year sub, ARPU, and profitability target. Collect a 'Netflix revenue multiple' against that guidance priced into the stock."

67.    As the calendar turned to fall, however, and the pandemic dragged on, Disney+ ran into a problem: subscriber growth was slowing. Making matters worse, Disney had no new content for the platform as Disney's movie and television production remained frozen. This left Defendant Chapek and the other Executive Defendants in a bind as they needed continued subscriber growth to keep investors happy but had nothing new to entice subscribers to the platform.

68.    Chapek pleaded with the various studio heads to release new material that could be added to the Disney+ content library. However, Chapek encountered resistance as the studio heads wanted to save their best material for star-studded premieres after the pandemic.[6]

69.    Knowing they would soon have to face Wall Street with slowing subscriber growth and no new content to energize Disney+, the Executive Defendants devised a multi-part plan to seize control of Disney content and maintain the illusion, at any cost, of meteoric and sustainable Disney+ subscriber growth, driving up the Company's stock price—and their personal wealth—along with it.

70.    The Executive Defendants convinced the market that Disney+ subscriber growth would continue to skyrocket and be a significant source of profitability for the foreseeable future. Unfortunately for investors, this façade of growth and profitability was masking a house-of-cards propped up by unsustainable tactics and obfuscation, and the Defendants knew it. In the end—but not before each Executive Defendant personally profited handsomely—the scheme collapsed, costing shareholders nearly $50 billion.

71.    The first steps in this scheme, described below (¶¶ 72-84), were to

---

[6] *Id.*

completely reorganize the Company and enchant Wall Street with eye-popping new subscriber targets.

### A. Defendants Lay the Foundation for their Scheme to Defraud Disney's Investors

#### 1. Chapek Creates DMED to Seize Full Control over Disney+

72.    Prior to late 2020, Disney was organized into four reporting segments: (1) Media Networks, which included Disney's television production and distribution; (2) Parks, Experience and Products (Chapek's old stomping ground), which included Disney theme parks, cruise lines, and merchandise; (3) Studio Entertainment, which included movie production and distribution; and (4) Direct-to-Customer & International, which included Disney+, ESPN+, and Hulu.

73.    As noted above, this structure created frictions that prevented Chapek from dictating when and what new content was added to Disney+ along with limiting his control over the budgets and financial aspects of the content generating divisions. Specifically, budgetary and distribution control for Disney content was vested in the heads of the various content groups.

74.    To seize complete control over Disney+, including its content and budget, Chapek relied on "one of [his] perceived strengths [of] corporate organization," and reorganized the entire company into just two reporting segments: (1) Disney Media and Entertainment Distribution ("DMED"); and (2) Disney Parks, Experiences and Products ("DPEP").

75.    DMED became responsible for the commercialization of all Disney content globally and oversaw the operations of the Company's DTC streaming services. The practical effect of the reorganization was to strip control from Disney's creative heads over content—including over budgets and distribution—and give bottom-line responsibility for all the Company's content spending, decision making, and distribution, to the head of DMED. The new head of DMED, in turn, reported directly to Chapek.

76.    To further consolidate his control, Chapek appointed Daniel as the new head of DMED. Daniel was one of Chapek's most "loyal" and "most trusted lieutenant[s]." The two had previously worked together in consumer products and were reportedly friends outside of the office. Nonetheless, Daniel, who "had little experience with movies or television,"[7] was now in charge of (though reporting directly to Chapek) the profit and loss management, distribution, operations, sales, advertising, data, and technology functions for the Company's entire content apparatus worldwide. As the media reported, Defendant Daniel was "given arguably the greatest power vested in one executive in Hollywood – the final say on how viewers experience Disney movies and TV shows, whether that's in theaters, on Disney+, Hulu, Disney networks, or some combination of the above."[8] The reorganization thus vested Chapek, Daniel, and the rest of the Defendants with unfettered power to deploy any number of tactics to unsustainably inflate subscriber growth and keep Wall Street's attention at the expense of long-term profitability and viability.

77.    To instill investor confidence in the new structure—and deflect from the true motivation for the radical reorganization—Chapek described the overhaul as a rational move to streamline distribution decisions and better monetize Disney's content.

78.    Chapek also sought to portray his radical reorganization as well received within the Company. Analysts often inquired about whether the overhaul was supported by the other executives. For example, a Morgan Stanley analyst specifically asked, "[what] kind of reaction [have you] gotten from your senior executives." Chapek eagerly boasted in response, "I'm 100% confident that this is

---

[7] *Id.*

[8] Nicole Laporte, *Disney's Mysterious Kareem Daniel*, ANKLER (May 18, 2022), https://theankler.com/p/disneys-mysterious-kareem-daniel.

going to play out exactly as we had intended. It's going extremely well. And despite the disruption in everyone's roles, I think we have 100% buy-in."

79. To further instill investor confidence in Daniel specifically, when Disney announced Daniel as the new head of DMED, Chapek lauded Daniel as "an exceptionally talented, innovative and forward-looking leader, with a strong track-record for developing and implementing successful global content distribution and commercialization strategies." Chapek further remarked "[a]s we now look to rapidly grow our direct-to-customer business, a key focus will be delivering and monetizing our great content . . . I can think of no one better suited to lead this effort than Kareem."

### 2. Defendants Set Unattainable Disney+ Paid Subscriber Targets at Investor Day 2020

80. Simultaneous with the reorganization of the Company, Disney held its first Investor Day since the beginning of the pandemic on December 10, 2020. The Company had previously touted the event as "where it will present further details of its direct-to-consumer strategies."

81. Chapek led off the event, telling investors that "Disney+ has exceeded our wildest expectations with 86.8 million subscribers as of December 2, [2020]." Daniel then boasted about all the new content that would be added to Disney+, including "roughly 10 Marvel series, 10 Star Wars series, 15 Disney live-action, Disney Animation and Pixar series." Iger also spoke, touting the Company's focus on new content, telling investors that "the single most effective way to grow our subscriber base is with great content" and reassuring investors that "the emphasis will always be on quality, not volume."

82. Defendant McCarthy further wowed investors by announcing that the Company was *quadrupling* the Disney+ subscriber targets that Iger had set just twelve months prior. Rather than Iger's previous target of 60-90 million subscribers by 2024, the Company was now targeting "*between 230 million and 260 million*

***total paid Disney+ subscribers***" by 2024. This new target would propel Disney+ ahead of the undisputed leader of the streaming market, Netflix. Chapek added "we're incredibly confident that we will achieve the long-term guidance that [McCarthy] outlined," and emphasized the importance of what they had just announced, declaring that it "will fundamentally transform The Walt Disney Company."

83.     As intended, analysts were "blown away" by the new paid subscriber target. For example, Wolfe Research lauded "Expectations Blown Away"; Barclays noted "DTC guidance blows past consensus expectations"; and Morgan Stanley exclaimed "To infinity and Beyond." Other analysts predicted that Disney+ would surpass Netflix as the most widely adopted paid streaming service in the world. Finally, the full market responded enthusiastically, pumping Disney's stock price up to an all-time high of over $180 per share by the end of December 2020.

84.     In short, Chapek and the Executive Defendants succeeded in their plan. Despite the crush of the pandemic, they were now in a position where Disney's stock price had eclipsed pre-pandemic levels, growing their own wallets and putting their futures at the Company on firmer ground. Moreover, they knew that this bold subscriber target would place a floor under Disney's stock, ***so long as*** they could convince investors that Disney+'s subscriber growth remained on track at each quarterly marker. To do so, the Defendants would need to keep up the mirage of rapid yet sustainable subscriber growth and profitability. Fortunately for Chapek and the other Defendants, DMED's iron grip over Disney's content and financials meant they had a panoply of tricks at their disposal to portray a rosy picture to investors, no matter what was really happening behind the walls of the magic kingdom (at least for the time being).

**B. Defendants Repeatedly Touted Positive Information About Subscriber Growth, Disney+ Content Growth and DTC Operating Losses, International Expansion, the DMED Reorganization, Disney+ Churn, and Ultimately Disney+ Profitability**

**1. Defendants Repeatedly Touted Paid Subscriber and Subscriber Growth, Assuring Investors that Disney+ Growth Was "On Track"**

85.     After laying the foundation for their scheme, Defendants set out to convince Wall Street that Disney+ was well on track to meet its ambitious 230-260 million subscriber target. As discussed herein, analysts and investors' attention was directly on Disney+'s subscriber growth. According to FE-1,[9] a former senior executive at Disney Streaming, there was pressure from Wall Street to increase subscriber numbers, and "[t]he Company let Wall Street run the show." FE-8,[10] a former Director of Strategic Finance at Disney Streaming, similarly recounted the emphasis on what Wall Street was thinking. FE-8 noted that every big decision was evaluated on how it would impact quarterly and long-term subscription growth (largely because of pressure to hit quarterly subscription goals) and how the decision

---

[9] FE-1 was a former senior executive at Disney Streaming from 2019 through mid-2021. As a senior executive, FE-1 regularly attended meetings with other Disney executives, including Daniel. FE-1's role included communicating with studio heads along with Daniel regarding content production and progress and how much money studio heads intended to spend on their projects. FE-1 provided data on how content was performing and how the streaming services were performing overall to Daniel and other executives. These data presentations included subscriber numbers and performance. FE-1 also provided specific reports and metrics to Disney's corporate accounting organization. FE-1 helped "to write the script for earnings calls that pertained to the streaming business," including churn and subscriber additions. In order to preserve the identify of former employees who provided the accounts in this Complaint, "he/him/his" pronouns are used throughout.

[10] FE-8 was a former Director of Strategic Finance at Disney Streaming Services from approximately April 2018 through September 2022. In that role, FE-8 had various P&L responsibilities related to Disney streaming products. Part of FE-8's responsibilities were to attend meetings with the various personnel with P&L responsibilities for all of the Disney streaming services, including Disney+.

would impact Wall Street's views of the Company.

86.    Defendants dealt with this subscriber pressure from Wall Street by insisting that Disney+'s modest quarterly subscriber growth demonstrated it was on track to achieve its subscriber targets and profitability goals. Even in moments of doubt from the market, such as when it appeared subscriber growth was plateauing or even hitting a valley, the Defendants nevertheless reassured investors that everything was going according to plan and that subscriber growth was "on track." At quarterly investor conferences and during media interviews, Defendants repeatedly touted that paid subscriber growth on Disney+ was on track. Defendants thus kept up the mirage that everything was going according to plan even as things unraveled behind the scenes.

87.    The first quarterly earnings call after the December 2020 Investor Day took place on February 11, 2021. During the call, in which both Defendants Chapek and McCarthy participated, McCarthy announced that Disney+ had hit 94.9 million paid subscribers. The Defendants touted that Disney "saw strong additions to our subscriber base." Chapek highlighted that Disney+ had "exceeded even our highest expectations in just over a year since its launch with 94.9 million subscribers as of the end of the first fiscal quarter."

88.    On May 13, 2021, during the Company's Q2 2021 earnings call with analysts, Defendant Chapek announced that Disney+ "amassed nearly 104 million paid subscribers as of the end of the second fiscal quarter." Chapek reassured investors that "*[w]e are on track* to achieve our guidance of 230 million to 260 million subscribers by the end of fiscal 2024." Defendant McCarthy echoed these reassurances, stating, "[W]e had almost 104 million Disney+ paid subscribers at the end of the second quarter," and "*we remain right on track* to reach our fiscal 2024 guidance of 230 million to 260 million subs, powered by the addition of 30 million paid Disney+ subs in the first half of the year."

89.    Defendants Chapek and McCarthy did the same during the Q3 2021

earnings call held on August 12, 2021. Chapek touted that "[i]n terms of the health of Disney+, we feel really great about our sub-trajectory." During that same call, an analyst asked Chapek about net add trends. Chapek quelled any concerns, claiming that, "[i]n terms of the net add question and how that's going to improve first half versus second half. ***Again, we feel really great about our sub-trajectory***."

90.    The following quarter, Disney+ failed to meet analyst expectations concerning subscriber growth, but Defendants continued to squash any investor concerns about Disney+'s subscriber growth and profitability. During the November 10, 2021 Q4 2021 earnings call, Defendant Chapek unequivocally represented to investors that "***we're confident we are on the right trajectory*** to achieve the guidance that we provided at last year's Investors Day, reaching between 230 million and 260 million paid Disney+ subscribers globally by the end of fiscal year 2024 and ***with Disney+ achieving profitability that same year***." Defendant McCarthy piled on, claiming "we ended the fourth quarter and the fiscal year with over 118 million ***global paid Disney+ subscribers***, reflecting over 2 million net additions from Q3, ***in line with the subscriber guidance we gave in September***." McCarthy continued, "***we are well positioned*** to achieve the subscriber target of 230 million to 260 million by fiscal 2024 that we laid out at last year's Investor Day. And ***we also remain confident*** in our expectation that Disney+ ***will achieve profitability*** in fiscal 2024."

91.    Analysts credited Defendants' repeated representations concerning Disney+'s subscriber growth and profitability, even when the Disney+ financial metrics were lower than expected. For example, following the Company's May 13, 2021 Q2 2021 earnings call, analysts at Guggenheim credited Chapek and McCarthy's reassurances: "[m]anagement anticipates subscriber net adds to slow in the back half of the year due to the suspension of the IPL tournament in India and the company delaying the launch of Star+ in Latin America to F4Q (August 31) to take advantage of a strong sports calendar, ***but reiterated that the company remains***

*on track to reach 230mm-260mm subscribers by FY24*." J.P. Morgan analysts also highlighted that "*management reiterated they remain on track to reach 230-260m subscribers by the end of F24*."

92.    Even when analysts expressed concern over Disney's ability to reach its ambitious 230-260 million subscriber target, Defendants refused to waver on their assurances. For example, on February 9, 2022, during Disney's Q1 2022 earnings call, an analyst questioned the achievability of the subscriber targets if Disney+ lost its right to broadcast cricket in India. In direct response to this question, Chapek dispelled any potential concerns about Disney+'s ability to reach its subscriber targets. Specifically, Chapek reassured investors: "If you look at India, we're certainly going to try to extend our rights on the IPL. *But we're very confident that even if we were not to go ahead and win that auction that we would still be able to achieve our 230 million to 260 million*. So it's an important component for us around the world. Obviously, really important in India, but not critical to us achieving the 230 million to 260 million number that we've guided to."

93.    The Defendants continued to tout paid subscriber growth and reassured investors that Disney+ growth was on track. On March 7, 2022, during a Morgan Stanley Technology, Media, and Telecom Conference, Defendant McCarthy told investors that Disney was "well suited to achieve the subscriber guidance as well as the profitability guidance." On May 11, 2022, during Disney's Q2 2022 earnings call with analysts, Chapek highlighted Disney's modest subscriber growth, noting an additional "7.9 million Disney+ subscribers, keeping us on track to reach 230 million to 260 million Disney+ subscribers by fiscal 2024." Chapek once again reassured investors, "*we're very confident that going forward we're going to hit both of those sub-guidance and profitability* guidance and by *bringing in the cost at a reasonable level*, relative to their ability to attract and retain our subs." McCarthy added that the Company still expected "that Disney+ will achieve profitability in fiscal 2024."

94.    Even up until November 8, 2022—just twelve days before Chapek was

fired—he continued to falsely reassure investors. During that day's earnings call with analysts, Chapek stated Disney was "particularly pleased with growth in the fourth quarter" and that "*we still expect Disney+ to achieve profitability in fiscal 2024*."

95.   Ultimately, Defendants' repeated assurances were false and misleading. Far from reflecting genuine growth, these assurances were part of the broader scheme to placate Wall Street, maintain investor confidence in the Company, and keep the Company's stock price artificially high. The artifice worked, as analysts trusted the Defendants and the stock price remained inflated, even as the proverbial walls were closing in around Defendants.

### 2.   Defendants Touted Aggressive Disney+ Content Spend as Fueling Growth While Downplaying DTC Operating Losses

96.   In furtherance of the scheme, Defendants poured tens of billions of dollars into new Disney+ content. Defendants' goal was to "flood the so-called digital shelves with as much content as possible to achieve . . . as much sub growth as possible."[11] According to FE-1, Chapek directed the studios to "produce as much content as you can," and the Company's strategy was essentially "buying subscribers" to match Wall Street's focus on subscriber growth. FE-1 further noted that Chapek would say: "the game will be won by whoever has the most content." Likewise, FE-2,[12] a former executive in Global Product at Disney Streaming,

---

[11] Disney Q2 2023 earnings call, May 10, 2023.

[12] FE-2 was an executive in Global Product at Disney Streaming until mid-2022. In that role, FE-2 was in charge of implementing the global roadmap for Disney+; in other words, "where and when to launch and what features" would be implemented in the different markets where Disney+ was expanding internationally. FE-2 had weekly meetings with the "entire executive team" at Disney Streaming. FE-2 also met with Chapek on two occasions, attended several meetings with Daneil and interacted with McCarthy. FE-2 recalled during weekly meetings that the topics were about "increasing growth and slowing churn."

recalled that "growth from a subscription perspective was all anyone wanted to hear about." Similarly, FE-9,[13] a former Executive Director of Global Content Operations for Disney+, recalled that a lot of money was being spent on Disney+ content. Another former employee, FE-10,[14] (a former Content Operations Library Title Manager with Disney Streaming) recounted that everything Defendants were doing with Disney streaming felt like they had a blank check. Defendants touted this aggressive spending strategy as fueling subscriber growth, while downplaying the severe and growing DTC operating losses it created.

97.    After assuming full control of content distribution under DMED, Defendants Chapek and Daniel immediately increased the Company's total content budget to an unprecedented $33 billion for fiscal year 2021. Of that amount, $16 billion was allocated specifically to Disney+ content. By comparison, Netflix, despite having a far larger subscriber base, spent only $17 billion on streaming content that same year. According to the *Wall Street Journal*, "Mr. Daniel control[led] the purse strings for spending on content," under the new DMED structure, thereby giving him decisive authority over how much was spent and on what.

98.    Defendants repeatedly peddled this exorbitant content spend, assuring investors that new and original Disney+ content would drive subscriber growth. Indeed, it became Chapek's mantra to investors and analysts on quarterly earnings

---

[13] FE-9 worked as an executive within Global Content Operations from February 2017 through May 2023. FE-9 oversaw a team that was responsible for launching content on the Disney+ streaming service. FE-9's role made them a critical go-between the studio heads and business heads, including personnel just under Chapek and Daniel. FE-9's role gave them insight into decision making regarding where content would be launched.

[14] FE-10 was a Content Operations Library Title Manager from March 2022 through October 2023. FE-10's role was as a project manager for content that was being added to the streaming services, including Disney+. This role gave FE-10 insight into the breadth and pace of new content being purchased and added to the library.

calls: new and original Disney+ content was synonymous with the subscriber growth Wall Street craved. All the while, however, Defendants concealed the devastating financial consequences of this unchecked spending, namely that DTC operating losses were ballooning, thereby undercutting Disney's long-term profitability.

99.    For example, during Disney's Fiscal Q2 2021 earnings call, an analyst asked Chapek what was driving Disney+ subscriber growth. Chapek responded in part that content was responsible for subscriber growth:

> First of all is our content slate. *As you know, we're spending a lot of money across our variety of franchises in order to create the content that's going to keep consumers coming back and keep not only our sub number growing, but also our engagement growing across all our platforms*. So, the first one is content slate.

100.    Chapek often emphasized the cadence of new shows launching on Disney+. For example, at the May 24, 2021 J.P. Morgan Global Technology, Media, and Communications Conference, Chapek told an analyst: "Our goal is something new every week for our guest[s]."

101.    Likewise, at the Q4 2021 Investor conference, Chapek touted a "surge of new content" with more than 340 local original titles in various stages of development and production across Disney's DTC platforms. Chapek added, "In total, we are nearly *doubling* the amount of original content from our marquee brands, Disney, Marvel, Pixar, Star Wars and National Geographic, coming to Disney+ in FY 2022." In response to an analyst question regarding content, Chapek noted:

> Michael, your first question was about sort of the kink of the supply chain, if you will, of new content coming into the service and its impact on our net sub adds. As you can probably suspect in a world of Direct-to-Consumer, we have a lot of information, a lot of data. And we have a pretty good idea of what the marginal impact of a particular title might be to our service. *And we always say that library titles tend to increase engagement and minimize churn, but new titles, new content, whether they're movies or series, actually add new subs. And that is actually*

*the reason why we're pretty confident that the increase in content flow towards the second half of fiscal 2022 will actually lead to the types of results that we're anticipating*.

102.    McCarthy also spoke during the November 10, 2021 conference, adding:

> *As Bob mentioned, we are increasing our overall long-term content expense for Disney+, and we believe we are well-positioned to achieve the subscriber target of 230 million to 260 million by fiscal 2024 that we laid out at last year's Investor Day. And we also remain confident in our expectation that Disney+ will achieve profitability in fiscal 2024*.

103.    Disney held its Q2 2022 earnings call on May 11, 2022. During the call, Chapek again touted content spend as critical to subscriber growth, which would in turn fuel profitability. Chapek noted the following about Disney+ projections and content:

> *So, as you know, we're very carefully watching our content cost growth*. And we reaffirmed, as you heard earlier, our targets, our guidance on both subs and on profitability. *So, we think they move together. It's obviously a balancing act, but we believe that great content is going to drive our subs and those subs then, in scale, will drive our profitability. So we don't see them as necessarily counter*. We see them as sort of consistent with the overall approach that we've laid out. . . .
>
> That said, we're balancing all three *and we're very confident that going forward we're going to hit both of those sub-guidance and profitability guidance and by bringing in the cost at a reasonable level, relative to their ability to attract and retain our subs*. . . .
>
> * * *
>
> So as we sort of take each of these elements, when we get a new piece of content, we'll look at first view, we'll look at engagement, we'll look at the amount of time they spend at it, and we can model. We can do a lot of modeling *and that modeling suggests that in addition to things like local market content, new content coming online, both in terms of general entertainment and from franchises as well as new markets being added that, that Disney+ guidance is going to be very achievable*

*for us both in terms of the sub adds and in terms of the operating performance*.

104.    During much of this same time, Defendants misled investors about the operating losses associated with the enormous content spending spree. In several investor calls and various SEC filings, Defendants touted favorable operating results from Disney+ without disclosing the underlying accounting tricks to achieve these "results."

105.    For example, on February 11, 2021, Disney released its Q1 2021 financial results, and McCarthy and Chapek participated in an earnings call with analysts. Disney's Fiscal Q1 2021 Form 10-Q reported that "[t]he operating loss from Direct-to-Consumer decreased $644 million, to $466 million from $1,110 million, due to improved results at Hulu, and to a lesser extent, at Disney+ and ESPN+." During earnings call, McCarthy stated:

> Moving on to direct-to-customer. ***Improved results at all 3 of our streaming services drove an improvement in direct-to-consumer operating results of nearly $650 million versus the prior year***. Last quarter, we guided to direct-to-consumer operating income declining by $100 million versus the prior year under our former segment structure. ***Our reported results are $750 million higher than that guidance***.

106.    Disney released its Q2 2021 financial results on May 13, 2021, with Chapek and McCarthy participating in the earnings call with analysts. Disney's Fiscal Q2 2021 Form 10-Q stated: "The operating loss [for the six months ended April 3, 2021] from Direct-to-Consumer decreased $1,159 million, to $756 million from $1,915 million, due to improved results at Hulu, and to a lesser extent, ESPN+ and Disney+." On the earnings call, McCarthy reported that: "direct-to-consumer operating income improving modestly versus the prior year. Actual [direct-to-consumer operating] results came in significantly better versus the prior year due to Hulu advertising sales upside, lower content and marketing expense at Hulu and Disney+, and better-than-expected ESPN+ pay-per-view results." On the same call,

an analyst asked: "you guys have consistently beat us on [Operating Income] profits or lack of losses, I'd say, on DTC. Which of the platforms is providing the biggest surprise?" McCarthy omitted any reference to the reporting change and merely responded: "*[L]ook, the biggest drivers for direct-to-consumer were coming out of Hulu and Disney+*."

107.    Defendants continued reporting "decreas[es]" in operating losses in subsequent SEC filings without disclosing the underlying accounting gimmicks that produced these "results." For example, Disney's Fiscal 2021 10-K stated: "Operating loss from Direct-to-Consumer decreased $1,234 million, to $1,679 million from $2,913 million due to improved results at Hulu and, to a lesser extent, ESPN+, partially offset by a higher loss at Disney+."

### 3. Defendants Touted Disney+ International Expansion as a Sustainable Way to Increase Subscriber Growth and Drive Engagement

108.    Knowing that Wall Street was closely tracking Disney+'s subscriber growth, Defendants Chapek, Daniel, and McCarthy pursued aggressive international expansion efforts to boost Disney+ subscriber numbers. Disney even instituted a surprise second round of international market launches despite Disney+ having already been launched in the vast majority of major markets. All the while, Defendants touted this push as another means of sustainably growing the Disney+ subscriber base.

109.    On Disney's fiscal year end 2021 earnings call, held on November 10, 2021, Chapek announced that the Defendants had decided to *double* the number of countries and territories in which Disney+ would launch:

> We are expanding our global reach by introducing Disney+ in additional markets around the world. The service is now available throughout Japan, and we're thrilled to be launching it this Friday on Disney+ Day in South Korea and Taiwan, and in Hong Kong on November 16. *In just 2 short years, we are now in over 60 countries* and more than 20 languages. And *next year, we plan to bring Disney+ to consumers in 50-plus additional countries*, including in Central

Eastern Europe, the Middle East and South Africa. ***Our goal is to more than double the number of countries we are currently in to over 160 by fiscal year '23***.

110.    On the same call, the Company stated that it was also increasing investment into local and regional content for its international markets, and it was developing over 340 local programs to drive international subscriptions:

> We recognize that the single, most effective way to grow our streaming platforms worldwide is with great content, and we are singularly focused on making new high-quality entertainment including local and regional content that we believe will resonate with audiences. ***Of note, we have 340-plus local original titles in various stages of development and production for our DTC platforms over the next few years***. As you know, we announced at our last Investor Day that we expect our total content expense to be between $8 billion and $9 billion in fiscal 2024, and ***we will now be increasing that investment further with the primary driver being more local and regional content***.

111.    As the calendar turned to 2022, the Defendants continued pushing international expansion at a frenetic pace, boasting about subscriber growth in the process. On January 19, 2022, Disney issued a press release announcing that it had created an "International Content Group To Expand Pipeline Of Local Content And ***Continue To Grow Its Global Direct-To-Consumer Business***." One week later, on January 26, 2022, the Executive Defendants announced the countries and launch dates for most of the countries in Disney+'s second round of international launches.

112.    On February 9, 2022, Chapek again addressed investors during the Company's quarterly earnings call. Chapek plugged new international launches as a driver of subscriber growth: "And so we're bullish on the future of Disney+, both domestically and internationally, driven by not only additional prevalence of titles within our major franchises, but also general entertainment and specifically in the international territories for content."

113.    During the following quarterly earnings call, Chapek continued to harp on this message, while downplaying any concerns about the costs associated with

these launches:

> Beyond targeting specific demos, we are equally enthusiastic about our growth potential in international markets . . . We believe these premium local originals, along with branded content with broad international appeal, ***will attract new subscribers and drive engagement***.

114.   Again hitting this message, on August 10, 2022, during the Company's Q3 2022 earnings call, Defendant McCarthy told investors, "Strong Disney+ core net subscriber additions of 6 million reflect growth in existing markets as well as launches in over 50 new markets during the quarter."

### 4. Chapek Repeatedly Assured Investors That There Was "Very Strong Buy-In" at Disney for the DMED Reorganization

115.   To instill investor confidence in the radical reorganization of the entire company, Chapek and the rest of the Defendants repeatedly assured the market of the "buy-in" within the Company for DMED.

116.   While concealing internal strife, and in response to specific interest from analysts, Chapek boasted to investors: "I'm 100% confident that this is going to play out exactly as we had intended. It's going extremely well. And despite the disruption in everyone's roles, I think we have a 100% buy-in. I think we have 100% buy-in because we have clarity on accountability, which everyone really likes, and we separate out roles to what people tend to do best."

117.   During a March 2021 Morgan Stanley conference, Chapek discussed the reorganization and response within the Company: "And I'll tell you, we've had very strong buy-in. People like the idea of clear accountability. They like the ability to be nimble, to be able to pivot and to respond in away that the consumer is going. And it requires a very collaborative environment, which I'm pleased to say we're seeing."

118.   While appearing at the June 14, 2022 Credit Suisse Communications Conference, Chapek was asked by the moderator if there were "any bumps in the road implementing th[e] new structure." Chapek responded "***it's really gotten very***

***strong buy-in by our execs*** . . . But, I think, everyone appreciates the clarity and accountability . . . We're ramping up in scale in this – ramping up scale in this new content, and it really enables us on the other end, on the distribution end for, let's call it, an objective assessment for what's right for distribution for our company from an enterprise level given those changing consumer preferences over time."

119.    In reality, the DMED reorganization did ***not*** have "very strong buy-in." Disney would later admit that the reorganization "***created a huge divide*** between the creative side of the company, the content engines, movies and television and the monetization, distribution side of the company."

### 5.    Defendants Repeatedly Assured Investors that the Company Was "Pleased" With "Low" and Declining Churn

120.    In line with Defendants' subscriber growth story, the Executive Defendants repeatedly denied any ill-effects related to "churn" (i.e., the rate of subscribers who cancel their Disney+ subscriptions within a given time period). "Churn" is a vitally important metric in the streaming world as a high churn rate indicates that users do not value the service at full value in perpetuity, which negatively implicates downstream subscriber growth and long-term profitability. Accordingly, high churn was a central concern among Disney executives, and something they repeatedly reassured investors was not a problem. Chapek at various points told investors that Disney+'s churn had "declined," and "we're extraordinarily pleased with the low churn that we see." Defendants made sure to mollify investors regarding churn throughout the duration of their scheme.

121.    For example, on February 11, 2021, during Disney's Q1 2021 earnings call, McCarthy claimed, "[s]o in regard to the specific churn related to the anniversary of the Verizon launch promotion from last November 2020, we're really happy with the conversion of numbers that we have seen there."

122.    A few months later, Chapek addressed investors at a Credit Suisse Communications Conference held on June 14, 2021. Chapek insisted that Disney+'s

price hike had no ill-effects on churn: "But you're right, we did launch at a very attractive price value opening point. And the first price point – or our first price increase that you mentioned in the first 16 months happened recently, and ***we've seen no significantly higher churn as a result of that***."

123.    This steady drumbeat continued on, even as the Defendants were confronted with hard data that belied their public assertions (discussed further below). For example, on Disney's August 12, 2021 earnings call, Chapek stated, "***our churn is low***," and "***[w]e're really pleased with churn . . . . And what you're seeing is that our churn has declined***." Chapek stayed on message months later during the Company's May 5, 2022 earnings call, touting, "***we're extraordinarily pleased with the low churn that we see, particularly given the bundle***. The bundle is really efficient in terms of churn. And that gives us a lot of bullishness when it comes to the idea of bigger offerings from Disney."

124.    In repeatedly assuring its investors about "low" and "declining" churn, Defendants never once disclosed what the actual data was telling them or the internal consternation about the rate of churn on the platform.

### 6.    Defendants Assured Investors that Disney+ Was "Well Situated" to Achieve Long-Term Profitability

125.    As discussed above (*supra* ¶¶ 85-95), in addition to representing that Disney+ subscriber growth was on target, Defendants also repeatedly assured investors that Disney+ remained on track to achieve profitability by fiscal year 2024. Despite various opportunities to inform investors that the Company was not well-positioned to achieve long-term profitability, Chapek and McCarthy refused to waver on their assurances.

126.    Quarter after quarter, Defendants Chapek and McCarthy told investors that Disney+ was on track to achieve its lofty profitability goals. On November 10, 2021, during a Q4 2021 earnings call with analysts, Chapek assured investors: "***[W]e're confident we are on the right trajectory to achieve the guidance that we***

*provided at last year's Investor Day*, reaching between 230 and 260 million paid Disney+ subscribers globally at the end of fiscal year 2024, and *with Disney+ achieving profitability that same year*." McCarthy similarly stated, "[W]e are well positioned to achieve the subscriber target . . . [a]nd we also remain confident in our expectation that Disney+ will achieve profitability in fiscal 2024." On March 7, 2022, with their scheme in full swing, McCarthy affirmed that Disney was "well suited to achieve the subscriber guidance as well as the profitability guidance." Similar assurances continued throughout 2022. For example, on May 11, 2022, Chapek stated: "*[W]e're very confident that going forward we're going to hit both of those sub guidance and profitability guidance* by bringing in the cost at a reasonable level relative to their ability to attract and retain our subs." On August 10, 2022, McCarthy once again stated that she was "confident that Disney+ will achieve profitability in fiscal 2024."

127.  Finally, on November 8, 2022, just twelve days before Chapek was fired, he continued the scheme by assuring investors during the Q4 2022 earnings call that Disney was particularly pleased with Disney+ subscription growth and that the Company was "well situated to leverage our position for long-term profitability." In response to analyst questioning, Chapek touted that "*we still expect Disney+ to achieve profitability in fiscal 2024*."

128.  Chapek and McCarthy's assurances that Disney+ remained on track to achieve profitability by fiscal 2024 effectively reassured investors. In quarters where the Disney+ financial metrics were lower than expected, analysts repeated these false assurances. For example, after the Company's lower-than-expected November 10, 2021 Q4 2021 results, analysts reiterated Chapek and McCarthy's assurances that Disney+ subscriber growth and profitability remained on track. Analysts at Cowen wrote that "Disney+ sub growth is expected to remain soft in H1:F22, but *management reiterated confidence in the company's FY24 sub and profit targets*." Credit Suisse analysts wrote: "Beyond mgmt. indicating they are on the right

trajectory to reach between 230m an 260m paid Disney+ subs globally by the end of FY24, ***they also reaffirmed Disney+ achieving profitability in FY24*** despite exceeding guidance of $8B-$9B in FY24 content amortization laid out at the last Investor Day."

129.    These assurances thus gained analyst trust and kept Disney's stock price artificially inflated.

## C.    The Scheme Succeeded

### 1.    Investors Expected Disney+ to Achieve Long-Term Profitability Through Sustainable Subscriber Growth and the Stock Price Soared

130.    Defendants' scheme worked as intended and successfully kept Disney's stock price inflated. *First*, during the December 2020 Investor Day conference, Defendants announced aggressive subscriber targets designed to shift the market's focus towards Disney+ and away from Disney's struggling and impaired businesses. *Second*, quarter after quarter, Defendants reinforced this false narrative and convinced analysts and investors that subscriber growth and profitability were on pace for fiscal year 2024.

#### a.    Defendants Set Aggressive Subscriber Targets to Redirect Investor Focus on Disney+

131.    The Executive Defendants unfurled their scheme at Investor Day 2020 by turning Wall Street's focus squarely on Disney+. Nine months into the pandemic, Disney's core businesses—theme parks, cruises, theatrical releases, and cable television—were still struggling to recover. Seeking to redirect investor focus, Defendants highlighted Disney+ as the Company's key growth driver. As analysts at Evercore acknowledged: "the more investors focus on streaming the better it is for the stock." According to FE-2, Disney executives likewise acknowledged that "Disney+ was the only revenue engine" and "growth from a subscription perspective was all anyone wanted to hear about."

132.    Thus, during the Investor Day presentation, the Executive Defendants

announced that Disney was *quadrupling* Disney+'s subscriber targets to "between 230 million and 260 million total paid Disney+ subscribers" by 2024. This was a drastic change from the 60 million to 90 million subscriber target that Iger had announced only twelve months earlier. To put this into perspective, Disney's new subscriber target would surpass Netflix's subscriber base. According to FE-11,[15] this Netflix-like target was not a coincidence because Disney was going after Netflix. FE-12[16] similarly stated that Netflix was a guiding light for Disney+. FE-2 also recalled that "Chapek and [Daniel] were very, very focused on what Netflix was doing," and were "literally obsessed with the Netflix-Disney comparison." The Netflix-like target focused Wall Street on Disney+ as the growth engine of the Company.

133.    Disney's announcement had its intended effect, pushing Disney's stock price to its highest point in Disney's history. Analysts were "blown away" by the "massive" new target of "230-260M subs with profitability." Analysts also began to view Disney+ as a clear contender to Netflix in the global streaming market, reporting: "*We believe Disney is almost certain to be a clear winner in streaming along with Netflix*[.]"

### b.    Defendants Misled Investors Into Believing Disney+ Growth Targets Were on Track

134.    After Defendants announced their aggressive Disney+ subscriber

---

[15] FE-11 was a Digital Media Specialist within DMED through February 2023. FE-11's responsibilities included overseeing various websites within the DMED umbrella.

[16] FE-12 was a Project Manager within Global Content Operations and Strategy at Disney Streaming from May 2021 through September 2022. According to FE-12, the main goal of global content operations was to launch services in different regions, including Europe, the Middle East, and Africa. FE-12's team planned launches for individual titles and specials as well as general platforms. Part of FE-12's responsibilities included participating in meetings where content performance was discussed, including churn.

targets, they needed to convince analysts and investors that those goals were achievable. To maintain the market's confidence, Defendants executed a three-part strategy, under which Defendants needed to: (i) generate some subscriber growth each quarter, often through short-sighted tactics solely designed to boost reported numbers, rather than long-term performance; (ii) repeatedly reassure the market that Disney+ was on pace to meet both its subscriber and profitability targets; and (iii) conceal the negative consequences of their scheme for as long as possible, including concealing high subscriber churn, runaway content losses, underperforming Disney+ content, and mounting losses. Through this scheme of announcing growing subscribers and providing misleading assurances, Defendants maintained the illusion that Disney+ was steadily progressing toward its ambitious 2024 targets.

135. *First*, the Executive Defendants used the short-sighted growth tactics to generate modest subscriber growth each quarter. As depicted in the chart below, Disney reported at least some subscriber growth in every quarter through Q4 2022. Undisclosed to investors, however, this growth was propped up by unsustainable tactics (described further below, ¶¶ 165-212), including temporary promotions, steep discounts, and unprofitable expansion into low-revenue international markets. Nevertheless, the Defendants used these artifices to "close gaps" and generate just enough subscriber growth to convince investors (along with other disingenuous reassurances) that Disney was on track to reach its 230 to 260 million subscriber target.

136. *Second*, alongside reporting quarterly subscriber growth, Defendants consistently reassured investors through Q4 2022 that Disney+ remained on pace to achieve its 230 to 260 million subscriber target.[17] Quarter after quarter, they

---

[17] Disney reaffirmed the 230 to 260 million target each quarter through Q3 2022. In August 2022, Disney adjusted the target to 215 million to 245 million subscribers to

reaffirmed this goal without qualification and explicitly told investors that both the growth plan and subscriber target was "on track."

137.   *Third*, the Executive Defendants successfully concealed the negative impacts of the scheme that would have revealed that Disney+ was not, in fact, on track to meet its subscriber and profitability targets. Specifically, Defendants concealed the high subscriber churn, runaway content costs, underperforming Disney+ content, and losses in unprofitable international markets that the Company would later exit entirely, and mounting Disney+ losses.

138.   Tellingly, after Chapek and Daniel were fired and Iger began to unwind their scheme, Disney+'s reported subscriber growth abruptly slowed. This decline confirmed what Defendants had concealed: that the earlier subscriber growth was artificial and could not be maintained once the scheme ended.

---

account for the loss of cricket licensing rights in its India market. Disney reaffirmed the original subscriber targets in all other markets (i.e., its "core Disney+" subscribers). The 230 million to 260 million subscriber target, used herein, refers to the original subscriber target provided at Disney's December 10, 2020 Investor Day and incorporates the adjustment in August 2022. Other than this one-time adjustment, Disney maintained its original subscriber target through Q1 2023, at which point it was formally withdrawn.

1



*Reported Disney+ Subscriber Growth During the Relevant Period*

139.    The scheme effectively convinced many analysts that Disney+ would reach the 230 to 260 million subscriber target by fiscal 2024, and some analysts even expected that Disney+ would reach its targets earlier than Chapek indicated. For example, on February 12, 2021, Credit Suisse wrote: "[P]rofitability could come a year earlier than the FY24 guide." Similarly, on April 22, 2021, a J.P. Morgan analyst reported: "[W]e believe subscribers will rapidly ramp and its DTC services should reach profitability by F2023." Another analyst wrote: "[T]he profitability timeline appears conservative in our view as we model Disney+ breakeven at F23 vs. guidance of F24."

140.   Even when subscriber growth slowed in May 2021, investors continued to credit Defendants' representations about Disney's subscriber and profitability targets. On May 14, 2021, following a Disney earnings call, analysts at Wells Fargo noted "***we're not worried***" about a "slowdown in Disney's DTC ramp" after "FY24 Disney+ subscriber guidance of 230-260mm was reiterated" by management. Similarly, investors remained confident in Disney+'s subscriber and profitability targets after November 10, 2021 when Disney+ reported relatively low subscriber growth. Once again, analysts accepted Defendants' representations and highlighted Chapek and McCarthy's reassurances that additional content spend would lead to subscriber growth and profitability. For example, on November 11, 2021, Rosenblatt Securities analysts wrote: "[W]ith an increased content budget, ***we remain confident Disney+ will comfortably achieve 230-260M subscriber target and profitability in FY'24***."

141.   In truth, Disney was never "on track" to reach its subscriber target, and Defendants knew they could not reach the subscriber target without resorting to unsustainable growth-at-any-cost tactics that made profitability impossible. Indeed, after Chapek was fired, Iger dismantled the high-cost-high-growth Disney+ model that Chapek and the other Executive Defendants had regularly touted quarter after quarter to investors. And, by Q1 2023, Disney formally abandoned its 200 million+ subscriber target, explaining that it would "no longer be providing long-term subscriber guidance in order to move beyond an emphasis on short-term quarterly metrics."

142.   In contrast to the false picture the Executive Defendants painted, what remained now is a far smaller streaming platform with only modest quarter-to-quarter subscriber growth, a reduced content slate with titles frequently removed, a smaller international market reach, and no claim to rival Netflix. *Bloomberg* most recently reported that the Company "expects to ***fall tens of millions of subscribers short of its last publicly stated 2024 target*** for the Disney+ streaming service,

according to people familiar with the matter." The Executive Defendants' version of Disney+, with a target of 260 million subscribers and profitability, was a charade. But, for more than eight quarters, the Executive Defendants' scheme succeeded in misleading investors and maintaining Disney stock at an inflated price.

### 2. Chapek's Contract was Renewed

143.   Almost immediately upon being named CEO, Chapek was confronted with the reality that his future as Disney's CEO depended on a meteoric rise for Disney+. Chapek's motivation for the scheme was thus clear: to ensure the Board renewed his contract while obtaining the maximum bonus possible.

144.   Disney's Compensation Committee (the "Committee") made it clear from the outset that Chapek would be evaluated and compensated based on both his personal performance and the performance of the Company overall. As the Company's 2021 proxy statement explained, 90% of Chapek's compensation would derive from performance-based pay. Moreover, Chapek was eligible for an annual incentive bonus of at least 300% of his base salary, though the actual bonus could be lower or higher depending on results: "[d]epending on performance, the actual amount payable as an annual bonus to Mr. Chapek may be less than, greater than or equal to the stated target bonus (and could be zero)." Chapek was also eligible for an annual equity award with a target accounting value of $15 million, which similarly depended on the Company's performance and stock value: "[t]he actual benefits conveyed to [Chapek] in respect of any such awards may be less than, greater than or equal to the target award value, as such benefits will be dependent on a series of performance and other factors, such as the value of the Company's common stock."

145.   At the start of each fiscal year, the Committee set financial and strategic goals to measure executive and Company performance, and the Committee would measure performance against those objectives at the end of the fiscal year. Throughout Chapek's tenure as CEO, the Committee identified DTC growth as a

"key strategic goal." In its 2020 end-of-year review, for example, the Committee highlighted Chapek's expansion of Disney+, and characterized the international expansion of DTC services as one of Chapek's "key performance highlights." That year, Chapek received an equity award valued at $9,502,990.

146.    Chapek recognized that his subscriber growth agenda was earning the Board's attention, and he pressed forward with his growth-at-any-cost scheme. For fiscal 2021, the Committee again credited him with significant DTC growth, noting subscriber gains across Disney+, Hulu, and ESPN+, and the launch of Disney+ in 35 additional countries. Chapek received a bonus of $14,330,000 and an equity award valued at $13,965,478.

147.    However, even with this substantial compensation in 2021, Chapek still faced an impending contract expiration. Chapek's CEO contract was set to expire by the end of 2022, and by the middle of 2022, only six months away from the expiration date, Disney had still not offered Chapek a contract renewal. Chapek was determined to secure a contract renewal, and so he charged forward with the scheme into 2022.

148.    On June 28, 2022, the Board finally renewed Chapek's contract. According to the Company's 2023 Proxy statement, "the Board agreed to extend Mr. Chapek's employment agreement based on Mr. Chapek's work navigating the Company through the unprecedented challenges of the pandemic **_and growing the Company's streaming business_**." The amended agreement increased the target accounting value of Chapek's annual equity award from $15 million to $20 million, and his contract was extended by three years.

### 3.    McCarthy Made Millions on Stock Sales

149.    While the scheme pushed Disney's stock to record highs, McCarthy took advantage of the inflated prices to sell a substantial portion of her holdings. Between December 2020 and her eventual resignation, McCarthy sold over 122,014 Disney shares, generating insider trading proceeds of $17,101,573 and profits of

$11,809,441. As detailed below (*infra* ¶¶ 443-445), these sales stood in stark contrast with her historical trading patterns during the equivalent prior period of time, and they disposed of a significant share of her total Disney stock.

### D. Unknown to Investors at the Time, the "Success" of Disney+ was an Illusion Propped Up by Misleading Half-Truths and Financially Disastrous Growth-At-Any-Cost Tactics

#### 1. Foundational Artifices

##### a. Executive Defendants Create DMED

150. As set forth above (*supra* ¶¶ 72-79), The Executive Defendants, spearheaded by Chapek, created DMED in late 2020. The move consolidated the bottom-line power over content, budgets, and distribution for all of Disney's media and entertainment business in one place, the Chairman of DMED. This chair in turn reported directly, and only, to Chapek. Defendant Chapek tapped one of his most "loyal" and "most trusted lieutenant[s]," Defendant Daniel, as the Chair of DMED. The practical effect of this reorganization was to strip the content heads of their power over budgets and distribution, instead vesting near unfettered power over Disney content to Defendants Chapek and Daniel.

151. Furthermore, as set forth above (*supra* ¶¶ 115-119), Chapek undertook a vigorous campaign to instill investor confidence in both the new structure and Daniel. For example, Chapek lauded "I can think of no one better suited to lead this effort than [Daniel]," and "I think we have 100% buy-in" in the restructuring. Chapek also touted this new structure as a rational move to streamline distribution decisions, promote efficiency, and better monetize Disney's content.

152. The truth, however, was very different from Chapek's boasts to investors. Unbeknownst to investors at the time, the DMED reorganization was widely unpopular amongst Disney employees and met with significant backlash from managers and executives. Daniel was not even Chapek's first choice to lead DMED, with insiders "stunned" by the appointment. Chapek's true motive was to wrest control over content and budgets to drive Disney+ subscriber growth at any

cost.

153.   To start, Iger himself dissented from the reorganization. As the *Wall Street Journal* later reported, "***Mr. Iger had long expressed displeasure with the organizational structure Mr. Chapek put in place*** to handle content distribution" and "told people close to him that he didn't think the new regime made sense . . . according to people familiar with the matter."[18] According to the *New York Times*, Iger told Chapek "I hate it" in reference to the reorganization.[19] In fact, "[a]t least a dozen senior Disney executives had told Mr. Chapek that the reorganization was a bad idea."[20] Likewise, another media report, citing a Disney insider, noted that "everyone knew DMED as a source of tension, with 'so much angst' that never got resolved."[21] Iger later stated "***it was very, very apparent . . . that [the reorganization] was a mistake***" and that the reorganization was not "healthy for this company." Disney itself has since admitted that the reorganization "***created a huge divide*** between the creative side of the company, the content engines, movies and television and the monetization, distribution side of the company."

154.   Former employees similarly corroborate that DMED was very unpopular and did not work well. FE-2, an executive in Disney+ Streaming recalled that the DMED reorganization was not favorably received internally: "Most of us

---

[18] Robbie Whelan and Emily Glazer, *Walt Disney CFO, Others Brought Concerns to Board Over Bob Chapek*, WALL ST. J. (Nov. 21, 2022), https://www.wsj.com/articles/walt-disney-cfo-others-brought-concerns-to-board-over-bob-chapek-11669072222.

[19] James B. Stewart and Brooks Barnes, *The Palace Coup at the Magic Kingdom*, N.Y. TIMES (Sept. 8, 2024), https://www.nytimes.com/2024/09/08/business/media/disney-bob-iger-chapek.html.

[20] *Id.*

[21] Brian Welk, *Disney Under Bob Iger Will Be More Dream, Less Factory*, INDIEWIRE (Nov. 22, 2022), https://www.indiewire.com/features/general/disney-bob-iger-analysis-1234784730/.

were scratching our heads." FE-2 could not recall talking to anyone that thought favorably of the reorganization: "I didn't talk to anyone who thought it was a good idea," further noting that the "decision was made in a vacuum." FE-2 ultimately resigned due to the "toxic culture" at DMED. Likewise, FE-3[22] explained that the reorganization "ruffled the feathers of the majority of the creative engine," and he could sense a lack of enthusiasm for the DMED restructuring when employees no longer had influence over distribution decisions. FE-14[23] similarly explained that the reorganization was upsetting for filmmakers and the people who greenlight movies and marketed the stories. *Business Insider* later reported, citing insiders, that "DMED hindered collaboration and brought inefficiency to the process of distributing Disney's content on its various platforms."[24]

155.   Moreover, Chapek's public praise for Daniel belied an underlying lack of confidence. Daniel was not Chapek's first choice for the role of Chair of DMED. Chapek originally offered the position to Alan Bergman, then the chairman of Walt Disney Studios. Mr. Bergman, however, turned down the offer, reportedly because he thought "DMED was a terrible idea."[25] Only after his first choice had turned him

---

[22] FE-3 was a senior manager overseeing strategic planning and growth strategy at Disney+ and ESPN until mid-2021. FE-3's role included attending meetings to discuss "spending numbers" and international market expansion." In this role, FE-3 had was part of discussions regarding content distribution and subscriber retention and spoke with colleagues about Disney's activities, including the DMED reorganization.

[23] FE-14 worked as a Social Media & Audience Development Lead within Disney, including for Disney+ through early 2022. FE-14 worked on digital marketing strategies for shows and films that were launching and streaming on Disney+.

[24] Alison Brower and Lucia Moses, *CEO Bob Iger's return was celebrated by many at Disney, but company insiders are still bracing for layoffs and cuts in January*, BUSINESS INSIDER (Dec. 27, 2022), https://www.businessinsider.com/disney-insiders-surprised-relief-at-bob-iger-ceo-return-2022-11.

[25] James B. Stewart and Brooks Barnes, *The Palace Coup at the Magic Kingdom*, N.Y.          TIMES          (Sept.          8,          2024),

down did an "exasperated" Chapek give the job to Daniel.

156. And, despite Chapek's public claims, Daniel was inexperienced and ill-equipped to run such a massive and important entertainment company. Daniel "had little experience with movies or television."[26] FE-2, who directly interacted with Daniel when he ran DMED, also recalled that Daniel "didn't understand [the] technology; he didn't understand the [streaming] business." Insiders within the Company were "stunned" when Daniel was appointed.[27] Unbeknownst to investors, Chapek had selected Daniel because of his loyalty and willingness to carry out Chapek's scheme, and not based on his skill set. As FE-2 explained: "Daniel did exactly what he was told to do by Chapek."

157. Finally, in furtherance of the scheme, Chapek hid his true motive behind the reorganization from investors. Publicly, Chapek touted the reorganization was designed to enhance accountability, make better platform distribution decisions, and better monetize Disney's content; in short, Chapek touted it as efficient. In reality, the reorganization was about inflating Disney+ subscriber growth by (i) stripping Disney studio executives of authority regarding production and distribution of their content (including whether the content should debut on Disney+ or "legacy" platforms such as television and theater); and (ii) utilizing full control over DMED's finances and distribution to divert content to Disney+ (bypassing more lucrative theater windows in the process) while hiding escalating content costs. The new DMED structure perfectly positioned Chapek and Daniel to (i) push content directly to Disney+; (ii) hide runaway costs; and (iii) spend billions on unproven new

---

https://www.nytimes.com/2024/09/08/business/media/disney-bob-iger-chapek.html.

[26] *Id.*

[27] Brooks Barnes, *The Former Electrical Engineer Leading Disney's Streaming Strategy*, N.Y. Times (June 27, 2022), https://www.nytimes.com/2022/06/27/business/media/kareem-daniel-disney.html.

content. Former employees similarly noted the mismatch between Chapek's public stance and the real reasons for the reorganization. As FE-9 put it, the reorganization was simply for power.

158.    Chapek later admitted his true intentions, stating he felt he "had to make the move," to grow Disney+. Chapek claimed, "[i]f I left it to the individual creative groups in the company, everything would [still] be going to the legacy platforms . . . How do you grow [streaming] if everything goes to the legacy platforms?" Unbeknownst to investors, DMED was simply one piece of the growth-at-any-cost scheme. Distribution decisions, in turn, were made at the expense of overall Company profitability, instead with an eye towards juicing Disney+ subscriber numbers. Immediately after Chapek and Daniel were fired in November 2022, decision making over content distribution was returned to the studio executives.

### b.    Defendants Set Unattainable Subscriber Targets

159.    Despite COVID's crushing impact on Disney's parks, hotels, and cruises business segments, the Company saw its stock price steadily increase up through December 2020 as investors became hyper-focused on Disney+, and subscriber numbers in particular (*see supra* ¶¶ 62-71). Chapek, whose compensation and contract renewal were directly tied to Disney's stock price, knew he needed to stoke the market's fervor by maintaining the illusion of meteoric, sustainable and profitable Disney+ subscriber growth.

160.    Chapek and the other Executive Defendants sent the scheme into full swing on Investor Day, December 10, 2020. There, the Defendants wowed Wall Streed by announcing the Company was quadrupling its Disney+ subscriber targets up to "***between 230 million and 260 million total paid Disney+ subscribers***" by 2024. The fact that this new target would eclipse Netflix was not an accident. According to FE-2, "Chapek and Kareem Daniel were very, very focused on what Netflix was doing," and were "literally obsessed with the Netflix-Disney comparison." Several other former employees, including FE-9 and FE-15, similarly

recalled the focus on Netflix and how reactive the Company appeared to what Netflix was doing. The Executive Defendants in turn knew a Netflix-like target would keep Wall Street's focus on Disney+ rather than the still struggling parts of the Company.

161.    Just as the Executive Defendants had intended, analysts were "blown away" by the new estimates. The market responded in kind, jumping to an all-time high of over $180 per share by the end of December 2020. It peaked the following spring, up to nearly $200 per share.

162.    Unbeknownst to investors, these subscriber estimates were unmoored from any legitimate analysis or projections, with Company insiders viewing them as "batshit crazy." FE-2 recalled thinking the targets were "batshit crazy" and recalled everyone he spoke with having no understanding of what could be the possible basis for the subscriber numbers: "We were all looking at each other on the [executive] level going did you provide the numbers? No. Did you? No." Despite being an executive in Global Product at Disney steaming, FE-2 emphasized that their group was never consulted. FE-11 similarly viewed the targets as unreasonable. FE-15[28] likewise viewed the targets as developed in a vacuum without a lot of insight or input from people who were actually on the ground.

163.    As the *Wall Street Journal* later reported, even "Iger thought Mr. Chapek's projections went too far." In another article, the *Wall Street Journal* reported that "privately, Mr. Iger questioned the eye-popping prediction" of 230-260 million Disney+ subscribers.

164.    In sum, the Defendants made up a target they knew would enthrall the market but was not based on serious analysis or derived in consultation with the relevant personnel. Even though insiders questioned the targets (including Iger),

---

[28] FE-15 held various VP level operations and strategy roles at Disney Streaming from January 2019 through June 2022. In this role, FE-15 led weekly meetings with other streaming executives to address issues that arose within the streaming services, including Disney+. FE-15 also interacted with various higher ups.

Defendants went with them anyway because they knew the market would reward their deceit with a significant stock price bump.

## 2. Unsustainable Growth-At-Any-Cost Artifices

### a. Defendants Steered Films to Disney+ Through DMED to Boost Subscriber Growth at the Expense of Profitability

165.    Unbeknownst to investors, Defendants steered feature films away from lucrative theatrical windows straight to Disney+ in order to boost subscriber growth, even if doing so was detrimental to the Company's overall profitability. As a media report later detailed, citing Disney insiders, "[F]or nearly three years, all Disney creators turned over their work to something called DMED, aka Disney Media & Entertainment Distribution, a division led by Chapek's, No. 2, Kareem Daniel. DMED, not the creative divisions, would then make the call on whether a film would get a theatrical release or go to streaming, and how much marketing it received. . . . One Disney insider [stated] that everyone knew DMED as a source of tension, with 'so much angst' that never got resolved."[29]

166.    Defendants Chapek and Daniel used their complete control over content distribution to override studio executives and send highly anticipated films, most notably big-budget Pixar animated films, directly to Disney+ rather than movie theaters. In fact, Disney continued steering major films to Disney+ long after the pandemic dictated the necessity of such moves. In other instances, Chapek and Daniel used their DMED control to shorten the "theatrical window" from the customary 90 days down to just 45 days in order to steer major films to Disney+ faster. And, in nearly all instances, Disney completely jettisoned the lucrative home video pay-per-view window to get films to Disney+ quicker. Every one of these

---

[29] Brian Welk, *Disney Under Bob Iger Will Be More Dream, Less Factory*, INDIEWIRE (Nov. 22, 2022), https://www.indiewire.com/features/general/disney-bob-iger-analysis-1234784730/.

maneuvers foreclosed significant revenue opportunities for the Company, all in an effort to boost subscriber growth.

167.   Furthermore, Chapek overstated the purported benefits of launching films exclusively on Disney+ and the financial downsides of bypassing the theatrical release of these feature films. Worse, Defendants' short-sightedness negatively impacted Disney's future box-office revenues. For example, according to the *New York Times*, Pixar Chief Creative Officer Pete Docter has argued that Disney, in the hopes of growing subscriber numbers, was too eager to send films directly to streaming. Docter confirmed that this short-term growth tactic has had long lasting effects on Disney's once lucrative movie business. Docter described that Chapek's and Daniel's DMED distribution decisions, and not simply the pandemic itself, are to blame for the change in consumers' viewing habits and unwillingness to go to the theaters to view Pixar's new blockbuster movies: "There has been an overall shift in viewing habits as a result of the pandemic, but ***it's also specific to Disney+***," Docter said. "We've told people, 'Hey, all of this is going to be available to you on Disney+!'" Iger likewise agreed, stating "[t]here were three Pixar releases in a row that went direct to streaming . . . I think that . . . may have created an expectation in the audience that they're going to eventually be on streaming and probably quickly, and there wasn't an urgency [to see the movies in the theater]."

168.   The long-term consequences were devastating to Disney's once lucrative feature movie business. Prior to Chapek and Daniel taking over the content distribution, Pixar's *Toy Story 4*, released during 2019, was the third-highest-grossing movie of all-time domestically for Disney with $434 million in box office revenue. The following three releases by Pixar—*Soul*, *Luca*, and *Turning Red*—all were released direct-to-streaming and bypassed the theaters. As a result, consumers expect to be able to stream Pixar movies shortly after release, and therefore wait for them to come out on streaming platforms rather than going to the theaters. Three more recent Pixar theatrical releases—*Onward*, *Lightyear*, and *Elemental*—

combined for just $293 million in box office revenue. *Elemental*, in particular, generated just $29.6 million in domestic ticket sales in June 2023—the worst opening in Pixar history.

169.   Iger himself has since acknowledged these long-term consequences, stating: "There were three Pixar releases in a row that went direct to streaming. . . . ***I think that may have created an expectation in the audience that they're going to eventually be on streaming and probably quickly***, and there wasn't an urgency [to see the movies in the theaters]."

170.   Disney has also since admitted that "***it's already clear to us that the exclusivity***" tactic that Chapek and Daniel "***thought would be so valuable in growing subs . . . wasn't as valuable as we thought***." Disney has also acknowledged, "the best way to monetize [content] is to make use of all platforms, streaming and traditional." Likewise, Disney has conceded that the "***greater use of legacy distribution opportunities***," rather than streaming alone, would lead to increased revenue and allow the Company to "***more effectively amortize content investment***." Finally, Disney has admitted that "***we were so aggressive at supporting the streaming business***. . . . In some cases, ***we made a lot of films just for streaming***. In some cases, we made films with ***shorter exhibition windows***. In almost all cases, we made films that ***no longer had the sell-through window*** in it, which home video at one point, as we called it, ***was extremely lucrative for our company***."

### b.   Disney Chased Subscriber Growth Through Unsustainable Content Spend

171.   A key component of Defendants' scheme was to effectively "buy subscribers" by spending tens of billions of dollars on new Disney+ content to attract and retain subscribers. This strategy, however, was untethered to any analysis of what kind of content would produce ***sustainable*** subscriber growth. Instead, it was based on a dogma that more content equaled more subscribers. Utilizing his new DMED structure, which was firmly under his and Daniel's control, Chapek set out

"***to flood the so-called digital shelves with as much content as possible to achieve . . . as much sub growth as possible***." According to FE-1, there was a directive by Chapek to the studios to "produce as much content as you can." Chapek would say: "the game will be won by whoever has the most content." FE-1 labeled Disney's strategy as essentially "buying subscribers" in order to match Wall Street's new relentless focus on streaming subscriber growth. Likewise, FE-2 recalled that "growth from a subscription perspective was all anyone wanted to hear about," and that subscriber growth was always considered when making decisions.

172.    The Defendants ramped up Disney's streaming content budget to $33 billion for FY 2021, of which more than $16 billion was earmarked for Disney+ content. This was comparable to Netflix's content budget, yet Netflix had twice the subscriber base at the time. Moreover, the DMED reorganization perfectly catered to this content spending spree. According to the *Wall Street Journal*, "Mr. Daniel control[led] the purse strings for spending on content."[30] FE-1 stated that the creation of DMED, under the executive leadership of Chapek and Daniel, resulted in much more spending power from the studios. FE-10 similarly recalled that everything with Disney streaming felt like a blank check.

173.    Meanwhile, according to FE-1, the studios "didn't have P&L responsibility" and were only tasked with producing more content "to get as many subscribers as possible." Nonetheless, according to FE-1, "Disney+ just had to take whatever [the studios] made and pay for it." Put simply, as summarized by FE-1: "They spent too much money making too much content."

174.    Publicly, Defendants repeated the mantra that a steady stream of new Disney+ content would equate to more and more subscriber growth. Chapek

---

[30] Robbie Whelan and Joe Flint, *Disney Fires Top TV Executive Peter Rice as Board Backs CEO Bob Chapek*, Wall St. J. (June 9, 2022), https://www.cnbc.com/2022/06/09/disney-fires-tv-content-chief-peter-rice-source-says.html.

specifically touted the positive aspects of the spending spree, namely the "cadence" of new Disney+ content being added to the platform each quarter. For example, at the May 24, 2021 J.P. Morgan Global Technology, Media and Communications Conference, Chapek told an analyst, "Our goal is something new every week for our guests, . . . a new movie or a series, . . . add every week." Likewise, at a Q4 2021 investor conference, Chapek touted a "surge of new content" with more than 340 local original titles in various stages of development and production across its direct-to-consumer (DTC) platforms. Chapek said: "In total, we are nearly doubling the amount of original content from our marquee brands, Disney, Marvel, Pixar, Star Wars and National Geographic, coming to Disney+ in FY '22." At no point, however, did any Defendant reveal the devastating near-term financial consequences of this strategy. The message to the investing public was not to worry about costs because more content equals more subscribers.

175. Internally, and unbeknownst to investors, Defendants knew that much of the content spend was not driving subscriber growth. Defendants hid this information from investors. As FE-1 recalled, the content produced for Disney+ was "not driving subscriber growth." Similarly, FE-9 recalled that subscriber growth slowed as the pandemic subsided, people went back to work, and theaters started opening. Putting it bluntly, FE-9 felt that the people at the top should have been asking why subscriber growth was slowing down and yet they were spending so much. Disney only later admitted, after much fanfare from Chapek and after investors were severely damaged, that Disney "made a lot of content that [was] not necessarily driving sub growth."

176. The nature of Disney's content cost accounting model was also perfectly suited for this part of the scheme. Defendants used Disney's cost accounting model to mask the impact of runaway costs from investors. Defendants used the accounting model to amortize or spread billions in content expenses over many quarters, in turn allowing Defendants to delay recognition of these costs (and

associated losses). However, as FE-1 explained: "spending hundreds of millions of dollars on a single show accumulates." He further explained that the "accounting treatment of content-cost recognition, in which costs are spread across the useful life of the content, means you don't see the immediate hit to P&L. The losses start accumulating."

177. Of course, even with manipulative accounting, the costs did not stay hidden forever. As depicted in the chart below, Disney+ quarterly content costs rose from $500 million per quarter in Q1 2021 to $1.7 billion per quarter in Q1 2023, a more than 325% increase. The scheme had resulted in Disney+ content costs becoming a runaway train.



**Disney+ Content Costs Q1 2020 to Q1 2023**

178. The Defendants never informed investors of the impending avalanche of delayed content costs when the proverbial bill would eventually come due. Meanwhile, the Executive Defendants internally were fully aware of the precipitous climb in content costs and Disney+ operating losses barreling towards them. FE-1 described that Disney's content cost accounting model "provided good visibility for costs upcoming." The amortized expenses eventually triggered a crushing $1.5 billion loss in Q4 2022. The Defendants knew this was coming but hid it from

investors, instead pushing forward with the massive content spend and prioritizing near-term subscriber growth.

179. On certain occasions, Chapek and McCarthy acknowledged that content costs were expected to increase over the next quarters. Not only did they, in doing so, admit they had good visibility into future content costs, but they also always placed a positive spin on and glossed over the details of the ever-increasing content costs, falsely leading investors to believe that more content costs would inevitably equal more and more subscribers.

180. In reality, while quarterly content costs soared 325%, as depicted in the chart above, Disney+ core subscribers rose just 58% over the same timeframe. As Chapek himself would later admit on his way out the door, spiraling content costs were "com[ing] through the [flood]gate and . . . hitting us all at once" and needed to be "normalized very, very quickly."

181. For Disney investors, who relied on Defendants' growth story, it was too late to "normalize" costs. Immediately after Chapek was fired, Disney worked to quickly undo the excess content bubble. Iger cut the total Disney Streaming budget by $6 billion from Chapek's more than $33 billion per year target in FY 2022 to just $27 billion in FY 2023. The vast majority of these cuts were to Disney+ content budget, which was slashed by billions of dollars, or more than 35% from the levels Chapek had set.

182. Iger eventually admitted that, under Chapek, Disney+ had been "*chasing (subscribers) with . . . aggressive spend on content*." Iger acknowledged "*it's critical we rationalize the volume of content we're creating and what we're spending to produce our content* . . . going forward, *we intend to produce lower volumes of content*." Disney+ would be "spending less on what we make, and making less." Meanwhile, Disney removed over fifty of the same shows and films that Defendants had touted to investors just quarters earlier. The over $2 billion impairment charge to write off the shows was necessary to halt the amortization of

content costs from reaching Disney's bottom line. Finally, Disney would significantly cut back on expensive local programming in unprofitable international markets including exiting some of the worst performing markets altogether. Iger admitted that "there are some markets that we will invest less in local programming but still maintain the service. There are some markets that we may not have a service at all."

### c.    Disney Chased "Low Quality" Subscriber Growth with Steep Discounts and Aggressive Promotions

183.   As part of Defendants' scheme to boost Disney+ subscriber growth, Disney also deployed a series of promotions that handed consumers heavily discounted subscriptions. Unbeknownst to investors, this meant chasing "low quality" subscribers (i.e., subscribers that Defendants knew they could not count on to remain long-term subscribers or subscribers that would ever pay full price for a subscription). As such, these subscriber growth tactics came at the expense of profitability. Meanwhile, externally, Defendants touted the growing "paid" subscriber base without disclosing how many of these "subscribers" were low quality or the increasingly devastating financial impact Disney's reliance on these consumers was having.

184.   As Disney's ability to sell full-price subscriptions diminished (and subscriber growth slowed considerably), the Company increasingly turned toward these promotions to maintain the auspices of robust subscription growth. Most commonly, the Company would offer discounts through third-party partnerships, where another company would offer a Disney+ subscription as an incentive to use its own products or services, and then pay Disney a small portion of the regular subscription cost.

185.   For that reason, the promotional subscriptions provided much less revenue to Disney on a per-subscription basis than traditional subscriptions. Moreover, customers who subscribed via promotion were substantially less likely to

stay subscribers when the promotion ended and the price increased, which amplified "churn," or the rate of cancellations. Disney felt the increased churn from a promotion most profoundly after the deal ended and the promotional period for the last batch of subscribers expired. This spike in churn occurs because the cancelations are not being replaced with new promotional subscriptions. For example, if a 6-months-free promotion ends on December 31, then the churn will be felt most strongly starting on May 31 of the following year. In short, these discounts and promotions, though providing temporary boosts in subscriber numbers (and allowing Defendants to tout this "growth"), came at the expense of profitability and long-term sustainability of the platform.

186.    FE-1 confirmed that Disney ramped up promotional activity in order to "*fill the gap*" left by unreasonable targets. FE-9 similarly recalled that these promotions brought people in because of the low costs. Shortly after FE-1 took over as a Disney Streaming executive in the fourth quarter of 2020, he quickly came under pressure to "hit subscriber numbers and revenue targets." FE-1 further explained that, to boost subscription growth, Disney counted promotional subscriptions the same way as full-price subscriptions. FE-1 said Disney defined a "paid subscriber" as any "subscriber who has access to the service and is paying Disney indirectly or directly for the service."

187.    As an example of an indirect subscriber, FE-1 noted the partnership Disney had with Verizon that provided a free Disney+ subscription to Verizon customers. The free subscription still counted as a "paid subscriber" because the deal entailed Verizon paying Disney "a fee for the subscriber." FE-4,[31] a former employee

---

[31] FE-4 was employed by Disney in data and analytics throughout the Relevant Period. FE-4's responsibilities included preparing and analyzing data for Daniel and other executives. FE-4 specifically worked with a team to create an "executive dashboard" to deliver daily, updated subscriber numbers on Disney's streaming platforms. FE-4's role gave them access to a wealth of Key Performance Indicator ("KPI") data regarding Disney+, including the "paid subscriber" metrics.

within data analytics at Disney+, corroborated this account. According to FE-4, Disney made the decision that everyone **entitled** to a subscription through a partnership would be counted as a "paid subscriber" even if they never actually subscribed. He confirmed when asked "if you signed up for Verizon regardless of whether you activated your Disney+ subscription, would you be counted as a paid subscriber?" FE-13[32] similarly described how Disney would count as paid subscribers consumers who had distinct email addresses with Verizon.

188. Defendants launched and sustained several partnerships that handed promotional Disney+ subscriptions to consumers over the course of Chapek's tenure, as set forth below.

189. **Amazon Music**. On June 28, 2021, Disney announced what would prove a costly promotion through Amazon Music. The promotion gave free Disney+ subscriptions to Amazon Music customers. New Amazon Music customers received a free 6-month subscription to Disney+, with existing customers getting a 3-month subscription. The revenue Disney received from these subscriptions was severely diminished. Indeed, at the time, the Amazon Music subscription itself was the same price as a normal Disney+ subscription, $7.99/month. The deal continued through the end of 2021. Then, like clockwork, churn increased beginning in the middle of 2022 as the Amazon Music deal officially wound down and customers could no longer obtain free Disney+.

190. **American Express**. On or about April 6, 2022, Disney provided consumers with another "free" subscription bundle opportunity. American Express added Disney+ and the Disney Bundle to its list of streaming services for which cardholders would receive a full refund for subscriptions up to $20/month. American

---

[32] FE-13 was a Data Engineer at Disney Streaming, working for Disney between September 2020 and June 2023. As part of his responsibilities, FE-13 served on the data security team at Disney Streaming. FE-13's role gave him insight into subscriber metrics and data, along with other relevant KPIs.

Express customers were ecstatic, and Disney+ quickly became the headline service of that particular benefit. The list prior to Disney's addition included a short and "disappointing" list of less desirable streaming services, including The Wall Street Journal, Peacock, Sirius XM, and The New York Times. As with its prior wholesale arrangements with Verizon and Amazon Music, Disney accepted a much lower per-subscription remuneration, but never disclosed to investors exactly what it received.

191.    To shield these aggressive tactics and the financial consequences of the promotions and discounts from investors, Defendant Chapek reassured investors that discounted partnerships were carefully managed, proclaiming, "we're very selective. We've got guidelines in terms of what percentage of our overall constituency we want to come from a third-party so that we can get the – extract the benefits of those type relationships." This was flatly untrue. In reality, Defendants quickly abandoned any notion of a "selective" or "conservative" approach in order to show rapid subscriber growth.

192.    *Verizon*. Disney's promotional deal through Verizon gave free, one-year subscriptions to Disney+ to any new Verizon customer under certain wireless plans. The promotion had an immediate impact on subscriptions, with *over 20%* of Disney's subscribers coming via the Verizon subscription over the course of the first two months. The growth, however, came at a high cost, including through dramatically reduced revenues per subscriber. Though Verizon paid Disney an undisclosed amount per subscription, Verizon Consumer Group's CEO Ronan Dunne emphasized, "while I won't go into the details of any of my commercial arrangements, you can be sure I'm not paying retail for my Disney+."

193.    Compounding the impact on profitability, the Verizon deal empowered Verizon—but not Disney—to bill the customers for the Disney+ subscription (after the one year free period) as part of the customer's wireless bill. Verizon would then take a portion of the revenue before sending the remainder to Disney. Additionally, as Verizon CEO Hans Vestberg later explained, the original contract dictated that

Disney would pay Verizon a "bounty" for any Disney+ customers who decided to convert to full-price subscribers after the free year expired, further increasing costs for Disney.

194.    Despite the absence of upfront payments by the consumer and the significantly diminished revenue for Disney from these Verizon-based subscriptions, Disney still counted each subscription as a full "paid subscription." As FE-1 explained, and FE-4 confirmed, Disney would count a Verizon subscription, ***even though Verizon customers "automatically became Disney+ members*.**" Accordingly, despite limited revenues and only temporary benefits to the Company, the promotion proved extremely successful in driving the claimed subscription growth in the near term.

195.    The terms of the Verizon deal dictated that, toward the end of 2020, the free year-long subscriptions would come to an end, and Verizon customers would be forced to either cancel their Disney+ subscriptions or pay full price. FE-6,[33] a former manager in Global Content Operations for Disney Streaming, worked on the Verizon deal and explained "there should have been an expectation that customers wouldn't renew after 12 months." To limit churn from a substantial portion of their subscriber base, Disney extended, and even enhanced, the partnership. On August 17, 2020, Verizon and Disney announced an even better deal for new Verizon customers or those who enhanced their plans. The Disney+-only promotion was expanded to include a free subscription to the entire Disney Streaming Bundle (Disney+, Hulu, and ESPN+). Moreover, the subscription would extend ***indefinitely, without the one-year cutoff*.**

---

[33] FE-6 worked as a manager in Global Content Operations for Disney Streaming during the Relevant Period. FE-6's duties and responsibilities in that position included overseeing the localization of Disney content that was distributed or streamed overseas or in languages other than English. FE-6 worked on Disney+ from its beginning. FE-6's responsibilities also encompassed promotional deals such as the Verizon deal. FE-6 attended meetings during which the Verizon arrangement was discussed.

CEO of Verizon Consumer Group Ronan Dunne conceded that Verizon and Disney decided to offer the enhanced plan in an effort to retain consumers who were "starting to roll off" the free 12 months of Disney+. Ultimately, in a continued effort to delay the impending churn, Disney repeatedly extended the Verizon offer throughout Chapek's tenure as CEO. It did not wind down the deal until May 16, 2023, when Verizon announced that Disney+ would no longer be automatically included for free, but rather customers could opt in to pay a slightly discounted rate of $10/month for the Disney bundle.

196.    ***Hulu+ Live TV and ESPN***. Hulu+ Live TV is a premium version of Disney's Hulu streaming service that also includes live television, including live sports, on traditional channels. ESPN (the popular sports network) similarly operated an online streaming service. Disney acquired control of both Hulu and ESPN prior to Defendants' scheme to boost Disney+ subscribers. Defendants leveraged the existing subscriber bases of Hulu and ESPN, as well as the new subscribers those services attracted, to artificially inflate Disney+ subscriber metrics.

197.    Up until December 2021, Disney sold Hulu+ Live TV and Disney+ as separate products. However, in December 2021 just before the end of Q1 2022, Disney provided ***a free subscription*** to every one of the 4.3 million domestic Hulu+ Live TV subscribers. Since this promotion came from inside Disney, it ***did not receive*** any outside revenue as consideration for these promotional subscriptions. Nevertheless, Disney automatically counted every one of these subscribers as a Disney+ subscriber. According to FE-13, Disney deployed a similar trick with ESPN streaming. If ESPN subscribers paid for a heavily discounted "bundle," they were counted as both ESPN and Disney+ subscribers, even though they were not paying anywhere near full price for Disney+.

198.    Moreover, the timing of the Hulu promotion explains the true motivation. The 4.3 million extra Disney+ subscribers the deal provided comprise the vast majority of 6.6 million in year-over-year domestic growth the Company

reported for Disney+ in its Q1 2022 earnings call. Without this promotion, Disney would have had to report paltry growth of just 2.3 million subscriptions in a full year.

199.   Iger later admitted, on February 8, 2023, "in our zeal to go after subscribers, I think we might have gotten a bit too aggressive in terms of our promotion," and conceded that "the promotion to chase subs that we've been fairly aggressive at globally wasn't absolutely necessary." Iger admitted Disney had chased low quality subscriber growth and assured investors that, moving forward, Disney would "grow quality subs that are loyal and where we actually have the ability to continue to price effectively to those subs." Before this admission, Disney's opacity about its deeply discounted promotional subscriber growth allowed the Company to misleadingly convey steady, on-target subscription growth to the market, without disclosing the concurrent deterioration in the quality and sustainability of that growth.

### d.    Disney Chased Subscriber Growth in Unprofitable International Markets

200.   Knowing that Wall Street was closely tracking Disney+'s subscriber growth, Chapek, Daniel, and McCarthy pursued aggressive international expansion efforts to boost Disney+ subscriber numbers. By 2021, Disney+ had already launched in nearly all major markets. By that same time, subscriber growth had slowed, leaving Defendants increasingly desperate for additional subscribers. In an effort to find more subscribers, the Defendants pressed ahead with a second wave of international launches. However, because Disney+ had already launched in the major international markets, this second wave targeted inherently less lucrative countries and territories. Moreover, the Defendants knew these second wave markets offered limited financial upside: markets with low ARPU, limited broadband access, minimal Disney presence, and government censorship or bans on several Disney programs. To further support this push, the Defendants drastically increased production of international content to attract subscribers in existing international

markets, despite the limited economic benefit. Unbeknownst to investors at the time, the additional subscribers generated through this plan came without regard to—and at the expense of—profitability.

201. The original plan was for Disney+'s international rollout to be completed by the end of 2021. From November 2019 through 2020, Disney+ launched in over 50 countries and territories. This first international launch included nine of the top ten global economies and Disney's most lucrative international markets, including Canada, Australia, Germany, the United Kingdom, France, and Italy. These international launches fueled rapid subscriber growth throughout 2020 and into early 2021. By first quarter of 2021, 88% of Disney+'s new subscribers came from international markets.

| Fiscal Quarter | Total New Subscribers | New International Subscribers (Including Hotstar) | New Domestic Subscribers (U.S. and Canada) | Percentage of New Subscribers from International Markets |
|---|---|---|---|---|
| 2Q20 | 7 million | 3.6 million | 3.4 million | *51%* |
| 3Q20 | 24 million | 21.1 million | 2.9 million | *88%* |
| 4Q20 | 16.2 million | 13.7 million | 2.5 million | *84%* |
| 1Q21 | 21.2 million | 18.8 million | 2.5 million | *88%* |

202. However, as Disney+'s international rollout wound down in 2021, Disney+ subscriber growth began to slow. In furtherance of their scheme to reflect growing subscriber numbers, the Executive Defendants decided to **double** Disney+'s international presence. According to FE-6, "international expansion was 'a key part' of Disney's strategy to add subscribers," because Disney "could get subscribers by adding markets." FE-2 also stated, "the only way to increase subscriptions was via international expansion," and "a launch in individual markets would create a short-term bump" in new subscribers.

203. Chapek announced this plan to **double** the number of countries and territories in which Disney+ operated during the Company's November 10, 2021

earnings call:

> We are expanding our global reach by introducing Disney+ in additional markets around the world. The service is now available throughout Japan, and we're thrilled to be launching it this Friday on Disney+ Day in South Korea, in Taiwan, and in Hong Kong on November 16*. **In just 2 short years, we are now in over 60 countries** and more than 20 languages. And **next year, we plan to bring Disney+ to consumers in 50-plus additional countries**, including in Central, Eastern Europe, the Middle East, and South Africa. **Our goal is to more than double the number of countries we are currently in to over 160 by fiscal year 2023**.

204.    On the same call, the Company revealed that it was also increasing investment into local and regional content for its international markets, and it was developing **over 340** local programs to drive international subscriptions:

> We recognize that the single, most effective way to grow our streaming platforms worldwide is with great content, and we are singularly focused on making new high-quality entertainment including local and regional content that we believe will resonate with audiences. **Of note, we have 340-plus local original titles in various stages of development and production for our DTC platforms over the next few years**. As you know, we announced at our last Investor Day that we expect our total content expense to be between $8 billion and $9 billion in fiscal 2024, and **we will now be increasing that investment further with the primary driver being more local and regional content**.

205.    With their plan for international expansion in place, on January 19, 2022, Disney issued a press release announcing that it had created an "International Content Group To Expand Pipeline Of Local Content And Continue To Grow Its Global Direct-To-Consumer Business." The Chairman of International Content and Operations, Rebecca Campell, would be "responsible for expanding the international content creation pipeline, amplifying the Company's localized content strategy," and she would report directly to Chapek.

206.    The "second wave" launches began in May of 2022 and ended in June of 2022. Some of the countries and territories included in the second round of

launches were Algeria, Bahrain, Libya, Malta, Åland Islands, and Gibraltar. Because Disney+ had already launched in nearly all of its major markets, many of the countries launched in 2022 were smaller, where Disney had a limited presence, and broadband access was not as widespread. This limited the total addressable market ("TAM"), lowered ARPU, and increased marketing costs. Many of the countries also censored and even banned some of Disney's content. For example, in June 2022, Disney launched in the Middle East, where "Lightyear" and "Baymax" were banned due to LGBTQIA+ content.

207.    This scheme did produce a bump in subscribers – for a short while. For the first three quarters of 2022—and through Chapek's contract renewal in June 2022—Disney+ reported subscriber growth that met or exceeded Wall Street's expectations. Significantly, most of the subscriber growth was attributable to new subscribers from international markets. Notably, in the third quarter of 2022, ***99.3%*** of Disney+'s new subscribers came from international markets:

| Fiscal Quarter | Total New Subscribers | New International Subscribers (Including Hotstar) | New Domestic Subscribers (U.S. and Canada) | Percentage of New Subscribers from International Markets |
|---|---|---|---|---|
| 1Q22 | 11.8 million | 7.7 million | 4.1 million | *65%* |
| 2Q22 | 7.8 million | 6.3 million | 1.5 million | *80%* |
| *3Q22* | *14.4 million* | *14.3 million* | *.1 million* | *99.3%* |

208.    As the Defendants intended, analysts reacted to this subscriber growth favorably. Analysts were encouraged by the renewed subscriber growth and expected that international expansion would continue to drive additional subscribers. For example, RBC analysts noted that "53 new market launches should support sub[scriber] growth." Similarly, Wells Fargo commented, "DIS+ future takes shape, and it looks brighter."

209.    Unbeknownst to investors, however, these new launches actually

created a problem: the cost to launch and operate Disney+ in many of its international markets was greater than the revenue generated in those markets. As discussed above, these international launches steeply increased marketing and operating costs. While touting subscriber growth, Chapek and McCarthy concealed that the costs required to launch and operate in many of the international markets exceeded the revenue that Disney+ could generate in those markets. Disney spent prolifically to make and acquire local content tailored to the international markets in which it was launching. As FE-9 recalled, the costs of creating translations of the content alone were enormous. Disney also had to fulfill local quotas—mandates that required Disney to make or spend a certain amount. Disney also spent significant amounts on marketing Disney+ and its content in international markets, especially in countries and territories with lower broadband access where Disney's presence was limited (i.e., where the population did not already have an affinity for Disney specifically or streaming generally). Combined, these costs made many of these international markets cost prohibitive.

210.  Defendants downplayed the costs associated with this second wave of international launches, and instead turned analysts' focus to the subscribers generated by the additional market launches. For example, during Disney's Q2 2022 earnings call with analysts, Chapek stated, "we are equally enthusiastic about our growth potential in international markets. We currently have over 500 local original titles in various stages of development and production. . . . We believe these premium local originals, along with branded content with broad international appeal, will attract new subscribers and drive engagement." Similarly, during a Q3 2022 earnings call, McCarthy told investors, "[s]trong Disney+ core net subscriber additions of 6 million reflect growth in existing markets as well as launches in over 50 new markets during the quarter."

211.  By downplaying the costs, the Executive Defendants concealed from investors that their prolific spending to chase subscribers in international markets

came at the expense of Disney+'s profitability. Indeed, the quarter after Chapek was fired, the Company announced plans to "reassess all markets we have launched in and also determine the right balance between global and local content." As Iger belatedly revealed after he retook control of the Company:

> We launched Disney+ in many, many markets around the world, including many very low ARPU markets . . . *we spend a lot of money on marketing in those markets and we spend money on local content*. So as we rationalize this business and we *head in the direction of profitability*, clearly, we're looking at opportunities to reduce expenses in *those markets where the revenue potential just isn't there*.

212.   In response to an analyst's question in 2023 about whether "it [is] essential that you reshape that international strategy in any way to meet your long-term profitability objectives," Iger admitted:

> We actually have been looking at multiple markets around the world with an eye toward prioritizing those that are going to help us turn this business into a profitable business. *What that basically means is there are some markets that we will invest less in local programming but still maintain the service*. There are some markets that we may not have a service at all. Basically, what I'm saying is not all markets are created equal. And in terms of our march to profitability, one of the ways we believe we're going to do that is by *creating priorities internationally*.

### 3.   Half-Truth and Coverup Artifices

#### a.   Chapek and McCarthy Assured Investors that Disney+ Growth Was On Track

213.   After laying the foundation for their scheme, Defendants set out to convince Wall Street that Disney+ was well on track to meet its ambitious 230-260 million subscriber target. Analysts and investors' attention was directly on Disney+'s subscriber growth. According to FE-1, there was pressure from Wall Street to increase subscriber numbers, and "[t]he Company let Wall Street run the show for them." Defendants dealt with this subscriber pressure from Wall Street by insisting that Disney+'s modest quarterly subscriber growth demonstrated it was on track to

achieve its 230-260 million subscriber target. Often times, the Disney+ subscription and profitability assurances came in moments of doubt, such as when subscriber growth hit a valley, and analysts wanted assurance that Disney still planned to hit the target. Defendants' representations that Disney+'s subscriber growth was squarely on track each quarter was thus a centerpiece of Defendants' scheme. Despite having opportunities to soften their positions on Disney+ subscriber growth and profitability, Chapek and McCarthy did not hesitate to continue the scheme by informing analysts and investors that Disney+ was purportedly on track.

214.   On May 13, 2021, during the Company's Q2 2021 earnings call with analysts, Chapek reminded investors that "***[w]e are on track*** to achieve our guidance of 230 million to 260 million subscribers by the end of fiscal 2024." McCarthy did the same: "***we remain right on track*** to reach our fiscal 2024 guidance of 230 million to 260 million subs, powered by the addition of 30 million paid Disney+ subs in the first half of the year."

215.   Chapek and McCarthy did the same during the August 12, 2021 Q3 2021 earnings call with analysts. Chapek touted that "Disney+ . . . performed incredibly well with 116 million" subscribers. Chapek assured investors that "[i]n terms of the health of Disney+, we feel really great about our sub trajectory." During that same call, an analyst asked Chapek about net add trends, and Chapek again confirmed that "[i]n terms of the net add question and how that's going to improve, first half versus second half. ***Again, we feel really great about our sub trajectory***." McCarthy similarly stated: "[a]s [Chapek] mentioned earlier, we ended the third quarter with 116 million global paid subscribers to Disney+, up from approximately 104 million in the second quarter." McCarthy added that "subscriber growth was also solid at our core Disney+ markets, excluding Disney+ Hotstar, with total quarter-over-quarter net adds in those markets consistent with net adds from Q2."

216.   After a quarter where Disney+ failed to meet analyst expectations concerning subscriber growth, during the November 10, 2021 Q4 2021 earnings call,

Chapek and McCarthy assured investors that the subscriber and profitability targets would be met. Chapek said "we're confident *we are on the right trajectory* to achieve the guidance that we provided at last year's Investor Day, reaching between 230 million and 260 million paid Disney+ subscribers globally by the end of fiscal year 2024, and with Disney+ achieving profitability that same year." And McCarthy followed Chapek's lead: "we are well positioned to achieve the subscriber target of 230 million to 260 million by fiscal 2024 that we laid out at last year's Investor Day. And we also remain confident in our expectation that Disney+ will achieve profitability in fiscal 2024."

217.    Analysts credited Defendants' repeated representations concerning Disney+'s subscriber growth. For example, following the Company's May 13, 2021 Q2 2021 earnings call, analysts at Guggenheim credited Chapek and McCarthy's reassurances: "[m]anagement anticipates net adds to slow in the back half of the year due to the suspension of the IPL tournament in India and the company delaying the launch of Star+ in Latin America to FQ4 (August 31) to take advantage of a strong sports calendar, *but reiterated that the company remains on track to reach 230mm-260mm subscribers by FY24*." J.P. Morgan analysts also highlighted that "*management reiterated they remain on track to reach 230-260m subscribers by the end of F24*."

218.    Similarly, following the Company's lower-than-expected November 10, 2021 Q4 2021 results, analysts reiterated Chapek and McCarthy's assurances that Disney+ subscriber growth and profitability remained on track. Analysts at Cowen wrote that "Disney+ sub growth is expected to remain soft in H1:F22, but management reiterated confidence in the company's FY24 sub and profit targets." Credit Suisse analysts wrote: "Beyond mgmt indicating they are on the right trajectory to reach between 230m and 260m paid Disney+ subs globally by the end of FY24, they also reaffirmed Disney+ achieving profitability in FY24 despite exceeding guidance of $8B-$9B in FY24 content amortization laid out at the last

Investor Day[.]"

219.    Chapek and McCarthy kept this façade going right up until Chapek was terminated. On March 7, 2022, during a Morgan Stanley Technology, Media, and Telecom Conference, McCarthy told investors that Disney was "well suited to achieve the subscriber guidance as well as the profitability guidance." On May 11, 2022, during Disney's Q2 2022 earnings call with analysts, Chapek highlighted Disney's modest subscriber growth, stating that Disney ended the quarter with an additional "7.9 million Disney+ subscribers, keeping us on track to reach 230 million to 260 million Disney+ subscribers by fiscal [20]24." Chapek once again reassured investors, "*we're very confident that going forward, we're going to hit both of those sub guidance and profitability guidance* by bringing in the cost at a reasonable level relative to their ability to attract and retain our subs." On August 10, 2022, during Disney's Q3 2022 earnings call, Chapek represented that Disney had "*significant subscriber growth at our streaming services* which added . . . 14.4 million Disney+ subscribers." McCarthy added that she was "*confident that Disney+ will achieve profitability in fiscal 2024*." Finally, on November 8, 2022— only twelve days before Chapek was fired—Defendants continued to reassure investors. During the Company's Q4 2022 earnings call with analysts, Chapek stated that Disney was "particularly pleased with growth in the fourth quarter, which saw the addition of . . . 12 million Disney+ subscriptions."

220.    Ultimately, Defendants' repeated assurances that Disney+ was on pace to reach 230 million to 260 million subscribers and profitability by fiscal 2024 were false and misleading. Subscriber data, which Defendants tracked carefully, showed *slowing* subscriber growth that wasn't keeping pace with projections. FE-9 recalled that subscriber growth was slowing despite so much money being spent by Disney. Moreover, the Defendants knew by at least April 2021 that Disney+ *was not projected* to become profitable by that date. As FE-1 confirmed, by April 2021 the five-year plan showed Disney+ would not hit profitability until a full year later than

Defendants had touted to investors.

221. Thus, far from reflecting genuine growth, these assurances were part of the broader scheme to placate Wall Street, maintain investor confidence in the Company, and keep the Company's stock price artificially high.

### b. Defendants Used Accounting Gimmicks to Conceal Runaway Costs

222. Central to Defendants' scheme was convincing investors that costs and losses were under control. Of course, they were not, as Disney was spending huge amounts of money on content and incurring massive operating losses. To conceal these consequences, the Defendants utilized the new DMED structure to make costs and losses with at least two types of accounting manipulations, as described below:

### i. DMED Restructuring to Artificially Lower Content Costs

223. The Defendants' massive content spending spree was triggering significant losses in the streaming division. Indeed, Disney's DTC business was on track to report a $1.2 billion operating loss in the first quarter of FY 2021, which could have led to investors questioning the sustainability and viability of Chapek's Disney+ growth plan. The DMED reorganization, however, offered Defendants a convenient way to significantly alter how the Company calculated and reported content costs (and ultimately losses).

224. Prior to the reorganization, the film and general entertainment studio divisions produced content and then sold the content to a separate Disney+ streaming division at fair market value, which included actual production costs plus a customary industry profit markup. The studio divisions recognized the revenue, including profit markup, on their books while Disney+ recognized the full costs they paid, including the profit markup, on their books. By consolidating the studios under DMED, the Executive Defendants eliminated the intersegment studio sales altogether. This allowed Disney+ to record its content costs at the much lower actual

production cost rather than the higher fair market value it had used under the pre-DMED business structure. This simple accounting manipulation dramatically reduced Disney+'s reported content expenses and artificially inflated its profitability, particularly when compared to earlier periods that used a fair market valuation.

225. For example, the chart below demonstrates the significant, and undisclosed, impact the reporting change had on Disney+ content costs and DTC operating losses:

| | Pre-DMED reporting change | Post-DMED reporting change | % difference |
|---|---|---|---|
| Q1 2021 DTC Operating Loss | ($1.162 billion)[34] | ~$466 million[35] | ~60% |
| FY 2020 Disney+ content costs | ~ $2 billion[36] | $1.352 billion[37] | ~32% |

226. McCarthy only partially acknowledged the significant impact of the accounting change on the Q1 2021 earnings call, but misleadingly left out material facts. McCarthy highlighted an "improvement in direct-to-consumer operating results of nearly $650 million versus the prior year" which she first attributed to

---

[34] On the Q4 2020 call, prior to the reporting change, McCarthy stated: "[W]e expect the Q1 [2021] operating results of our DTC businesses to decline by approximately $100 million relative to the prior year quarter." The Q1 2020 DTC operating loss was $1.062 billion. Thus, the expected DTC operating loss for Q1 2021 was $1.162 billion.

[35] Rather than the expected $1.162 billion loss under the pre-DMED structure, Disney reported a loss of just $466 million under the new reporting structure, Disney noted: "[T]he majority of the variance relates the elimination of intersegment pricing markups under our new financial reporting structure."

[36] At the December 10, 2020 Investor Day, prior to the reporting change, McCarthy stated: "[O]n the content amortization, the original guidance that we gave at the original Investor Day was $2 billion. And that is consistent with what actually occurred in fiscal '20."

[37] In February 2022, Disney broke out historical Disney+ content costs for the first time. FY 2020 content costs under the new reporting structure totaled $1.352 billion.

"improved results at all 3 of our streaming services [including Disney+]." McCarthy then stated, "while some of the outperformance reflects better-than-expected results from Hulu and Disney+, the majority of the variance relates to the elimination of intersegment pricing markups under our new financial reporting structure." However, McCarthy intentionally concealed any further details and did not break out the financial impact of the DMED reporting change on the DTC year-over-year comparison or the impact of the reporting change on the operating results or content costs at the Disney+ level. Going further, the Company's Form 10-Q removed any reference to the reporting change at all.

227.    Throughout the duration of the scheme, Defendants completely omitted any mention of the accounting change, causing analysts to mistakenly attribute the results to Disney+'s "improved performance," rather than Defendants' accounting manipulation. For example, on the Q2 2021 call, McCarthy attributed better than expected DTC operating results to "lower content . . . expense at . . . Disney+." On the same call, an analyst asked: "you guys have consistently beat us on [Operating Income] profits or lack of losses, I'd say, on DTC. Which of the platforms is providing the biggest surprise?" McCarthy knew the accounting change was the biggest driver of the improved operating results, but instead responded: "look, the biggest drivers for direct-to-consumer were coming out of Hulu and Disney+."

228.    The Company's Form 10-Q for Q2 2021 similarly misled investors, concealing the impact of the reporting change: "The operating loss [for the six months ended April 3, 2021] from Direct-to-Consumer decreased $1,159 million, to $756 million from $1,915 million, *due to improved results at Hulu, and to a lesser extent, ESPN+ and Disney+*."

229.    The ploy worked. Analysts bought these misleading explanations:

- Credit Suisse: "direct-to-consumer losses were well ahead [of our expectations], supporting our view that profitability could come a year earlier than the FY24 guide"

- UBS: "DTC cut its losses by more than half . . ."
- BofA: "DTC segment OI of -$466mn, which significantly outperformed our expectations."

230.   The reporting change also distorted the operating results of Disney+ and muddied any comparison between pre-December 2020 and post-December 2020 performance. When Disney later broke out historical Disney+ content costs for the first time in February 2022, the material impact of the change became apparent. At the December 2020 Investor Day presentation, McCarthy represented that Disney+ content expenses totaled approximately $2 billion in FY 2020. Unbeknownst to investors, the Company then utilized the new model to adjust Disney+ content costs downward to just $1.35B for FY 2020. Thus, the accounting change shaved off $650 million, over 30%, from Disney+ content costs.

231.   This undisclosed reset on costs continued to materially deceive investors. For example, the Company reported in FY 2021, Disney+ content costs of $2.9 billion, roughly 45% higher than the $2 billion figure the Executive Defendants had previously reported for FY 2020 at Investor Day. However, that was an apples-to-oranges comparison. When adjusting for the accounting change, the actual spike in content costs was over 115% during FY 2021 (FY 2021 reported content cost of $2.9 billion vs FY 2020 content cost adjusted for the new accounting model of $1.35B).

### ii.   Defendants Utilized DMED to Artificially Shift Disney+ Costs to Other Divisions

232.   Under the DMED structure, Chapek and Daniel had full control over when and where new shows and films launched on Disney's various platforms (Disney+, theaters, linear TV networks, etc.). Taking advantage of this control, they would briefly debut Disney+ content on Disney's legacy distribution channels (mostly Disney's linear cable television networks) before making the content available on Disney+ shortly thereafter. This sequence allowed the Defendants to

artificially shift significant content and marketing costs from the Disney+ division to a separate linear network division, thus lowering the Disney+ costs reported to investors on quarterly earnings calls. As FE-9 explained, certain TV shows and movies that were set to launch on Disney+ were instead quickly re-routed for release on live TV or Hulu/ESPN first. According to FE-9, this allowed Defendants to reallocate the budget to the studio where the content launched rather than Disney+. FE-9 recalled several different shows were slated to premiere on Disney+ first and then were aired elsewhere to reallocate the budget and make Disney+ look like it was performing better than it was. FE-14 similarly recalled internal conversations about getting creative with moving things from one business line to another.

233. According to Disney's own internal policies, these actions were blatant accounting manipulations. Disney's internal cost accounting policies stated, "the initial costs of marketing campaigns are generally recognized in the DMED business/distribution platform of initial exploitation, and allocation of programming and production costs is driven by distribution of the relevant content across windows." The *Wall Street Journal* later reported that the accounting manipulations weighed on McCarthy: "'Cute,' she said disparagingly of the move during a conference call with colleagues." The report also described that "Ms. McCarthy was concerned about this [cost shifting] strategy."

234. None of these accounting manipulations were ever disclosed to investors at the time. Instead, Chapek falsely represented that in deciding how to "most effectively distribute our programming . . . our goal is always to serve consumers in the best way possible." Daniel added: "as Bob mentioned, consumer behavior really does drive our decision-making."

c. **Defendants Concealed Significant Subscriber Churn**

235. A significant driver of Defendants' scheme to inflate subscriber growth was targeting "low quality" subscribers through promotions or expensive one-off pieces of content, such as specials with Beyonce or Taylor Swift. As FE-9 recalled,

these promotions and special content were designed to draw in subscribers. Unfortunately for Disney, this also meant significant churn as these low-quality subscribers tended to cancel their subscriptions once the promotional periods ended or the content lost its novelty. As FE-5[38] explained, Disney tried to "juice subscription numbers and tell the market they're doing well," but this created "a 'fastfood' subscriber. You get subscribers but then there's a fast drop-off." This strategy sent Disney's churn rate to increasingly concerning levels, but Defendants knowingly withheld that information from investors in furtherance of the scheme.

236.    Publicly, Defendants told investors that Disney+'s "churn has declined" and "we're extraordinarily pleased with the low churn that we see." For example, during Disney's Q3 2021 earnings call on August 12, 2021, Chapek stated: "We're really pleased with churn. We've taken some price increases over the past few quarters. And what you're seeing is that our churn has declined. . . . So the fact that our churn is low, our engagement is so high, our retention is so high." Likewise, during Disney's Q1 2021 earnings call on February 11, 2021, McCarthy told investors: "[I]n regard to the specific churn related to the anniversary of the Verizon launch promotion from last November 2020, we're really happy with the conversion numbers that we have seen there going from the promotion to become paid subscribers."

237.    Chapek, Daniel, and McCarthy all closely monitored subscriber churn. As FE-1 explained, Disney regarded churn as "the most important thing" and therefore "tracked churn very closely." FE-1 reported that he and his team grew particularly concerned about Disney+ churn because it "was significantly higher at Disney+ than at Hulu." Therefore, the streaming team "sliced and diced" Disney+

---

[38] FE-5 was an advertising sales executive at Disney's DMED group from early 2021 through mid-2022. FE-5 attended "weekly executive meetings" attended by executives at the "SVP" level. In this role, FE-5 had insight into strategies for attracting new subscribers.

churn data to thoroughly analyze churn. Specifically, FE-1 analyzed churn for various cohorts of subscribers (such as "partnerships, age group, various Facebook social media campaigns") to determine which cohorts experienced the most churn. FE-1 recalled identifying one cohort of readily identifiable subscribers for which churn was particularly high: people who watched less than three hours of content per week. FE-1 also revealed that Chapek, McCarthy, and other Disney executives "got presentations of versions of this data on an ongoing basis," including at regular staff and Board meetings. FE-1 specifically recalled that Chapek, McCarthy, and other Disney executives received churn data and information at "off-site" meetings, where they saw presentations with "slides on churn reduction." FE-1 himself put together one such presentation, which he forwarded to Disney's Corporate Development Team for presentation to Chapek.

238.   Unbeknownst to investors, high churn was a significant concern among Disney executives. Ever since Defendants launched the scheme in December 2020, Defendants watched as churn on Disney+ rose to alarming levels. Contrary to Defendants' public claims that churn had "declined," monthly churn on Disney+ actually *increased*. FE-1 reported there was "four or five percent monthly churn" at Disney+, and it got so bad that "[w]e called it the leaky bucket. No matter how much water you put in, some leaks out." Confirming FE-1's account, data from a third party media analytics firm demonstrates that Disney+'s monthly churn rate *increased* from 3.75% to 4.25% between 2021 and 2022. To provide context, in 2021, Disney+'s monthly churn rate was 88% higher than Netflix's 2.0% churn rate. Later, the *Wall Street Journal* confirmed this worsening trend, reporting that

Disney+'s churn rate climbed 30% year-over-year from Q2 2021 to Q2 2022.[39]



**Disney+ Monthly Churn Rate**

239.   Instead of alerting investors to these concerning trends in churn, Chapek and McCarthy falsely assured investors that churn was "low" and "declin[ing]." For example, On February 11, 2021, McCarthy claimed: "[s]o in regard to the specific churn related to the anniversary of the Verizon launch promotion from last November 2020, we're really happy with the conversion numbers that we have seen there." On August 12, 2021, Chapek assured investors that "***our churn is low***" and also said "***[w]e're really pleased with churn*** . . . . ***And what you're seeing is that our churn has declined***." On May 5, 2022, Chapek reiterated that "***we're extraordinarily pleased with the low churn that we see, particularly given the bundle***."

240.   Iger belatedly revealed, only after retaking the reins as the CEO and after investors had lost billions, that Defendants' growth strategies resulted in low-quality subscribers who cancelled their subscriptions instead of paying full price. On

---

[39] Robbie Whelan and Sarah Krouse, *Disney+ Price Increase Shows Limits of Subscriber-Growth Push*, WALL ST. J. (Aug. 11, 2022), https://www.wsj.com/articles/disney-price-increase-shows-limits-of-subscriber-growth-push-11660256118.

February 8, 2023, he admitted "in our zeal to go after subscribers, I think we might have gotten a bit too aggressive in terms of our promotion." He assured investors that, unlike during Chapek's tenure, moving forward Disney would "grow quality subs that are loyal and where we actually have the ability to continue to price effectively to those subs." Iger's seminal focus on "loyal" subscribers Disney could "price effectively" highlights the lack of loyalty and price tolerance of low quality subscribers amassed by the prior regime.

### 4. Internal Data Contradicted Defendants' Public Statements

241. As set forth in greater detail below (*infra* ¶¶ 388-406), the Defendants had access to sophisticated internal data that showed their public statements touting Disney+'s path to profitability and sustainable subscriber growth were materially false and misleading. Indeed, the Company publicly confirmed to investors that Disney had "access to an incredible number of touch points across [the Company]" and touted the "insights gained from this wealth of data." As former employees have confirmed, Defendants closely monitored key business performance and user engagement data points including profitability, subscriber numbers, and churn.

242. ***Profitability***. Chapek and the other Executive Defendants boasted to investors at the December 2020 Investor Day that Disney+ would be profitable by 2024. In reality, the Defendants knew that Disney+ ***was not projected*** to become profitable by that date. As FE-1 confirmed, by April 2021 the five-year plan showed Disney+ would not hit profitability until a full year later than Defendants had touted to investors. Unfortunately for investors, however, Defendants never provided this information to the market, instead continuing to tout profitability by 2024 (*see supra* ¶¶ 213-221).

243. ***Subscriber Numbers***. Defendants closely monitored Disney+ subscriber numbers through data dashboards. As former employees have confirmed, these dashboards and data were "used for briefings" at the "C-levels" of the Company. This data told a very different story than the growth story Defendants

touted to investors. As FE-9 recalled, subscriber growth was slowing despite how much money Disney was spending.

244. **Churn**. One metric Defendants tracked particularly closely was subscriber churn (i.e., the number of subscribers that cancelled or let their Disney+ subscription lapse). Contrary to Defendants' public statements that churn was "declining" and "low," Defendants actually saw churn rise to alarming levels. According to FE-1, churn was "a constant problem" that was internally referred to as "the leaky bucket." Other former employees likewise recalled "lots of churn." Indeed, the data showed Defendants just how bad the churn problem was. By comparison, the churn rate on Netflix consistently hovered around 2% during the Relevant Period. The Disney+ churn rate, on the other hand, rose to 3.75% in 2021, fully 88% higher than Netflix. That churn rate then **rose** in 2022 to 4.25%, **more than 112% higher** than the Netflix churn rate. Later that year, the *Wall Street Journal* also confirmed the worsening trend, noting the U.S. churn rate for Disney+ increased almost 30% in Q2 2022 compared to the prior year.[40]

### 5.    Internal Strife Mounted as Executives Warned Chapek

245. In a particularly colorful and revealing episode, before Chapek made further misleading statements during the November 8, 2022 earnings call, several senior colleagues repeatedly advised him about the true state of the business and urged him to be transparent with investors about Disney+'s worsening performance. In late September 2022, Chapek and McCarthy gave an executive presentation to Disney's Board of Directors previewing the Company's fourth quarter 2022 results. During the meeting, McCarthy bluntly told the Board that the quarter's financials

---

[40] Robbie Whelan and Sarah Krouse, *Disney+ Price Increase Shows Limits of Subscriber-Growth Push*, WALL ST. J. (Aug. 11, 2022), https://www.wsj.com/articles/disney-price-increase-shows-limits-of-subscriber-growth-push-11660256118.

were "on pace to be very bad."[41] McCarthy "told the Board that Disney's earnings that quarter would fall dramatically short of Wall Street's consensus estimate of 55 cents per share," and she relayed that this would be the largest miss relative to Wall Street's consensus estimates in a decade.[42] McCarthy blamed the miss on Disney's focus on subscriber growth over profitability and Chapek's restructuring. When colleagues later asked why she had gone off script, McCarthy explained "she hoped her honesty with the board would jar Chapek into realizing his rosy outlook of the business wasn't based on reality."[43]

246. During an October 2022 executive retreat in Orlando, Chief Communications Officer Kristina Schake and Head of Investor Relations Alexia Quadrani warned Chapek that investors would be upset by the Company's results, describing the coming reaction as potentially "devastating" to the Company.[44] Then, during a meeting on the day of the November 2022 earnings call, Disney's finance team again urged Chapek to acknowledge that the streaming division's net losses had more than doubled from the prior year.[45]

247. McCarthy was reportedly "appalled" by Chapek's conduct during the November 2022 earnings call, telling board members that she was unhappy with Chapek's statements to investors.[46]

### E.    The Truth Emerges

248. The relevant truth concealed by Defendants' misrepresentations,

---

[41] Alex Sherman, *Disney's wildest ride: Iger, Chapek and the making of an epic succession mess*, CNBC (Sept. 6, 2023), https://www.cnbc.com/2023/09/06/disney-succession-mess-iger-chapek.html.

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*

omissions, and artifices first began emerging in November 2021, when the Company revealed a slowdown in Disney+ subscriber growth. The full truth, however, would not be revealed to investors until more than a year-and-a-half later in May 2023. The scheme began to unravel quickly (along with significant investor losses) in November 2022 when Disney reported a streaming segment operating loss of ***$1.47 billion***. Disney finally revealed the full truth in May 2023 when Iger, who had by then taken over the CEO post again after Chapek was fired (along with Daniel's termination and McCarthy's resignation), admitted to investors that the Executive Defendants' scheme was simply "chasing subscribers" at the expense of profits.

**1. November 10, 2021: Disney Revealed a Significant Slowdown in Disney+ Subscriber Growth and that Disney+ Losses Would Continue Longer Than Previously Disclosed**

249.   On November 10, 2021, after the market closed, Disney reported its financial results for the fourth quarter of 2021 and fiscal year ended October 2, 2021. Disney reported a slowdown in Disney+ subscriber growth that missed Wall Street's expectations. The Company added only 2.1 million subscribers during the quarter, representing the smallest quarterly gain since Disney+ launched two years prior. This also placed Disney+ at 1.5 million short of the Wall Street's estimates of total subscribers. The Company also revealed that Disney+'s losses would continue to grow over the next several months. McCarthy disclosed: "we now expect that Disney+ will reach its peak year of losses in fiscal 2022 instead of fiscal 2021."

250.   On this news, the price of Disney's common stock declined by $12.34 per share, or 7.1%, on November 11, 2021. In sharp contrast, on the same date the S&P 500 Index increased 0.1% and an index of Disney's peers increased by 0.4%.

251.   Disney's disclosure, however, did not come close to revealing the full truth. To the contrary, and as described above (¶¶ 213-221), Defendants continued to make additional false statements to soothe the market and conceal the full truth concerning the longevity of Disney+ and the financial health of the Company.

252.   For example, during the Q4 2021 earnings call, Chapek and McCarthy

continued to assure investors that the subscriber and profitability targets would be met. Chapek said "*we're confident we are on the right trajectory* to achieve the guidance that we provided at last year's Investor Day, reaching between 230 and 260 million paid Disney+ subscribers globally by the end of fiscal year 2024, and with Disney+ achieving profitability that same year."

253.    During the same earnings call, Chapek announced that Disney+ would be *doubling* the number of countries and territories in which Disney+ operated by the end of 2023, and that the Company was increasing investment into local and regional content for its international markets. McCarthy also reiterated the Company's prior subscriber growth and profitability forecast, stating:

> As Bob mentioned, we are increasing our overall long-term content expense for Disney+, and . . . *we are well positioned* to achieve the subscriber target of 230 million to 260 million by fiscal 2024 that we laid out at last year's Investor Day. And we also remain confident in our expectation *that Disney+ will achieve profitability* in fiscal 2024.

254.    Defendants' false assurances worked. Based on these representations, investors and analysts understood (mistakenly) that Disney's disappointing results were a one-off. For example, following the November 10, 2021 earnings call, Cowen analysts highlighted: "Disney+ sub growth is expected to remain soft in H1:F22, but management reiterated confidence in the company's FY24 sub and profit targets." Morgan Stanley analysts stated: "[w]e continue to believe its [subscriber] guidance is achievable," even though "it will cost more . . . to get there." Credit Suisse analysts similarly reported: "Beyond mgmt indicating they are on the right trajectory to reach between 230m and 260m paid Disney+ subs globally by the end of FY24, they also reaffirmed Disney+ achieving profitability in FY24 despite exceeding guidance of $8B-$9B in FY24 content amortization laid out at the last Investor Day."

255.    Defendants continued to make similar false statements to calm the market. For example, On March 7, 2022, McCarthy stated that Disney was "well suited to achieve the subscriber guidance as well as the profitability guidance." On

May 11, 2022, Chapek said: "*[W]e're very confident that going forward we're going to hit both of those sub guidance and profitability guidance* by bringing in the cost at a reasonable level relative to their ability to attract and retain our subs." On August 10, 2022, McCarthy maintained she was "*confident that Disney+ will achieve profitability* in fiscal 2024." Rosenblatt Securities analysts said: "[W]ith an increased content budget, *we remain confident Disney+ will comfortably achieve 230-260M subscriber target and profitability in FY'24*."

### 2. November 8, 2022: Disney Reported a Staggering $1.47 Billion Operating Loss in its Streaming Segment

256. On November 8, 2022, Disney stunned investors by announcing devastating financial results for its fourth quarter and fiscal year ended October 1, 2022. During a disastrous conference call, Chapek revealed the Company's DTC segment reported a staggering quarter-end operating loss of $1.47 billion, more than *twice* the $630 million in losses it reported in the same quarter the year prior.

257. Analysts were astonished, given Defendants' previous misstatements. Investors and analysts had fully bought into the Executive Defendants' growth story and were blindsided by the staggering near-$1.5 billion loss. For example, going into the earnings call, analysts from MoffettNathanson had expected the Company to forecast 34% growth in one significant income measure. MoffettNathanson analysts reported: "*Rarely have we ever been so incorrect in our forecasting of Disney profits*."[47]

258. This loss revealed the devastating downstream effects of the Executive Defendants' unmitigated Disney+ content spending spree and scheme to push subscriber growth at any cost. Analysts expressed concern about the Company's current financial condition and its ability to deliver on its promise to achieve its

---

[47] Joe Flint and Robbie Whelan, *Bob Iger vs. Bob Chapek: Inside the Disney Coup*, WALL ST. J. (Dec. 17, 2022), https://www.wsj.com/articles/bob-iger-bob-chapek-disney-coup-11671236928

subscriber and profitability targets by fiscal 2024. For example, a Barclay's analyst wrote: "we believe Disney may face a choice between its subscriber growth guidance and its streaming breakeven guidance as we believe it may be tough to meet both."

259.    On this news, the price of Disney's common stock plummeted by $13.15 per share, or 13.2% in a single day on November 9, 2022. This was one of the largest one-day drops in the Company's history. By contrast, on the same date, the S&P 500 Index and an index of Disney's peers each declined by just 2.1%.

260.    However, Disney's disclosure did not reveal the full truth and Defendants continued to make additional false statements to soothe the market. For example, despite warnings from Disney's financial team, Chapek reassured investors during the earnings call that day. Chapek stated that Disney was pleased with Disney+ subscription growth and that Disney "***still expect[ed] Disney+ to achieve profitability in fiscal 2024***." Chapek added: "Disney+ is well situated to leverage our position for long-term profitability and success." These assurances stood in stark contrast to the information Chapek had received heading into the call (*supra* ¶¶ 245-247). Nevertheless, these false assurances kept Disney's stock price artificially inflated.

### 3.    November 20, 2022: Chapek is Fired and Replaced as CEO by Iger

261.    The November 8 earnings call was the end for Chapek. The *Wall Street Journal*, citing people close to the matter, reported that "McCarthy told board members that she wasn't happy with the way Mr. Chapek had communicated with investors during the conference call." According to *CNBC*, "in a highly unusual move, board members also set up discussions with Disney division heads, who rarely speak to directors outside formal meetings. Schake, McCarthy, Gutierrez, Walden, Bergman and D'Amaro all told either Arnold, Mark Parker or the entire board that they no longer supported Chapek as CEO, according to people familiar with discussions." Soon after, the Board decided to fire Chapek and asked Iger to return

as CEO. On November 20, 2022, Disney's Board stunned Wall Street by announcing Chapek's termination and his replacement as CEO with Iger.

### 4.   May 10, 2023: Iger Acknowledged Disney Needed to Completely Change Course, Unwind the Disney+ Business Model, and Take an Impairment Charge of $1.5 Billion

262.   Over the next few months, Iger began taking drastic measures to roll back the Executive Defendants' scheme. To start, he fired Daniel and began reorganizing the Company's media entertainment division, including ***dissolving DMED***. Iger's sharp reversal of the scheme also involved a massive content purge from Disney+ in an effort to unwind years of unsustainable spending. In order to do so, Disney was forced to write-off billions in content and take a massive $1.5 billion impairment charge as a result of the content purge and company reorganization.

263.   Iger announced these consequences, along with other disastrous news, to investors during the Company's Q2 2023 earnings call held May 10, 2023. During the call, Iger stunned investors by acknowledging that Disney needed to radically alter the Disney+ business model. Iger also announced that Disney+ would be shifting its focus away from subscription growth in order to "rationalize this business" and "head in the direction of profitability." *Bloomberg* reported that, during this earnings call, investors learned that Disney and Disney+ were even "in worse shape than Iger realized," when he had taken over CEO in November.[48] Iger revealed that achieving profitability would require a complete reversal of Chapek's growth-at-any-cost plan. Iger announced sweeping cost-cutting measures, emphasizing that "it's critical we rationalize the volume of content we're creating and what we're spending to produce our content," and further admitted that "we made a lot of content that is not necessarily driving sub growth." Iger also acknowledged the need to "recalibrate[e] our investments internationally" by exiting

---

[48] Thomas Buckley, *Has Bob Iger Lost the Magic?*, Bloomberg (Oct. 10, 2023), https://www.bloomberg.com/news/features/2023-10-10/has-bob-iger-lost-the-magic-inside-disney-ceo-s-billion-dollar-crisis

markets that lacked "profitability potential."

264.   Adding to the bleak outlook, McCarthy announced that DTC streaming losses were projected to increase in the following quarter. McCarthy also explained that Disney was "in the process of reviewing the content on our DTC services to align with the strategic changes . . . you've heard Bob discuss. As a result, ***we will be removing certain content from our streaming platforms and currently expect to take an impairment charge of approximately $1.5 million to $1.8 billion.*** And going forward, we intend to produce lower volumes of content in alignment with this strategic shift."

265.   The magnitude of the content purge was staggering. Out of 275 Disney+ original film and series titles, Disney ultimately removed at least 55, i.e., the equivalent of 1 in 5 original titles. Many of the shows that were removed were the same shows that the Executive Defendants had touted as driving subscriber numbers. For example, after spending $105.9 million on production of *Willow*, Disney pulled it from Disney+ in May 2023 after only one eight-episode season. Similarly, Disney's film, *Artemis Fowl*—which had a $125 million budget and was enthusiastically promoted by Disney—was removed from Disney+ in May 2023. Dozens of Disney's original shows and films were similarly written off, as Iger was forced to write-off billions in content to stop the runaway content costs left by Chapek and Daniel.

266.   Unsurprisingly, analysts were stunned, given the rosy picture the Executive Defendants had painted over the prior two and a half years. For example, analysts at TD Cowen wrote: "We are lowering our estimates driven mainly by DTC sub losses." A Barclays analyst labeled the earnings call a "reset," and wrote "[g]rowth narrative heavy on cost cuts and light on a revenue may not justify current valuation," and noted that the necessary cost-cutting could "result in the Disney+ subscriber base not increasing much from present levels." A UBS analyst noted "management provided more detail on the strategy to rationalize the DTC business."

J.P. Morgan analysts cited to the outlook for "Lower DTC Subs Long-Term."

267. As a result of the Company's disclosures, the price of Disney common stock declined by another $8.83 per share, or 8.7%, in a single day on May 11, 2023. By contrast, on the same day, the S&P 500 decreased only 0.1%, and an index of Disney's peers increased by 0.3%.

268. By the end of May 2023, Disney+ was a shell of the purportedly limitless platform investors had been promised. Just to break even, the Company had to unwind nearly every aspect of Chapek's Disney+. Disney initiated significant price hikes, lowered the marketing budgets, and, as noted above, purged significant amounts of content from the platform. These changes have resulted in modest, if any, subscriber growth targets with no chance that Disney+ ever reaches the Netflix-like subscriber base the Company once touted.

269. The unsustainable growth-at-any-cost scheme inevitably proved disastrous for investors. Meanwhile, Chapek, Daniel, and McCarthy walked away with millions in compensation and stock sale proceeds. By the end of May 11, 2023, Disney's stock price had declined by over $100 per share, or 55%, from its high after the Defendants' scheme was first initiated. The stock price has yet to recover.

## VI.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

270. Defendants made materially false and misleading statements in violation of Sections 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Among other things, Defendants made numerous false and misleading statements, omitted material facts necessary to make their statements not misleading, or failed to disclose adverse facts, related to: (a) Disney's DMED reorganization, (b) Disney+'s paid subscribers and subscriber growth, (c) Disney+ content, (d) Disney's DTC operating losses, (e) Disney's international growth, (f) Disney+'s churn, and (g) Disney+'s profitability.

### A.    DMED Reorganization

271.    During a March 1, 2021 Morgan Stanley Technology, Media and Telecom Conference, Chapek boasted "way before the rest of the world knew what we were going to do from an organizational standpoint, I began a socialization process of the idea . . . *And I'll tell you, we've had very strong buy-in*."

272.    On June 14, 2022, during a Credit Suisse Communications Conference, Chapek responded to a moderator's questions regarding the DMED reorganization. The moderator asked Chapek if there were "any bumps in the road implementing the new structure and all the new reporting lines on the content side of the house?" Chapek replied:

> *[I]t's really gotten very strong buy-in by our execs*. Obviously, a lot of socialization and collaboration went into that before we did that. But, I think, everyone appreciates the clarity and accountability and the fact that as we now double down on our content investment going forward as we announced in our December investor conference, everyone appreciates the fact that they've got more time to do what they do best, given this increase in output that we have. *We're ramping up in scale in this – ramping up scale in this new content, and it really enables on the other end, on the distribution end for, let's call it, an objective assessment for what's right for distribution for our company from an enterprise level given those changing consumer preferences over time*.

273.    The statements in ¶¶ 271-272 above concerning the DMED reorganization were false and misleading when made. Contrary to the assertion that the DMED reorganization was actually designed to enhance accountability and enable an objective assessment of what was right for distribution, the reorganization was actually designed to shift power to Chapek and Daniel. Using this power, they inflated subscriptions at the expense of profitability, including by (i) pushing content directly to Disney+ irrespective of greater revenue opportunities via theatrical releases and pay-per-view windows; (ii) hiding the costs associated with running Disney+ and the DTC business, and (iii) spending billions on content in order to

drive subscriber numbers, then utilizing accounting manipulations to conceal these costs and amortize those costs without regard for downstream profitability.

274. Former employees lend support to Plaintiffs' allegations. FE-14, a team lead within the marketing department at Disney+, recalled that DMED was put together to centralize power over budgets and marketing. FE-9 similarly recalled the reorganization was simply for power. FE-1 recalled that, under DMED, Chapek gave the studios a directive to "produce as much content as you can." FE-1 also explained that the studios were not restricted by cost: "[w]e would go back to the studios and tell them to cut costs, but the studios would say the costs are going up." FE-1 explained that the studios "didn't have P&L responsibility, only content to produce to get as many subscribers as possible." Thus, the studios "create[d] expensive content" and "losses were accumulating." Moreover, contrary to Chapek's claims that the reorganization was enhancing accountability and efficiency, "[i]nsiders said DMED hindered collaboration and brought inefficiency to the process of distributing Disney's content on its various platforms."[49]

275. Former employees also explained (and subsequent reporting has confirmed) that, contrary to Defendants' statements, the DMED restructure did not have "very strong buy-in" internally. FE-2 reported that the DMED reorganization was not favorably received internally and that "[m]ost of us were scratching our heads" about the purpose of the reorganization. He added: "I didn't talk to anyone who thought it was a good idea. The decision was made in a vacuum. It didn't help us in Streaming in any way." Likewise, FE-3 explained that the reorganization "ruffled the feathers of the majority of the creative engine," and he could sense a lack of enthusiasm for the DMED restructuring when employees no longer had

---

[49] Alison Brower, *CEO Bob Iger's return was celebrated by many at Disney, but company insiders are still bracing for layoffs and cuts in January*, BUSINESS INSIDER (Dec. 27, 2022), https://www.businessinsider.com/disney-insiders-surprised-relief-at-bob-iger-ceo-return-2022-11

influence over distribution decisions. FE-14 similarly explained that the reorganization was upsetting for filmmakers and the people who greenlight movies and marketed the stories.

276. The *New York Times* later reported that "[a]t least a dozen senior Disney executives [told] Mr. Chapek that the reorganization was a bad idea." This included Iger and longtime Disney executive Alan Bergman. In fact, Mr. Bergman was so unenthused with the restructuring that he turned down Chapek's offer to be the Chairman of DMED. Iger later admitted that the reorganization "created a huge divide between the creative side of the company, the content engines, movies and television and the monetization, distribution side of the company."

277. Moreover, during the timeframe the statements referenced in ¶¶ 271-272 were made, McCarthy sold Disney common stock, as detailed in ¶¶ 443-445. Each time McCarthy sold Disney common stock, McCarthy violated her duty to abstain from insider selling or disclose the adverse, material, non-public information set forth in ¶¶ 273-276.

## B. Paid Subscribers and Subscriber Growth

278. During Disney's December 10, 2020 Investor Day, McCarthy assured investors that Disney "will continue providing the key metrics that help you understand our progress." McCarthy then stated that as of December 2, 2020, Disney had 86.8 million "paid" Disney+ subscribers.

279. On February 11, 2021, Disney released its Fiscal 2021 Form 10-Q, and McCarthy and Chapek participated in an earnings call with analysts. This was Disney's first earnings call since Chapek announced the 230 million to 260 million subscriber target. Disney's Fiscal Q1 2021 Form 10-Q stated that there were 94.9 million Disney+ "paid" subscribers as of the end of Fiscal Q1 2021. During the call, McCarthy stated that Disney had 94.9 million "paid" Disney+ subscribers at the end of Q1, adding that Disney "***saw strong additions to our subscriber base*** from our November launch in Latin America."

280.   On May 13, 2021, Disney released its Fiscal Q2 2021 Form 10-Q, and McCarthy and Chapek participated in an earnings call with analysts. Disney's Fiscal Q2 2021 Form 10-Q stated that there were 103.6 million "paid" subscribers at the end of Fiscal Q2 2021. During the earnings call, Chapek announced that Disney+ "amassed nearly 104 million *paid* subscribers as of the end of the second fiscal quarter." McCarthy reiterated these points, stating "we had almost 104 million Disney+ *paid* subscribers at the end of the second quarter. At our Annual Meeting, we announced we had reached 100 million global *paid* subscribers. We reached that milestone in early March, so we added subs at a faster pace in the last month of the second quarter than we did in the first two months."

281.   On August 12, 2021, Disney released its Fiscal Q3 2021 Form 10-Q. McCarthy and Chapek participated in an earnings call with analysts. Disney's Fiscal Q3 2021 Form 10-Q reported that there were 116 million paid Disney+ subscribers as of Fiscal Q3 2021. During the call, Chapek reported that "Disney+ . . . performed incredibly well, with 116 million" subscribers. McCarthy added: "As Bob mentioned earlier, we ended the third quarter with 116 million global paid subscribers to Disney+, up from approximately 104 million in the second quarter." McCarthy added that "*subscriber growth was also solid at our core Disney+ markets* excluding Disney+ Hotstar with total quarter-over-quarter net adds in those markets consistent with net adds from Q2."

282.   On November 10, 2021, Disney released its Fiscal 2021 Year End 10-K, and Chapek and McCarthy participated in an earnings call with analysts. Disney's Year End Fiscal 2021 Form 10-K reported that there were 118 million paid Disney+ subscribers as of Fiscal Year End 2021. During the call, Chapek announced: "we are extremely pleased with the success of our portfolio of streaming services. Disney+, ESPN+ and Hulu continue to perform incredibly well with 118.1 million, 17.1 million, and 43.8 million subscribers respectively for a total of 179 million subscriptions. *To put this growth in perspective, in the past fiscal year alone, we*

*have grown the total number of subscriptions across our DTC portfolio by 48%, and Disney+ subs in particular by 60%*." McCarthy stated, "we ended the fourth quarter and the fiscal year with over []118 million global paid Disney+ subscribers, reflecting over 2 million net additions from Q3, in line with the subscriber guidance we gave in September."

283.   On February 9, 2022, Disney released its Fiscal Q1 2022 10-Q, and Chapek and McCarthy participated in an earnings call with analysts. Disney's Fiscal Q1 2022 Form 10-Q reported that there were 129.8 million paid Disney+ subscribers as of Fiscal Q1 2022. During the earnings call, Chapek reported "11.8 million Disney+ subscribers" were added in Q1 2022. McCarthy reiterated this point, adding: "[w]e ended the quarter with nearly 130 million global paid Disney+ subscribers reflecting over 11 million net additions from Q4."

284.   On May 11, 2022, Disney released its Fiscal Q2 2022 10-Q. Chapek and McCarthy participated on an earnings call with analysts. Disney's Fiscal Q2 2022 10-Q reported that there were 137.7 million paid Disney+ subscribers as of Fiscal Q2 2022. During the investor call, Chapek reported to investors that Disney ended the quarter with an additional "7.9 million Disney+ subscribers, keeping us on track to reach 230 million to 260 million Disney+ subscribers by fiscal 2024." McCarthy stated: "[w]e ended the quarter with nearly 138 million global paid Disney+ subscribers, reflecting close to 8 million net additions from Q1."

285.   On August 10, 2022, Disney released its Fiscal Q3 2022 10-Q. McCarthy and Chapek participated in an earnings call with analysts. Disney's Fiscal Q3 2022 Form 10-Q also reported that there were 152.1 million paid Disney+ subscribers as of Fiscal Q3 2022. During the call with analysts, Chapek announced that Disney had "*significant subscriber growth at our streaming services*, which added . . . 14.4 million Disney+ subscribers." During the same call, McCarthy announced: "At Disney+, we crossed the 150 million subscriber milestone and ended the third quarter with more than 152 million global paid subscribers, a net addition

of more than 14 million subs versus Q2. Strong Disney+ core net subscriber additions of 6 million *reflect growth in existing markets, as well as launches in over 50 new markets during the quarter*. And we currently expect Disney+ core net additions in the fourth quarter to accelerate modestly versus Q3, particularly in the domestic market."

286.    On November 8, 2022, Disney released its Fiscal Year End 2022 10-K. Chapek and McCarthy participated on an earnings call with analysts. Disney's Fiscal Year End 2022 Form 10-K also reported that there were 164.2 million paid Disney+ subscribers as of Fiscal Year End 2022. During the call with analysts, Chapek announced, "[w]e are particularly pleased with growth in the fourth quarter, which saw the addition of . . . 12 million Disney+ subscriptions." McCarthy added: "Disney+ added over 12 million global subscribers . . . . Core Disney+ added over 9 million subs in Q4… as expected, versus the 6 million net adds we saw in the third quarter, *reflecting the success of Disney+ Day and our [Tempo] content releases in addition to continued growth from third quarter market launches*."

287.    The statements highlighted above in ¶¶ 283-291 concerning Disney+ "paid" subscriber metrics and positive statements concerning quarterly subscriber growth were false and misleading when made for a number of reasons.

288.    *First*, Defendants concealed from investors that the reported subscriber growth was the result of unsustainable growth tactics intended to convince Wall Street that Disney+ was on track to hit the 230-260 million subscriber target. Chapek and McCarthy further concealed that these growth-at-any-cost tactics targeted "low-quality" subscribers who were likely to churn (that is, leave the Disney+ platform). As FE-1 explained: "The Company let Wall Street run the show," and there was tremendous pressure to "hit subscriber numbers and revenue targets." This "Wall Street runs the show" mentality was similarly recalled by FE-8, who noted that every big decision was filtered through whether it would increase subscriber growth and how it looked to Wall Street. According to FE-1, "[e]very day it was all hands on

deck, discussing how will we meet the aggressive targets" handed down by Chapek and Daniel, and these targets could change "based on the performance [of the streaming business] during a quarter." FE-15 similarly recounted the "all hands on deck" mentality at the time. FE-1 also stated that, "[w]e all listened to earnings calls," then "teams sent communiques: 'here's the consensus from analysts: Disney+ should see this quarter-to-quarter subscriber growth.' Our goal would [then] be that." And if the internal goal was lower than analysts' consensus, FE-1 said: then "we had to find ways to be in range." After FE-1 received the new target, he would "start analyzing what levers we could pull to get there – churn, partnerships, etc." Likewise, FE-15 noted that Chapek was very reactionary to whatever the press was saying and that FE-15's "roadmap" changed constantly as a result.

289.   *Second*, Disney concealed key churn metrics, which would have informed investors that the subscriber growth was unsustainable, temporary, and low quality. According to FE-1, Defendants tracked Disney+ churn data "very closely," and churn was "a big topic, always, both at Hulu and Disney+," and "the most important thing." Churn was a constant problem at Disney+, so much so that it was referred to as "the leaky bucket," because "[n]o matter how much water you put in, some leaks out." Many other FEs, including FE-9, FE-12, and FE-13, all similarly recalled discussions of churn on the platform.

290.   *Third*, Defendants misleadingly referred to every subscriber as a "paid subscriber." The reality was that a growing number of those subscribers received the service for free, at a discounted price, or never actually subscribed. Disney further concealed that aggressive promotions resulted in low-quality subscribers that would eventually cancel their Disney+ subscriptions rather than pay full price. These subscribers were low quality because they were unlikely to ever pay full price for the service, and were much more likely to churn, so counting them as full "paid subscribers" was misleading. According to FE-4, for Disney's partnership promotions, Disney+ negotiated a number of minimum guaranteed subscribers with

the partner. FE-4 explained that "there was an effort to bring minimum guaranteed subscribers in the reporting," such that the full minimum guarantee would be counted as paid subscribers. FE-4 stated that Disney differentiated between people "entitled" to a subscription versus those who actually "activated" their subscription. FE-4 said that Disney made the decision to count the "entitled" people, as well as the "activated" people, as "paid subscribers." For example, FE-13 explained that Verizon customers who received Disney+ promotions automatically became Disney+ members, and they were counted as paid subscribers even if they never activated their accounts. The same was true for customers of similar "bundle packages" that were counted as Disney+ "paid subscribers." FE-1 reported similarly that, Verizon customers who received Disney+ promotions "automatically became Disney+ members." Notably, Disney would pull different levers, such as utilizing these partnerships, in order to meet Wall Street's consensus quarter-on-quarter subscriber growth. FE-6, who worked with Verizon on the arrangement, confirmed that the Verizon deal inflated Disney+ subscription numbers with customers that would likely churn, and "there should have been an expectation that customers wouldn't renew after 12 months."

291.    The Company later acknowledged that it chased low quality subscriber growth through aggressive promotions. Iger acknowledged that, "in our zeal to go after subscribers, I think we might have gotten a bit too aggressive in terms of our promotion." Iger also admitted that the "promotion to chase subs that we've been fairly aggressive at globally wasn't absolutely necessary." Iger promised investors that, moving forward, Disney would "grow quality subs that are loyal and where we actually have the ability to price effectively to those subs."

292.    *Fourth*, Disney launched Disney+ in international markets solely to generate subscriber growth. Despite already launching in its most lucrative markets, Disney proceeded to launch in many international markets that were unprofitable and characterized by highly discounted subscription fees and high costs to provide

local content and operate the platform. FE-2 confirmed that Disney "struggled to get content in other regions and with the regulatory bodies – especially in Europe – around privacy regulations." He also acknowledged that "a launch in individual markets would create a short-term bump." When Iger returned as CEO, he quickly admitted that Disney needed to withdraw from these unprofitable markets, stating: "[w]e launched Disney+ in many markets around the world, including many very low ARPU markets. . . . we spend a lot of money on marketing in those markets and we spend money on local content." Iger added: "as we rationalize this business and we head in the direction of profitability, clearly, we're looking at opportunities to reduce expenses in those markets where the revenue potential just isn't there."

293.    *Fifth*, Disney aggressively spent on creating content in an effort to chase subscribers, to the detriment of profitability. After the DMED reorganization, Chapek set out to "flood the so-called digital shelves with as much content as possible to achieve . . . as much sub growth as possible." According to FE-1, Chapek gave the directive to "produce as much content as you can," and stated that "[t]he game will be won by whoever has the most content." FE-10 similarly recalled that everything they were doing at Disney streaming felt like they had a blank check. Under Chapek and Daniel, content spend exceeded $30 billion per year. When FE-1 balked at the amounts the studios spent to make content, another senior executive would say: "Let's add $100 million to the revenues plan to make that work. We would need to find $100 million in revenues to offset the costs" of production. This exorbitant content spend ultimately led to runaway content costs and massive operating losses. Disney ultimately admitted that it was "chasing [subscribers] with . . . aggressive spend on content." Iger also acknowledged: "it's critical we rationalize the volume of content we're creating and what we're spending to produce our content."

294.    *Lastly*, contrary to Chapek and McCarthy's assertions that new content would generate subscriber growth, Disney produced content irrespective of whether

it grew subscribers. FE-1 confirmed that Chapek was more concerned about quantity over quality with respect to content. FE-1 stated that the content being produced was "not driving subscriber growth." As FE-1 stated: "[W]e knew what kind of content we needed. We needed unscripted reality content. But Disney doesn't do that. They did one-hour dramas and comedies. But those didn't have the same effect" on subscriber growth. FE-1 provided data to the studio heads that "gave the lay of the land for how the content was performing." The data indicated how appealing the show was, the show's quality, and how many viewers were brought to the service by a show. But Defendants ignored this data and instead continued under Chapek's directive to produce mass volumes of content to convince Wall Street that mass content was synonymous with subscriber growth. After Chapek was fired and Iger had taken over once again, he admitted that Disney's expensive content did not fuel subscriber growth: "we made a lot of content that is not necessarily driving sub growth."

295. The Defendants also restricted access to the inculpatory data. FE-6 confirmed that "Data was held closely internally" and "[t]here was not access for the vast majority of teams to data on subscribers. Most of us only got information from earnings reports." FE-7[50] confirmed that the process for obtaining access to data was "long and annoying." He said that the "Disney side" – the non-streaming side of the business – "complained they didn't have access to data" concerning the streaming business. Those on the non-streaming side of the business, who were mostly "creatives, those who created content," complained about the difficulty in accessing data.

---

[50] FE-7 was employed as an executive in Disney's Engagement and Retention Analytics group throughout the Relevant Period. FE-7's responsibilities included helping to aggregate and refine data on the retention and engagement of Disney+ subscribers in the Disney Streaming business. FE-7 was also part of a team called Data Governance which established rules on who at the Company could have access to data on subscriptions, retention, churn, and engagement.

296.   During the timeframe the statements referenced in ¶¶ 278-286 were made, McCarthy sold Disney common stock, as detailed in ¶¶ 443-445. Each time McCarthy sold Disney common stock, McCarthy violated her duty to abstain from insider selling or disclose the adverse, material, non-public information set forth in ¶¶ 288-295.

### C.   Disney+ Content

297.   On December 10, 2020, during Investor Day, Daniel, who had recently become Chairman of DMED told investors:

> And as Bob mentioned, consumer behavior really does drive our decision making. While we have always valued the data gained through our numerous consumer touch points, the rapid growth of our portfolio of D2C services provides us with an even greater opportunity to understand their preferences. And we are using these insights to help determine how to optimally engage with our audiences. In fact, *our team uses all of the information available to us when determining how best to allocate our annual creative content budgets across platforms with the goal to maximize both audience engagement and commercial impact*.

298.   On May 13, 2021, during Disney's Fiscal Q2 2021 earnings call, an analyst asked Chapek what was driving Disney+ subscriber growth. Chapek responded, in part:

> First of all is our content slate. As you know, *we're spending a lot of money across our variety of franchises in order to create the content that's going to keep consumers coming back and keep not only our sub number growing, but also our engagement growing across all of our platforms*. So, the first one is content slate.

299.   On September 21, 2021, during a Goldman Sachs Communacopia Conference, Chapek continued to insist that the abundance of Disney+ content was a driver of subscriber growth:

> As you know, last December when we had our Investor Day 2.0, we announced a pretty big amplification of our content. And right now our focus is making all the things that we said we would make, ramping up our production, but most importantly not just making more stuff, but

making great stuff. And that's the thing that's pleased me the most out of everything that came out of Disney+ Day is the quality and the resonance of everything across all of our different brand platforms, how great it is. So for us, it's now about executing what the plan was as opposed to going out and buying more or even amping up our production again. But what we have done since then has taken even our Fox Studios and really amplified what they're making for our services, and then you've got the local productions that I mentioned across the world. ***So, we've got plenty of product in the pipeline coming, and I think that's going to be enough to fuel that growth, again, that we're confident about delivering in the long term.***

300.    On November 10, 2021, during a conference call, McCarthy reiterated that Disney+ content would drive 230 million to 260 million subscriber mark and profitability by fiscal 2024:

> ***As Bob mentioned, we are increasing our overall long-term content expense for Disney+, and we believe we are well-positioned to achieve the subscriber target of 230 million to 260 million by fiscal 2024 that we laid out at last year's Investor Day. And we also remain confident in our expectation that Disney+ will achieve profitability in fiscal 2024.***

301.    During the same November 10, 2021 conference call, Chapek added:

> Michael, your first question was about sort of the kink of the supply chain, if you will, of new content coming into the service and its impact on our net sub adds. As you can probably suspect in a world of Direct-to-Consumer, we have a lot of information, a lot of data. And we have a pretty good idea of what the marginal impact of a particular title might be to our service. ***And we always say that library titles tend to increase engagement and minimize churn, but new titles, new content, whether they're movies or series, actually add new subs. And that is actually the reason why we're pretty confident that the increase in content flow towards the second half of fiscal 2022 will actually lead to the types of results that we're anticipating.***

302.    On May 11, 2022, during Disney's Q2 2022 earnings call, Chapek stated the following regarding Disney+ projections and content:

> ***So, as you know, we're very carefully watching our content cost***

*growth*. And we've reaffirmed as you heard earlier, our targets, our guidance on both subs and on profitability. ***So, we think they move together. It's obviously a balancing act, but we believe that great content is going to drive our subs and those subs then, in scale, will drive our profitability. So we don't see them as necessarily counter***. We see them as sort of consistent with the overall approach that we've laid out . . . so even though we're adding a lot of content both in local international and as well in the general entertainment area, it doesn't come at the per-title level, if you will, that we've been seeing sort of to-date on our general franchise films.

That said, we're balancing all three, ***and we're very confident that going forward we're going to hit both of those sub-guidance and profitability guidance and by bringing in the cost at a reasonable level, relative to their ability to attract and retain our subs.***

\*       \*       \*

So as we sort of take each of these elements when we get a new piece of content, we'll look at first view, [we'll] look at engagement, we'll look at the amount of time they spend [on] it, and we can model, we can do a lot of modeling ***and that modeling suggests that in addition to things like local market content, new content coming online, both in terms of general entertainment and from franchises, as well as new markets being added that [] Disney+ guidance is going to be very achievable for us both in terms of the sub adds and in terms of the operating performance***.

303.   The statements highlighted above in ¶¶ 297-302 were materially false and misleading when made.

304.   *First*, contrary to Defendants' statements, Disney was not producing content based on consumer preference, internal engagement data, or any other measure of growth. Instead, according to FE-1, Chapek had given the directive to produce as much content as possible and the content that was produced for Disney+ was "not driving subscriber growth." Both FE-1 and FE-10 recalled a focus on quantity over quality with respect to content. Like FE-1, FE-9 recalled that the outsized spending was not producing in kind subscriber growth.

305.   As FE-1 stated: "we knew what kind of content we needed. We needed

unscripted reality content. But Disney doesn't do that. They did one-hour dramas and comedies. But those didn't have the same effect" on subscriber growth. FE-1 provided data to the studio heads that "gave the lay of the land for how the content was performing." The data indicated how appealing the show was, the show's quality, and how many viewers were brought to the service by a show. Defendants ignored this data and instead continued under Chapek's directive to produce mass volumes of content to convince Wall Street that content was synonymous with subscriber growth.

306.  Iger ultimately admitted that Disney's expensive content did not fuel subscriber growth and that Disney "made a lot of content that is not necessarily driving sub growth."

307.  *Second*, the Company ultimately admitted that it was "chasing [subscribers] with . . . aggressive spend on content" to the detriment of profitability. As part of the scheme, Chapek set out "to flood the so-called digital shelves with as much content as possible to achieve . . . as much sub growth as possible." Content spending exceeded $30 billion per year and ultimately led to runaway content costs and massive operating losses. FE-1 confirmed that Chapek directed the studios to "produce as much content as you can." When FE-1 balked at spending what the studios requested to make the content, another senior executive would say, "let's add $100 million to the revenues to offset the costs" of production." FE-1 explained "they just spent too much money making too much content."

308.  Later, Iger acknowledged that, under Chapek's regime, the Company had produced an excess amount of Disney+ to the detriment of profits. In undoing damage, Iger acknowledged that "it's critical we rationalize the volume of content we're creating and what we're spending to produce our content." Iger added that, moving forward, Disney would "reduce costs, both in content and of course, infrastructure." In an effort to undo the damage of Chapek and Daniel's mass spending, Iger slashed the content budget by more than 35%, stating that Disney

"intend[ed] to produce lower volumes of content." The Company also announced that they would be removing certain content from Disney+, including much of the same content that Chapek had touted a few months earlier, resulting in "an impairment charge of approximately $1.5 billion to $1.8 billion."

309.    *Third*, unbeknownst to investors at the time, the Company artificially shifted costs between divisions to mask the growth in Disney+ content costs and DTC operating losses. Defendants purposely debuted certain content intended for Disney+ initially on Disney's legacy distribution channels before making the shows available on Disney+. This accounting manipulation allowed Defendants to artificially shift content and marketing costs from the Disney+ and DTC businesses to the linear network division. As the *Wall Street Journal* reported, Chapek and Daniel's strategy to shield losses in Disney's streaming division weighed on McCarthy: "'Cute,' she said disparagingly of the move during a conference call with colleagues." In a separate article, the *Wall Street Journal*, reported, "Ms. McCarthy was concerned about this [cost shifting strategy]."

310.    *Fourth*, Defendants manipulated Disney's accounting model to conceal the impact of runaway costs from investors. Defendants paid production costs upfront, but delayed recognition of costs for new shows and films by spreading out production costs over multiple quarters. Defendants had full visibility into the amounts and increasing accumulation of future content costs before they were reported to investors, and they used Disney's accounting model to delay the recognition of content costs and mislead investors. According to FE-1, the "accounting treatment of content-cost recognition, in which costs are spread across the useful life of the content, means you don't see the immediate hit to the P&L. The losses start accumulating." As FE-1 explained, "[i]t's OK if you have one piece of content. But if you have thousands of $25 million content, as your portfolio grows, your losses increase." Chapek himself later admitted that during his tenure, content costs were "com[ing] through the [flood]gate and . . . hitting us all at once" and

needed to be "normalized very, very quickly."

311.   *Fifth*, Disney failed to remove underperforming shows and films from the Disney+ platform, meaning Disney was stuck recording billions of dollars of costs on content that was not delivering subscribers. FE-1 explained that Disney had to write off a show and declare it as an impaired asset in order "to take it off the platform." According to FE-1, removing an underperforming show is "good practice" because "[y]ou can remove them and license them to other organizations to generate revenue." But, as FE-1 recalled, Disney refused to remove shows because, optically, it would have looked bad to remove content. Tellingly, after Chapek was fired, Disney cut over 50 of the same shows and films that Chapek had touted just quarters earlier.

312.   During the timeframe the statements referenced in ¶¶ 297-302 were made, McCarthy sold Disney common stock, as detailed in ¶¶ 443-445. Each time McCarthy sold Disney common stock, McCarthy violated her duty to abstain from insider selling or disclose the adverse, material, non-public information set forth in ¶¶ 305-311.

**D.   DTC Operating Losses**

313.   On February 11, 2021, Disney released its Q1 2021 financial results, and McCarthy and Chapek participated on an earnings call with analysts. Disney's Fiscal Q1 2021 Form 10-Q reported that "[t]he operating loss from Direct-to-Consumer decreased $644 million, to $466 million from $1,110 million, due to improved results at Hulu, and to a lesser extent, at Disney+ and ESPN+." During earnings call, McCarthy stated:

> Moving on to direct-to-consumer, ***improved results at all three of our streaming services drove an improvement in direct-to-consumer operating results of nearly $650 million versus the prior year***. Last quarter, we guided to direct-to-consumer operating income declining by $100 million versus the prior year under our former segment structure. ***Our reported results are $750 million higher than that guidance***.

314.   McCarthy added: "[w]hile some of the outperformance reflects better-than-expected results from Hulu and Disney+, the majority of the variance relates to the elimination of intersegment pricing markups under our new financial reporting structure." McCarthy declined to provide any further details on the impact of the reporting change.

315.   On May 13, 2021, Disney released its Q2 2021 financial results, and McCarthy and Chapek participated on an earnings call with analysts. Disney's Fiscal Q2 2021 Form 10-Q stated: "The operating loss [for the six months ended April 3, 2021] from Direct-to-Consumer decreased $1,159 million, to $756 million from $1,915 million, due to improved results at Hulu, and to a lesser extent, ESPN+ and Disney+." On the earnings call, McCarthy reported that: "direct-to-consumer operating income improving modestly versus the prior year. Actual [direct-to-consumer operating] results came in significantly better versus the prior year due to Hulu advertising sales upside, lower content and marketing expense at Hulu and Disney+, and better-than-expected ESPN+ pay-per-view results." On the same call, an analyst asked: "you guys have consistently beat us on [Operating Income] profits or lack of losses, I'd say, on DTC. Which of the platforms is providing the biggest surprise?" McCarthy omitted any reference to the reporting change and merely responded: "Look, the biggest drivers for direct-to-consumer were coming out of Hulu and Disney+."

316.   Disney's Fiscal Q3 2021 Form 10-Q stated: "The operating loss [for the nine months ended July 3, 2021] from Direct-to-Consumer decreased $1,490 million, to $1,049 million from $2,539 million, due to improved results at Hulu and to a lesser extent, ESPN+."

317.   Disney's Fiscal 2021 10-K stated: "Operating loss from Direct-to-Consumer decreased $1,234 million, to $1,679 million from $2,913 million due to improved results at Hulu and, to a lesser extent, ESPN+, partially offset by a higher loss at Disney+."

318. The statements highlighted above in ¶¶ 313-317 were false and misleading when made.

319. *First*, in making these statements, Defendants omitted that the Company artificially shifted costs between divisions to mask the growth in Disney+ content costs and DTC operating losses. Defendants purposely debuted certain content intended for Disney+ initially on Disney's legacy distribution channels before making the shows available on Disney+. As FE-9 recounted, these shifting tactics were hugely disruptive and their team had to halt everything with scheduling. In truth, this accounting manipulation allowed Defendants to artificially shift content and marketing costs from the Disney+ and DTC businesses to the linear network division. The *Wall Street Journal* reported that Chapek and Daniel's strategy to shield losses in Disney's streaming division weighed on McCarthy: "'Cute,' she said disparagingly of the move during a conference call with colleagues." In a separate article, the *Wall Street Journal*, reported, "Ms. McCarthy was concerned about this [cost shifting strategy]."

320. *Second*, Defendants utilized the DMED reorganization to reset the cost basis of Disney+ content and mask the growing content costs and DTC operating losses. Before DMED, Disney had separate film and general entertainment studio divisions that produced content and then sold the content to a separate Disney+ streaming division at fair market value. The studio divisions would then recognize the revenue, including the profit markup, on their books while Disney+ would recognize the full costs they paid for the content, including the profit markup, on their books (which then flowed through to DTC segment level operating results). Under DMED, Defendants eliminated this structure and instead consolidated the studio divisions into the new DMED division. In doing so, Defendants eliminated the intersegment studio content sales, which allowed Disney+ to record its content purchase at the much lower actual production cost than the higher fair market value, thereby boosting Disney+ and DTC profitability metrics.

321.   For example, as shown in the chart below, in Q1 2021, the first quarter the DMED reporting change took effect, the impact amounted to several hundred million dollars in DTC operating losses. Rather than the $1.2 billion DTC operating loss Disney was expected to report in Q1 2021, the Company reported a loss of just $466 million.

|  | Pre-DMED reporting change | Post-DMED reporting change | % difference |
|---|---|---|---|
| Q1 2021 DTC Operating Loss | ($1.162 billion)[51] | ~$466 million[52] | ~60% |

322.   For each quarter in FY 2021, the reporting change materially impacted Disney's year-over-year comparison of DTC operating losses. The result was a mismatched comparison of content costs which were significantly higher under the prior reporting structure than under the DMED structure, despite the fact that content costs were actually ballooning. Defendants concealed the impact of this accounting change from investors. For example:

- In Q1 2021, McCarthy omitted the full impact of the DMED reporting change. Although McCarthy acknowledged the impact of the accounting change during the earnings call, she left her explanation intentionally vague and omitted the exact financial impact of the DMED reporting change on the DTC year-over-year comparison. Instead, McCarthy referenced "improved results at all three of our

---

[51] On the Q4 2020 call, prior to the reporting change, McCarthy stated: "we expect the Q1 [2021] operating results of our DTC businesses to decline by approximately $100 million relative to the prior year quarter." The Q1 2020 DTC operating loss was $1.062 billion. Thus, the expected DTC operating loss for Q1 2021 was $1.162 billion.

[52] Rather than the expected $1.162 billion loss under the pre-DMED structure, Disney reported a loss of just $466 million under the new reporting structure. Disney noted: "the majority of the variance relates to the elimination of intersegment pricing markups under our new financial reporting structure."

streaming services," including Disney+, as a driver of the improved results. In reality, the improved results at Disney+ were the direct result of the DMED reporting change. Most analysts did not mention the reporting change at all. Certain analysts commented on McCarthy's vague reference to the accounting change, noting "the accounting mechanics here are a bit opaque" and that the "new segment reporting limits comparability." Meanwhile, almost every analyst commented on the better-than-expected DTC results. For example, analysts noted: "direct-to-consumer losses were well ahead [of our expectations], supporting our view that profitability could come a year earlier than the FY24 guide"; "DTC cut its losses by more than half"; "DTC segment OI of -$466mn, which significantly outperformed our expectations." Analysts were thus misled by McCarthy's explanation and were therefore surprised by the purported improvement in DTC results.

- In Disney's Q1 2021 Form 10-Q, Chapek and McCarthy removed any reference to the DMED reporting change, despite the fact that it was the biggest driver of the improved DTC operating loss results.

- In Q2 2021, McCarthy responded to an analyst question regarding "beat[ing] [analysts] on [Operating Income] profits of lack of losses . . . on DTC." In her response, McCarthy omitted any reference to the DMED reporting change and instead responded, "[T]he biggest drivers for direct-to-consumer were coming out of Hulu and Disney+." McCarthy's response was misleading because she knew the reporting change was the biggest driver of the improved DTC operating results.

- Disney's Forms 10-Q for Q2 2021 and Q3 2021 and Form 10-K for FY 2021 omitted any referenced to the DMED reporting change, despite the fact that Chapek and McCarthy knew it was a significant driver of the improved results.

323.   During the timeframe the statements referenced in ¶¶ 313-317 were made, McCarthy sold Disney common stock, as detailed in ¶¶ 443-450. Each time McCarthy sold Disney common stock, McCarthy violated her duty to abstain from insider selling or disclose the adverse, material, non-public information set forth in ¶¶ 319-322.

**E.    International Growth**

324.   During Disney's fiscal Q3 2021 earnings call in August 2021, Chapek stated:

> So our retention is very healthy across the globe. We're really, really pleased with that, and I think again it really goes back to the price value that we're offering our guests . . . So the fact that our churn is so low, our engagement is so high, our retention is so high [amongst] the local quarters where we're taking price increases I think says everything about it.

325.   On November 10, 2021, during Disney's fiscal year end 2021 earnings call, Chapek stated the following about international growth:

> We are expanding our global reach by introducing Disney+ in additional markets around the world. The service is now available throughout Japan, and we're thrilled to be launching it this Friday on Disney+ Day in South Korea, in Taiwan, and in Hong Kong on November 16. In just two short years, we are now in over 60 countries and more than 20 languages***, and next year, we plan to bring Disney+ to consumers in 50-plus additional countries, including in Central, Eastern Europe, the Middle East, and South Africa. Our goal is to more than double the number of countries we are currently in to over 160 by fiscal year 2023.***

326.   On the same call, Chapek added:

> [I]n terms of getting the growth rate back up to where it's been historically is really going to come in the third and the fourth quarters. ***The third quarter will be powered not necessarily by the content but by the number of adds that we have in terms of markets. Our number of markets that we're going to add will essentially double to more than 160 by FY 2023, and that will propel us in the third quarter. And the fourth quarter will be more of a function of that***.

327.    During Disney's Fiscal Q1 2022 earnings call, Chapek continued to hype international market launches as driver of subscriber growth, and touted local content as a driver of international subscriptions:

> The other thing, though, to your question directly on international that's going to drive the international business is the predominance of local content that we are developing in order to appeal to the unique taste of each of those international markets, and I'll point out to the 340 productions that we referenced on the last call that we're developing. And by the way, we just created a new organization within our company to shepherd the development of that content, so that we can maximize the chance that we get some global hits, if you will, out of some of that local content.

328.    Chapek continued the narrative during the Company's Fiscal Q2 2022 earnings call:

> We currently have over 500 local original titles in various stages of development and production. 180 of those titles are slated to premiere this fiscal year, increasing to over 300 international originals per year in steady-state. **_We believe these premium local originals, along with branded content with broad international appeal will attract new subscribers and drive engagement._**

329.    On August 10, 2022, during Disney's Q3 2022 earnings call, McCarthy also attributed subscriber growth to Disney+'s launch in 50 international markets: "strong Disney+ core net subscriber additions of 6 million **_reflect growth in existing markets, as well as launches in over 50 new markets during the quarter_**."

330.    The statements highlighted above in ¶¶ 324-329 were false and misleading when made. Chapek and McCarthy's statements that Disney+'s launches in international markets was going to increase subscriber growth concealed that Disney+'s paid subscriber growth had stalled and that further international subscriber growth was an unprofitable endeavor to grow subscribers at all costs. Despite already launching in its most lucrative markets, Disney proceeded to launch

in many international markets that were unprofitable and characterized by highly discounted subscription fees and high costs to provide local content and operate the Disney+ platform. As FE-2 noted, Disney "struggled to get content in other regions and with the regulatory bodies – especially in Europe – around privacy regulations." He also acknowledged that "a launch in individual markets would create a short-term bump" in new subscribers. FE-9 similarly recounted how Disney was spending exorbitantly on international expansion.

331. Iger later admitted that the second phase of international markets was not rationally aimed at achieving profitability. Iger acknowledged: "[w]e launched Disney+ in many markets around the world, including many very low ARPU markets . . . . we spend a lot of money on marketing in those markets and we spend money on local content." Contrary to Chapek and McCarthy's statements, Iger admitted that Disney needed to withdraw from unprofitable international markets: "[s]o as we rationalize this business and we ***head in the direction of profitability***, clearly, we're looking at opportunities to reduce expenses in those markets where the revenue potential just isn't there." Iger also conceded that a number of international markets were hindering profitability, stating that "not all markets are created equal. And in terms of our march to profitability, one of the ways we believe we're going to do that is by creating priorities internationally."

332. During the timeframe the statements referenced in ¶¶ 324-329 were made, McCarthy sold Disney common stock, as detailed in ¶¶ 443-445. Each time McCarthy sold Disney common stock, McCarthy violated her duty to abstain from insider selling or disclose the adverse, material, non-public information set forth in ¶¶ 330-331.

## F. Disney+ Churn

333. On February 11, 2021, during Disney's Q1 2021 earnings call, McCarthy stated: "[s]o in regard to the specific churn related to the anniversary of the Verizon launch promotion from last November 2020, we're really happy with

the conversion numbers that we have seen there going from the promotion to become paid subscribers."

334.   On June 14, 2021, during a Credit Suisse Communications Conference, Chapek misleadingly stated that the Disney+ price hike was having no effect on churn:

> In terms of, I guess, an objective way to look at the price/value relationship, the growth rate that we've experienced on Disney+ sort of stands out as the headline there. But you're right, we did launch at a very attractive price/value opening point. And the first price increase that you mentioned in the first 16 months happened recently, and ***we've seen no significantly higher churn as a result of that.***

335.   On August 12, 2021, during a Q3 2021 earnings call, Chapek stated:

> ***We're really pleased with churn****. We've taken some price increases over the past few quarters. **And what you're seeing is that our churn has declined. . . . So the fact that our churn is so low**, our engagement is so high, **our retention is so high** amongst the local quarters where we're taking price increases, I think, says everything about it.

336.   On May 11, 2022, during a Q2 2022 earnings call, Chapek stated that Disney executives look at "the amount of time spent, the engagement scores ***and then, of course, the churn,*** information." Chapek added, "***we've said this before in past earnings calls, but we're extraordinarily pleased with the low churn that we see, particularly given the bundle.*** The bundle is really efficient in terms of churn. And that gives us a lot of bullishness when it comes to the idea of bigger offerings from Disney."

337.   The statements highlighted above in ¶¶ 333-336 were false and misleading when made.

338.   Defendants were not "extraordinarily pleased with the low churn rate," but rather, Defendants closely tracked churn and were extraordinarily concerned about high churn rates. According to FE-1, churn was "tracked very closely" – "it was the most important thing"; "it was a big topic, always." FE-12 recalled that their

department held bi-weekly meetings just to discuss churn. FE-1 reported that Chapek, McCarthy and other Disney executives "got presentations of versions of this data on an ongoing basis." FE-2 corroborated that Disney+ closely tracked churn. FE-2 attended weekly meetings with senior leadership at Disney+ and Disney, during which Disney+ churn was discussed. According to FE-2, "[c]hurn was a key area. When we evaluated a feature, we always considered how it would increase subscriber growth and how it would decrease churn." FE-2 said that churn was in the "back of our mind every decision that we were making."

339.   Furthermore, in contrast to Defendants' reassurances that churn was "low," "declining," and that Defendants were "pleased" with low churn, churn *increased* between 2021 through 2022 and was an increasing source of concern for Defendants. According to FE-1, churn was a "constant problem" and Disney's data showed that Disney+ had a "four or five percent monthly churn" rate. FE-1 also noted that "churn was significantly higher at Disney+ than at Hulu," so Disney "sliced and diced" the data to determine why churn was so high at Disney+. Describing churn's impact on subscriber growth, FE-1 stated churn was called "the leaky bucket" because "[n]o matter how much water you put in, some leaks out." FE-9 similarly recounted how even when Disney+ released new content, people would simply churn and then subscribe again when the next season was released. FE-13 similarly recalled leaking subscribers, noting that Disney+ could get millions more subscribers, but over the next month, millions more could have churned. FE-2 explained that there was "general dissension from Streaming, that we needed to increase quality and personalization to prevent churn."

340.   Additional evidence confirms the problem of increasing churn. As shown in the chart below, Disney+'s monthly churn rate increased from 3.75% to 4.25% between 2021 and 2022. To provide context, in 2021, the Disney+ monthly churn rate was 88% higher than Netflix's 2.0% churn rate. The *Wall Street Journal* confirmed the worsening trend, noting the U.S. churn rate for Disney+ increased almost 30% in Q2 2022 as compared to the prior year.[53]



**Disney+ Monthly Churn Rate**

341.   Disney+'s churn problem stemmed from the fact that the Executive Defendants had employed unsustainable growth-at-any-cost tactics to temporarily boost subscriber growth to impress Wall Street. These tactics resulted in "low-quality" users who were more likely to churn off the Disney+ platform. For example, Disney+ boosted subscriber numbers by offering highly discounted or free promotions, including through arrangements with Verizon, American Express, Amazon Music, T-Mobile, and Hulu+ Live TV. These subscribers were "low quality" because they were more likely to cancel their Disney+ subscription after the promotion ended rather than pay full price. Disney concealed this churn data from investors. Disney ultimately acknowledged that it had chased subscriber growth

---

[53]*Robbie Whelan, Disney+ Price Increase Shows Limits of Subscriber-Growth Push*, THE WALL STREET JOURNAL (Aug. 11, 2022), https://www.wsj.com/business/media/disney-price-increase-shows-limits-of-subscriber-growth-push-11660256118

through aggressive promotion that had resulted in low-quality subscribers. Iger admitted, "in our zeal to go after subscribers, I think we might have gotten a bit too aggressive in terms of our promotion." Iger also acknowledged that the "promotion to chase subs that we've been fairly aggressive at globally wasn't absolutely necessary." Iger promised investors that Disney would focus on "grow[ing] quality subs that are loyal and where we actually have the ability to price effectively to those subs."

342.    During the timeframe the statements referenced in ¶¶ 333-336 were made, McCarthy sold Disney common stock, as detailed in ¶¶ 443-445. Each time McCarthy sold Disney common stock, McCarthy violated her duty to abstain from insider selling or disclose the adverse, material, non-public information set forth in ¶¶ 338-341.

### G.    Disney+ Profitability

343.    On November 8, 2022, Disney released its Q4 2022 financials, and McCarthy and Chapek participated in an earnings call with analysts. During this call, analysts expressed skepticism about Disney+'s profitability target, but Chapek reassured them stating that Disney was particularly pleased with Disney+ subscription growth and was "***well situated to leverage our position for long-term profitability and success***." Chapek added: "***[W]e still expect Disney+ to achieve profitability in fiscal 2024***."

344.    The statements highlighted above in ¶ 343 were false and misleading when made.

345.    *First*, Disney+'s focus was exclusively on subscriber growth, not profitability. Under the Executive Defendants' scheme, which involved (i) massive content spend, (ii) expansion into unprofitable international markets, and (iii) revenues hampered by promotions and discounts, Disney+ would not achieve profitability by the target date. Only twelve days after Chapek made these misleading statements, he was fired and replaced by Iger. Upon Iger's reinstatement as CEO, he

announced that Disney would cut the Disney+ content budget. Iger also announced that Disney would be removing certain content from Disney+, resulting in a $1.5 billion to $1.8 billion impairment charge.

346.  *Second*, in the leadup to the November 2022 earnings call, Chapek had been repeatedly advised about Disney+'s financial position and urged to be transparent with investors. Despite these warnings, Chapek continued to downplay the Company's challenges and continued to assure investors that Disney+ would reach profitability in fiscal 2024. As described below, Chapek was warned on three occasions: (i) September 2022 during a Board meeting, (ii) October 2022 during an executive retreat, and (iii) in a meeting the day of the November 2022 earnings call.

347.  In late September 2022, Chapek and McCarthy presented preliminary fourth-quarter results to Disney's Board of Directors. As was their practice, the two had spent weeks preparing and rehearsing their presentation. However, at the presentation, McCarthy diverged from their prepared remarks. According to people familiar with the discussion during the meeting, McCarthy "bluntly told the board the quarter's financials were on pace to be very bad." McCarthy "told the Board that Disney's earnings that quarter would fall dramatically short of Wall Street's consensus estimate of 55 cents per share." McCarthy relayed that the projected shortfall would be Disney's largest earnings miss in roughly a decade, and she attributed the problem to the Company's continued focus on subscriber growth over profitability and criticized Chapek's DMED restructuring. Chapek was reportedly blindsided by McCarthy's comments. Board members questioned Chapek on the situation, asking pointed questions about "forecasting techniques and how division heads shared financial information," which Chapek "struggled to answer." Chapek was unwilling to admit that "the results were as dire as McCarthy was painting them to be." According to *CNBC*, "McCarthy told colleagues she hoped her honesty with the board would jar Chapek into realizing his rosy outlook of the business wasn't based in reality."

348.  The following month, in October 2022, Disney held its annual management retreat in Orlando. During the retreat, General Counsel Horacio Gutierrez, "invited, half-forced" McCarthy, Daniel, members of the DMED finance team, and other executives to meet "to figure out a strategy" for disclosing what would be an unexpected $1.5 billion quarterly loss. According to *CNBC*, "Gutierrez told colleagues that people were entitled to their own opinions but not their own facts." Chapek only attended a few minutes of the first of these strategy meetings, further frustrating McCarthy and other executives, including Disney's head of communications, Kristina Schake, and head of investor relations, Alexia Quadrani, who warned Chapek that the market's "reaction to the quarter could be devastating."

349.  *Finally*, on the morning of the November 2022 earnings call, senior Disney executives met at the Company's New York office. Once again, members of the finance team advised Chapek "to deliver a sober message acknowledging that the streaming division's net operating losses were more than double that of the same period the previous year." According to the *Wall Street Journal*, citing people close to the matter, "McCarthy told board members that she wasn't happy with the way Mr. Chapek had communicated with investors during the conference call." Then, according to *CNBC*, "in a highly unusual move, board members also set up discussions with Disney division heads, who rarely speak to directors outside formal meetings. Schake, McCarthy, Gutierrez, Walden, Bergman and D'Amaro all told either Arnold, Mark Parker or the entire board that they no longer supported Chapek as CEO, according to people familiar with discussions."

350.  Within two weeks after making the statements, Chapek was fired and replaced by Iger as CEO. Iger announced a series of sweeping changes aimed at steering Disney+ toward profitability. In contrast to Chapek's earlier vision of international launches, aggressive content growth and mass spending, Iger presented a more modest strategy. Iger addressed Chapek's international growth plan: "We launched Disney+ in many markets around the world, including many very low

ARPU markets. . . . we spend a lot of money on marketing in those markets and we spend money on local content." Contrary to Chapek's statement two weeks earlier that Disney+ was tracking to profitability, Iger admitted that Disney needed to withdraw from unprofitable markets: "So as we rationalize this business and we ***head in the direction of profitability,*** clearly, we're looking at opportunities to reduce expenses in those markets where the revenue potential just isn't there." Next, addressing the aggressive content spend, Iger admitted: "it's critical we rationalize the volume of content we're creating and what we're spending to produce our content." Iger acknowledged: "We're going to reduce costs, both in content and of course, infrastructure." Iger also announced that he would be slashing the content budget by more than 35% and stated Disney "intend[ed] to produce lower volumes of content." Finally, the Company announced: "[W]e will be removing certain content from our streaming platforms and currently expect to take an impairment charge of approximately $1.5 billion to $1.8 billion."

351.    During the timeframe the statements referenced in ¶ 343 were made, McCarthy sold Disney common stock, as detailed in ¶¶ 443-445. Each time McCarthy sold Disney common stock, McCarthy violated her duty to abstain from insider selling or disclose the adverse, material, non-public information set forth in ¶¶ 345-350.

## VII.   DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF CONDUCT

352.    As set forth above, Defendants employed devices, schemes, and artifices to defraud investors and engaged in acts, practices, and courses of business which operated as a fraud and/or deceit upon Plaintiffs and the investing public in violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder. Summary descriptions of these artifices and practices are set forth below.

### A.    DMED Formation and Company Reorganization

353.    As described in further detail above, (*supra* ¶¶ 72-79), Chapek radically reorganized the entire Company, creating DMED and appointing his loyal lieutenant, Daniel, as Chairman, in order to consolidate control over Disney+ and the broader content distribution apparatus.

354.    This reorganization combined all content production, distribution, and finance units into a single powerful new media division called DMED. Moreover, this consolidation effectively placed total control over Disney+ and content distribution and financing in the hands of Chapek and whoever he appointed as chair of DMED. Chapek in turn appointed Daniel, a loyal acolyte, to run DMED, despite the fact(s) that Daniel "was barely known outside the company," "had little experience with movies or television," "had no experience with streaming services," and "did not understand the [streaming] business [or] technology."

355.    In furtherance of the scheme, the Executive Defendants utilized this consolidated power within DMED to employ various deceptive and ultimately unsustainable tactics to inflate subscriber growth and keep Wall Street convinced that Disney+ was "on track" to hit Netflix like subscriber numbers. These tactics ultimately proved financially disastrous and were later walked back entirely to salvage Disney's streaming business. Nevertheless, the scheme inflated Disney's stock price just long enough for Defendants to be rewarded with new contracts and many millions of dollars in compensation and stock sales, none of which has been paid back to the Company or shareholders.

356.    Chapek hid his true motives behind creating DMED from investors. Instead, he described the overhaul to investors as designed to help Disney make better platform distribution decisions based on consumer preference and to better monetize content to maximize profitability. Furthermore, Chapek boasted about having "100% buy-in" from within the Company.

357.    In reality, neither turned out to be true. The reorganization was actually

designed to inflate Disney+ subscriber growth, no matter the cost, by (i) stripping Disney studio executives of authority regarding production and distribution of their content (including whether the content should debut on Disney+ or "legacy" platforms such as television and theater) and (ii) utilizing full control over DMED's finances and distribution to divert content to Disney+ while hiding escalating content costs. Put simply, as FE-9 recalled, the reorganization of DMED was for power. Moreover, as FE-2 remembered, "the DMED reorganization was not favorably received internally." News media later reported that "everyone knew DMED as a source of tension, with 'so much angst' that never got resolved." Iger himself later admitted that Chapek's DMED reorganization "***created a huge divide***" within the Company and "***it was very, very apparent . . . that [the reorg] was a mistake***."

## B. Setting Unattainable Subscriber Targets

358. Key to the Defendants' scheme was wowing Wall Street with astronomical new subscriber targets. Wall Street had made it clear to Disney and the Executive Defendants that the Company's stock value (and the Executive Defendants' personal wealth along with it) was dependent on believing Disney+ was on a significant upward trajectory. So, the Defendants delivered, ***quadrupling*** the Disney+ subscriber target during the December 2020 Investor Day conference. The new target–230 to 260 million global subscribers–would put Disney+ ahead of Netflix, the undisputed leader in the streaming world.

359. As intended, investors were "blown away" by the new paid subscriber target. Some analysts even predicted that Disney+ would surpass Netflix as the most popular streaming service in the world. Most importantly for Defendants, the market rewarded them with an all-time high stock price of over $180 per share by the end of December 2020.

360. As described above, these targets were not realistically attainable, and insiders within Disney seriously questioned where these targets came from or how Disney+ could possibly reach them. That did not matter for the Executive

Defendants, so long as they could keep the market convinced that the target was achievable. Doing so would effectively place a floor under Disney's stock price. Thus, whenever investors expressed doubts, the Executive Defendants assured them, quarter after quarter, that the Company was on track to meet its paid subscriber targets.

361. The Defendants were able to provide investors with these false assurances because Defendants' consolidated power over DMED allowed them to deploy a variety of tricks and machinations to show subscriber growth while masking runaway costs. As described more fully throughout this Complaint, these artifices included (i) steering films to Disney+ at the expense of profitability, (ii) chasing subscribers with unsustainable content spend, expensive launches into unprofitable markets, and subscription discounts that attracted "low quality" subscribers, (iii) manipulating DMED's accounting, and (iv) concealing significant "churn" on the platform.

362. The plan worked for long enough to see Defendants rewarded with new contracts and multi-million-dollar compensation and stock sales. The market remained enamored with the Netflix-like targets and convinced Disney was on its way to achieving them. In turn, the price of Disney's common stock remained inflated while the market continued to believe the Defendants' deceit.

## C. Steering Films to Disney+

363. To entice more subscribers to the platform, Chapek and Daniel utilized DMED to steer feature films—films that would traditionally rake in millions at the box-offices—straight to Disney+. Doing so not only bypassed lucrative theatrical releases but eliminated valuable pay-per-view windows for these films. Unbeknownst to investors (in part because investors could not have the same visibility into DMED's finances as the Defendants), these decisions were made to boost subscriber growth, even if they were detrimental to the Company's overall profitability.

364.   Indeed, Chapek and Daniel even used their complete control over content distribution to override studio executives and send highly anticipated films, most notably big-budget Pixar animated films, directly to Disney+ rather than movie theaters. In fact, Disney continued steering major films to Disney+ long after the pandemic dictated the necessity of such moves. In other instances, Chapek and Daniel used their DMED control to shorten the "theatrical window" from the customary 90 days down to just 45 days in order to steer major films to Disney+ faster. And, in nearly all instances, Disney completely jettisoned the lucrative home video pay-per-view window to get films to Disney+ quicker. Every one of these maneuvers foreclosed significant revenue opportunities for the Company, all in an effort to boost subscriber growth.

365.   To obfuscate, Chapek and Daniel frequently described the direct-to-Disney+ decisions glowingly, citing to subscriber growth. Of course, they never disclosed the lost revenue associated with these decisions. In reality, and unbeknownst to investors, Disney suffered financially from bypassing or significantly shortening the theatrical windows. What had historically been blockbusters for Disney instead brought in modest revenues before being shunted to streaming. Worse, Chapek and Daniel's short-sightedness has negatively impacted Disney's future box-office revenues.

366.   Insiders have since confirmed that these decisions were short-sighted and cost Disney dearly. For example, Pete Docter, Pixar's Chief Creative Officer, has since conceded that Disney was too eager to send films directly to streaming. Docter explained to the *New York Times* that the steering tactic had long-lasting, deleterious effects on Disney's movie business. On top of simply lost revenues, Defendants' short-sighted maneuvers fundamentally altered consumers' viewing habits: "We've told people, 'Hey, all of this is going to be available to you on Disney+!'" Iger likewise agreed, stating "[t]here were three Pixar releases in a row that went direct to streaming . . . I think that . . . may have created an expectation in

the audience that they're going to eventually be on streaming and probably quickly, and there wasn't an urgency [to see the movies in the theater]."

367.   The Company itself has since admitted the folly of Chapek and Daniel's steering decisions: "it's already clear to us that the exclusivity . . . wasn't as valuable as we thought" and "the best way to monetize [content] is to make use of all platforms, streaming and traditional."

## D.   Chasing Subscriber Growth Through Unsustainable Spending

368.   In an attempt to "buy[] subscribers," Defendants embarked on a massive, unproven, and ultimately unsustainable content spending spree. Furthermore, this spending spree was untethered to any analysis of what kind of content would produce *sustainable* subscriber growth. Instead, it was based on a dogma that more content equaled more subscribers. Chapek and Daniel set out "***to flood the so-called digital shelves with as much content as possible to achieve . . . as much sub growth as possible***."[54] Indeed, FE-1 recalled a directive by Chapek to the studios to "produce as much content as you can." The Defendants ramped up Disney's streaming content budget to $33 billion for FY 2021, of which more than $16 billion was earmarked for Disney+ content. This was comparable to Netflix's content budget, yet Netflix had twice the subscriber base at the time. Put simply, as summarized by FE-1: "They spent too much money making too much content."

369.   Publicly, Defendants repeated the mantra that a steady stream of new Disney+ content would equate to more and more subscriber growth. Chapek specifically touted the positive aspects of the spending spree, namely the "cadence" of new Disney+ content being added to the platform each quarter. The message to anyone, both internally and the investing public, was not to worry about costs because more content equals more subscribers.

370.   Internally, Defendants knew that much of the content spend was not

---

[54] Disney Q2 2023 earnings Call May 10, 2023.

driving subscriber growth. Defendants hid this information from investors. As FE-1 recalled, the content produced for Disney+ was "not driving subscriber growth." Similarly, FE-9 recalled that subscriber growth slowed as the pandemic subsided. Disney only later admitted, after much fanfare from Chapek and after investors were severely damaged, that Disney "***made a lot of content that [was] not necessarily driving sub growth***."

371.   Furthermore, Defendants took advantage of Disney's cost accounting model to mask the impact of runaway costs from investors. Defendants used the accounting model to amortize or spread content expenses over several years, effectively masking the true scale of their expenditures. The Defendants never informed investors of the impending avalanche of delayed content costs when the proverbial bill would eventually come due. The amortized expenses eventually triggered a crushing $1.5 billion loss in Q4 2022. The Defendants knew this was coming but hid it from investors.

372.   Iger eventually came clean to investors after replacing Chapek: the Executive Defendants had been "chasing [subscribers] with . . . aggressive spend on content . . . going forward, we intend to produce lower volumes of content . . . Spending less on what we make, and making less." Beginning in May 2023, Disney removed more than fifty of the same shows and films previously touted by Chapek and others just quarters earlier, significantly contributing to the massive $2.4 billion impairment charges the Company was forced to record that same year.

### E.   Chasing Low Quality Subscriber Growth

373.   Central to the scheme to juice subscriber numbers, Defendants ramped up the use of steep discounts and promotions to chase "low quality" subscriber growth. Defendants increasingly turned to these promotions to maintain the auspices of robust subscriber growth. Most commonly, the Company would offer discounts through third-party partnerships, where another company would offer a Disney+ subscription as an incentive to use its own products or services, and then pay Disney

a small portion of the regular subscription cost. Naturally, these discounts and promotions came at the expense of profitability. FE-1 confirmed that Disney ramped up promotional activity in order to "***fill the gap***" to "***hit subscriber numbers and revenue targets***."

374. To mask the aggressive pursuit of subscriber numbers, Defendant Chapek reassured investors that discounted partnerships were carefully managed, stating, "we're very selective. We've got guidelines . . . to extract the benefits of those type relationships." However, reality painted a starkly different picture. Defendants quickly abandoned any semblance of a "selective" approach.

375. For example, in December 2021, Disney gifted all 4.3 million Hulu Live subscribers with free Disney+ subscriptions, subsequently counting them as full-fledged Disney+ subscribers to inflate reported growth. Even Iger later conceded, "in our zeal to go after subscribers, I think we might have gotten a bit too aggressive in terms of our promotion." Iger further admitted that the "promotion to chase sub[scription]s that we've been fairly aggressive at globally wasn't absolutely necessary," acknowledging Disney had prioritized quantity over quality. Iger then promised a shift towards "quality sub[scription]s that are loyal," where Disney could "continue to price effectively," a clear admission that the previous strategy was flawed.

**F.    Chasing Subscriber Growth in Unprofitable International Markets**

376. In furtherance of their scheme to boost subscriber numbers, Defendants launched Disney+ in unprofitable international markets. Between November 2019 through November 2020, Disney+ expanded into Disney's most lucrative international markets, covering more than 50 countries and territories. This first wave of launches fueled rapid subscriber growth: by the first quarter of 2021, nearly 88% of Disney+'s new subscribers came from these international markets. The initial rollout was expected to be completed by the end of 2021. However, once the first wave of international launches ended and Disney+'s subscriber growth slowed

down, Defendants announced their plan to **double** Disney+'s international presence through a second wave of international launches.

377.   Throughout mid-2022, Defendants launched Disney+ in dozens of additional countries and territories, which appeared to reignite Disney+'s subscriber growth. Indeed, by the third quarter of 2022, **99.3%** of Disney+'s new subscribers originated from international markets. This artifice of the scheme allowed Defendants to tout a "growing" subscriber base while concealing from investors that the second wave of launches came at the expense of profitability. Launching and operating in many of these markets required substantial spending. For example, producing original, non-English local content and paying local licensing fees made these markets cost prohibitive. As FE-9 recalled, Disney spent a lot of money on translations and launches into new territories. Compounding the issue, Defendants launched Disney+ in markets where the average revenue per user ("ARPU") was significantly lower, broadband access was limited, and many Disney programs were censored or banned. As a result, the high costs of operating in these markets far exceeded the revenue Disney+ could generate.

378.   Unbeknownst to investors, these circumstances undermined Disney's ability to operate profitably in those markets. Indeed, Iger later admitted, "***[w]e launched Disney+ in many, many markets around the world, including many very low ARPU markets*** . . . we spend a lot of money on marketing in those markets and we spend money on local content." Contrary to Chapek's prior assertions, Iger also acknowledged that "there are some [existing] markets that we may not have a service at all. . . . Basically, what I'm saying is not all markets are created equal."

### G.   Assuring Investors Disney+ Growth was On Track

379.   Defendants maintained the façade of their scheme by continually assuring investors that Disney+ remained on track to meet its ambitious subscriber and profitability targets. Defendants knew that analysts and investors closely tracked Disney+'s performance as a key measure of Disney's valuation. Indeed, FE-8

recalled that every big decision Disney made was based on how the decision impacted the Company's growth and long-term subscription growth because there was pressure to meet a subscription number for the quarter and how the decision impacted what Disney told Wall Street in terms of profitability. Thus, to keep Disney's stock price artificially inflated, Defendants needed to (1) report quarterly subscriber growth, and (2) issue quarterly reassurances that Disney+ would achieve its subscriber and profitability targets by fiscal 2024.

380.   Defendants carried out this part of the scheme successfully. Defendants repeatedly reaffirmed the 230 to 260 million subscriber target and assured investors that Disney+ remained "on track" to meet both its subscriber and profitability goals. For example, during an earnings call on August 12, 2021, Chapek and McCarthy told investors, "[W]e feel really great about our sub trajectory" and stated that they "remain confident in our expectation that Disney+ will achieve profitability in fiscal 2024." Then, in 2022, Chapek and McCarthy remained steadfast in their reassurances, stating that Disney was "well suited to achieve the subscriber guidance as well as the profitability guidance." Even on November 8, 2022—just days before Chapek's termination—Chapek again assured investors and the public, "[W]e still expect Disney+ to achieve profitability in fiscal 2024."

## H.   Accounting Manipulations to Conceal Runaway Costs

381.   Defendants manipulated Disney's accounting model to conceal Disney+'s content costs. The Executive Defendants shifted costs between divisions to mask the costs and hide Disney+'s operating losses. For example, Chapek and Daniel briefly debuted Disney+ content on Disney's legacy distribution channels (linear TV networks) before releasing the shows on Disney+. This strategy allowed Defendants to shift the associated content and marketing costs to the linear network division rather than properly attributing them to Disney+. As FE-9 explained, starting in 2021 or 2022, certain TV shows and movies that were set to launch on Disney+ were instead quickly re-routed for release on live TV or Hulu/ESPN first.

According to FE-9, this allowed Defendants to reallocate the budget to the studio where the content launched rather than Disney+. FE-9 recalled several different shows were slated to premiere on Disney+ first and then were aired elsewhere to reallocate the budget and make Disney+ look like it was performing better than it was. FE-14 similarly recalled internal conversations about getting "creative" with moving things from one business line to another. According to the *Wall Street Journal*, "Ms. McCarthy was concerned about this [cost shifting] strategy."

382. Defendants further manipulated Disney's reported results and obscured Disney+'s mounting costs and losses by changing how the Company calculated and reported content costs under the new DMED reorganization. Before the reorganization, Disney's film and television studios operated with a degree of independence, producing content and then selling it to Disney+ at fair market value which included a profit margin. After the reorganization, studios were consolidated under DMED and these inter-segment content sales were eliminated. Disney+ no longer paid fair market value and instead paid only the actual production costs. This simple accounting manipulation dramatically reduced Disney+'s reported content expenses and artificially inflated its profitability, particularly when compared to earlier periods that used a fair market valuation.

383. This accounting change artificially created the illusion that Disney+ was on track to achieve profitability. For example, in the first quarter after the DMED reorganization, analysts expected Disney Streaming to report $1.2 billion in operating losses. Instead, Disney shocked investors reporting a loss of only $466 million. Defendants downplayed the impact of the accounting change and vaguely attributed a portion of the results to Disney+'s performance. Throughout the duration of the scheme, Defendants completely omitted any mention of the accounting change, allowing analysts to mistakenly attribute the results to Disney+'s "improved performance," rather than Defendants' accounting manipulation.

### I. Concealing Subscriber Churn

384. Defendants concealed Disney+'s churn problem. One significant consequence of Defendants' growth-at-any-cost scheme was that it attracted "low quality" subscribers who tended to cancel their Disney+ subscription once promotional periods ended or the content lost its novelty. Publicly, Defendants told investors that Disney+'s "churn has declined" and "we're extraordinarily pleased with the low churn that we see." For example, during Disney's Q3 2021 earnings call on August 12, 2021, Chapek stated: "We're really pleased with churn. We've taken some price increases over the past few quarters. And what you're seeing is that our churn has declined. . . . So the fact that our churn is so low, our engagement is so high, our retention is so high." Likewise, during Disney's Q1 2021 earnings call on February 11, 2021, McCarthy told investors: "[I]n regard to the specific churn related to the anniversary of the Verizon launch promotion from last November 2020, we're really happy with the conversion numbers that we have seen there going from the promotion to become paid subscribers."

385. In reality, and unbeknownst to investors, high churn remained a central concern among Disney executives. As FE-1 explained, churn was a constant problem that Defendants closely monitored. According to FE-1, churn was so severe that Disney executives often referred to Disney+ as "the leaky bucket" because "[n]o matter how much water you put in, some leaks out." Contrary to Defendants' public claims that churn had "declined," Disney+'s monthly churn rate actually increased from 3.75% to 4.25% between 2021 and 2022. For context, Disney+'s monthly churn rate was 88% higher than Netflix's 2.0% churn rate. The *Wall Street Journal* confirmed this worsening trend, reporting that Disney+'s churn rate climbed 30% year-over-year from Q2 2021 to Q2 2022.

386. Iger belatedly admitted, after Disney's stock price tumbled and investors lost billions, Disney would need to move away from chasing low-quality subscribers and instead "grow quality subs[cribers] that are loyal and where we can

actually have the ability to price effectively to those subs[cribers]."

## VIII.  SUMMARY ALLEGATIONS OF SCIENTER

387.   A host of additional facts, in addition to those discussed above, collectively support a strong inference that Defendants knew, or at a minimum, were severely reckless in not knowing, the true and omitted facts.

### A.    Internal Data Contradicted Defendants' Public Statements

388.   Defendants had access to, and did access, extensive internal data systems that tracked key performance metrics for Disney+. As one of the most sophisticated media and entertainment companies in the world, Disney closely monitored key business performance and user engagement data points including: (1) profitability, (2) subscriber numbers, (3) subscriber churn, (4) content costs, and (5) content performance. Indeed, the Company publicly confirmed to investors that Disney had "access to an incredible number of touch points across [the Company]" and touted the "insights gained from this wealth of data." Multiple former employees also confirmed that the Executive Defendants had direct access to extensive data and were routinely briefed on the Company's streaming performance, including profitability, content costs, and churn. Through their access to, and use, of this data, Defendants knew—or, at a minimum, recklessly disregarded—that their public statements touting Disney+'s path to profitability and sustainable subscriber growth were materially false and misleading.

389.   *First*, Disney closely monitored Disney+'s path to profitability. From the outset, Disney executives had detailed visibility into Disney+'s profitability projections. FE-1 explained that the profitability targets Chapek announced at the December 2020 Investor Day came directly from the Company's internal "five-year plan," which set specific dates for when Disney+ and Hulu were projected to become cash-flow positive. According to FE-1, he presented the plan to Chapek before Investor Day and "walked him through the five-year plan financials before the big meeting." The plan projected that Hulu would be cash-flow positive by 2023, and

Disney by 2024. The plan also detailed the number of subscribers required to become cash-flow positive, as well as the content costs, including which number of shows would be included and removed from the service each year.

390. FE-1 confirmed that by April 2021 the five-year plan showed that Disney+ would *not* hit profitability until *one year later than planned*. FE-1 further confirmed that Chapek and McCarthy were notified that the five-year plan showed that by April 2021 Disney+ would not hit profitability until one year later than planned. FE-1 recalled telling executives that "Hulu would be profitable one year earlier and Disney+ one year later." FE-1 reported that Chapek and McCarthy were "not happy about that."

391. *Second*, Disney closely monitored Disney+'s subscriber numbers at a granular level through comprehensive, live feed dashboards. According to FE-4, in 2019, Disney created an "executive dashboard" to deliver daily, updated subscriber numbers on Disney+. FE-4 noted that "it was the first product that de-duped the number of subscribers across the [streaming] services," and "[i]t was the first time all the numbers would be available for geography, product, daily-versus-forecasted and budget." FE-4 also explained that after DMED was restructured, FE-4 then turned his focus to DMED's priorities, including paid subscriber numbers and other key performance indicators. Specifically, "the main metric [FE-4] was focused on was paid subscribers." The dashboard allowed a user to "look at it at a geographical level and a service level." FE-4 recalled that 90% of her/his efforts were spent on paid subscribers. FE-16,[55] a former Product Manager at Disney Streaming, similarly recounted that Disney was tracking subscriber numbers through live-feed

---

[55] FE-16 was a Product Manager at Disney Streaming from January 2019 through April 2021. FE-16 was specifically a product manager for data platforms. One major project that FE-16 worked on was the creation of internal analytics tools for executive leadership teams to support streaming. This included building dashboards for Disney+ that, among other things, tracked subscriber counts.

dashboards. According to FE-16, a flat channel bot provided real-time information that was monitored by the heads of Disney Streaming.

392.   FE-4 understood that the executive dashboard was "for the C-levels at Disney." FE-4 was "told it was used for briefings" with those leaders. Notably, FE-4 recalled that the subscriber numbers were provided to "Chapek and the Board." Moreover, according to FE-4, Daniel's Chief of Staff accessed the executive dashboard, and Daniel had his staff "feed him daily briefs" about the executive dashboard data.

393.   FE-4 estimated that in 2020 or early 2021, he was asked to build a data portal. According to FE-4, this was because "hundreds of reports were being used by all kinds of executives and employees. The thought was that there could be one place, a 'catalog,' where employees could access various information according to their approved level of access." FE-4 "defined the vision and requirements" for the data portal, and the data analysts "managed the reports in the portal." Those analysts worked on data analysis that concerned "content, viewership, subscribers, churn, engagement and marketing. Each [metric] was a team." Once the data portal was complete, FE-4 "taught [each team] how to put their content on the portal." FE-4 also noted that churn data was available on the portal.

394.   *Third*, Disney closely monitored Disney+'s subscriber churn, i.e., the number of subscribers that cancelled their Disney+ subscription or let them lapse. Chapek publicly acknowledged that Disney and the Executive Defendants had access to "***a tremendous amount of data that we get on our [DTC] platforms***. . . . There's also the amount of time spent, the engagement scores and then, ***of course, the churn, information***."

395.   Former employees corroborated that Disney, indeed, tracked subscriber churn data. As explained above, FE-4 recounted that Disney had a data portal that compiled data analysis on "content, viewership, subscribers, churn, engagement and marketing." FE-4 specifically recalled that churn data was available on the portal.

FE-1 also explained that Disney "***tracked churn very closely***," and churn was "the ***most important thing***. It was a big topic, always, both at Hulu and Disney+."

396.   According to FE-1, he "sliced and diced" the churn data to determine why churn was so high at Disney+ compared to Hulu. FE-1's team thoroughly analyzed churn, including by dividing Disney subscribers into different cohorts to determine which cohorts experienced more churn, including: (1) subscribers that Disney gained through partnerships; (2) subscribers in different age groups; and (3) subscribers that joined through various Facebook and social media campaigns. FE-1 explained that the data for their analyses came from Disney's data science team, which could "write scripts" to collect data after FE-1 told them what he was looking for.

397.   FE-1 recalled that the data showed churn was "***a constant problem***" for Disney+ as the platform suffered from a 4-5% churn. According to FE-1, churn was internally referred to as "***the leaky bucket***," because "***[n]o matter how much water you put in, some leaks out***." FE-9 and FE-13 similarly recalled that "people would churn then subscribe again when the next season was released" and "lots of churn." Thus, with Defendant's clear visibility into subscriber churn—and specifically, the cohorts of subscribers that churned—Defendants knew or, at minimum, were reckless in not knowing, that Disney's high churn rate was caused by Chapek's growth-at-any-cost scheme that attracted "low-quality" subscribers through promotions and/or expensive one-off content who cancelled their subscriptions after their promotions expired or after they viewed the new content.

398.   Additionally, FE-1 stated that Chapek, McCarthy, and others in the C-suite "***got presentations of versions of this data on an ongoing basis***." For example, Chapek and McCarthy were provided churn data at "off-site" meetings where they were presented with "slides on churn reduction." Disney executives were also provided with churn data at staff and Board meetings. FE-1 recalled putting together a presentation on churn, which he forwarded to Disney's Corporate Development

Team, that then repurposed the presentation to present it to Chapek. Similarly, FE-2 attended weekly meetings with the "entire executive team," during which FE-2 recalled discussions aimed at "increasing subscriber growth" and "slowing churn."

399.    *Fourth*, the Defendants kept close tabs on content costs. Indeed, Chapek explained to investors during the Company's Q2 2022 earnings call, "*we're very carefully watching our content growth – content cost growth*." Because Disney amortized its content costs, Disney effectively spread those costs for particular programs across many future quarters. This effectively allowed the Defendants to delay recognizing costs. On the other hand, this accounting treatment also gave the Defendants black and white insight into future content costs. In short, the Defendants could see the avalanche coming towards them, even if they didn't have to report it to investors immediately.

400.    As FE-1 explained, "accounting treatment of content-cost recognition, in which costs are spread across the useful life of the content, means you don't see the immediate hit to P&L. The losses start accumulating." According to FE-1, "[i]t's OK if you have one piece of content. But if you have thousands of $25 million content, as your portfolio grows, your losses increase. And the subscription business doesn't cover the gap." FE-1 confirmed that the scheduled amortization of content costs "*provided good visibility for costs upcoming*."

401.    Because of that "good visibility" into upcoming costs and, as Chapek acknowledged, Defendants "carefully watch[ed] . . . content cost growth," Defendants knew or recklessly disregarded that Disney+ losses were rapidly accumulating and inhibiting profitability. Disney has since admitted that, in order to re-direct Disney+ back toward profitability, "it's critical we rationalize the volume of content we're creating . . . going forward, we intend to produce lower volumes of content." To halt amortization of content costs hitting the Company's bottom line, Disney eventually removed over 50 programs from Disney+ and took a $2+ billion impairment charge to write them off.

402.   *Fifth*, Disney tracked and analyzed extensive data that showed how its content was performing, including which content was driving subscribers. Chapek himself acknowledged that Defendants "have a lot of information, a lot of data. And we have a pretty good idea of what the marginal impact of a particular title might be to our service" and "we have a tremendous amount of data that we get on our [DTC] platforms, things like the first view, what's the first view that somebody watches . . . which is a pretty good proxy for maybe why they signed up."

403.   FE-1 described the data Disney used to monitor content performance. *First*, the data showed how many people viewed a given program, which indicated how broadly appealing the program was. *Second*, the data showed how many people finished a given program, which indicated the program's quality. *Third*, the data showed how many viewers of a given program watched the program as their first program on Disney+. This third metric was used to determine how many new subscribers the program attracted.

404.   FE-1 recalled presenting these three metrics at monthly meetings that were attended by Daniel, Warbrooke, Disney's "content investment planning director," the "studio heads," and others. At the meetings, FE-1 presented data on "how the existing content was performing." Their presentations included the three metrics discussed above: content quality, how broadly appealing content was, and how many new subscribers the content was driving. FE-1 stated that the data he presented at the monthly meetings "gave the lay of the land for how the content was performing."

405.   FE-1 also attended weekly meetings with Daniel and other Disney executives where they discussed "performance for that week," including content, "subscriber numbers, what was working and what wasn't." Contrary to Defendants' public representations, the internal data showed the Company was producing lower quality content that was decidedly not driving subscriber growth or engagement. FE-1 added that Disney produced content for Disney+ that was "not driving subscriber

growth." He stated: "We knew what kind of content we needed. We needed unscripted reality content. But Disney doesn't do that. They did one-hour dramas and comedies. But those didn't have the same effect" on subscriber growth.

406.   Iger eventually admitted, after taking back over for Chapek, that the data showed Disney "made a lot of content that [was] not necessarily driving sub growth."

## B.    The Fraud Involved Disney's Core Operations

407.   Because the fraud involved Disney+, which became crucial to the Company's overall operations in response to the pandemic, a strong inference arises that Defendants were aware of and participated in the fraud. By March 2020, COVID-19 had severely disrupted Disney's operations and stock price. Disney+ became the one bright spot propelling the Company's stock price during the pandemic. Thus, Disney+ quickly became the Company's top priority and key growth driver. The streaming platform became so important that Defendants restructured Disney's entire business to elevate the streaming segment and devoted its 2020 Investor Day entirely to Disney+ and streaming. For example, during a May 5, 2020 earnings call, Chapek told investors: "[O]ur company's *top priority* and our *key to our growth* is our direct-to-consumer business. And I'm pleased to say that the response to Disney+, in particular, has exceeded even our highest expectations."

408.   Chapek and the other Defendants reiterated the same during the following two years:

- "And needless to say, Disney+ has exceeded our wildest expectations with 86.8 million subscribers as of December 2. That's quite an achievement. This success has bolstered our confidence in our continued acceleration towards a *DTC-first business model*," (December 2020 Investor Day);

- "Given that *our DTC business is key to the future growth of our company,* we've restructured our media and entertainment businesses.

By separating content creation from distribution, we've been able to streamline our processes and better align the organization towards these important strategic objectives as we accelerate our pivot to a ***DTC-first business model***," (Q4 2020 earnings call);

- "[W]e are more committed than ever to investing in our businesses, in particular our DTC strategy, which we see as ***the key driver of significant long-term value*** for our company," (Q4 2020 earnings call);

- "[O]ur recent strategic reorganization has enabled us to accelerate the company's pivot towards a ***DTC-first business model*** and further grow our streaming services," (Q1 2021 earnings call);

- "We're proud of all that we've accomplished, especially as it relates to ***our top priority, our DTC business*** . . . ." (Q1 2021 earnings call);

- "The incredible success of Disney+ in just its first year prompted us to ***accelerate our pivot to a DTC-first business model.*** We reorganized our media and entertainment businesses, separating content creation from distribution to align accountabilities in order to better support our DTC growth strategy and increase shareholder value," (2021 Annual Shareholder Meeting); and

- "Another standout this quarter were our streaming services," (Q2 2022 conference call).

409. Given the DTC business's importance to the Company, Disney+ was the subject of intense market scrutiny and concern. Either the Executive Defendants were intimately familiar with the defects plaguing Disney+, or they were reckless in making their false and misleading statements. That Defendants' misrepresentations concerned one of the most important aspects of Disney's business further strengthens the inference of scienter.

410. Moreover, Chapek and McCarthy repeatedly held themselves out as knowledgeable about the two key measures of Disney+'s success: subscriber growth

and the platform's path to profitability. Chapek and McCarthy regularly updated investors on these metrics and fielded analyst questions about them on *every* earnings call while they remained at the helm of Disney. For example, McCarthy frequently addressed changes in Disney+'s path to profitability and answered analyst questions about the adjustments to the Company's profitability targets. Notably, when questioned about whether Disney+'s profitability by fiscal 2024 was achievable, McCarthy responded in detail about the metrics involved in tracking and reaching profitability. For example, during a Q1 2021 conference call with analysts, McCarthy explained to investors: "We're also going to have some other cost drivers that we just have to factor into our timing for profitability, and that includes marketing, technology, customer service and just other expenses of running a new business. So we're sticking to that 2024 – fiscal 2024 profitability."

411.   Similarly, during a Q3 2023 conference call, McCarthy stated:

[W]e are reaffirming our guidance that Disney+ will achieve profitability by the end of fiscal 2024. . . . I have mentioned before, our expectations are built on certain assumptions around subscriber additions based on the availability and attractiveness of our future content, churn expectations, the financial impact of the Disney+ ad tier and price increases, our ability to quickly execute on cost rationalization while preserving revenue and macroeconomic conditions, all of which [is based] on *extensive internal analysis* as well as recent experience.

412.   Notably, Chapek and McCarthy consistently demonstrated their understanding of the intricacies and importance of Disney+ subscriber growth, a metric that was central to investor expectations and to the scheme's artifices described above (¶¶ 150-240):

- **McCarthy, Q1 2020 conference call:** "In the near term, we expect subscriber growth to come primarily from outside the U.S. with the next meaningful phase of domestic subscriber growth likely to coincide with the release later this calendar year of highly anticipated original content,

including Episodic Series from Marvel and Season 2 of The Mandalorian."

- **McCarthy, Q1 2021 earnings call:** "But we are also – given the value of growing our sub base, we are continuing to invest in high-quality content. We believe that content is the single biggest driver to not only acquiring subs, but retaining them."

- **Chapek, Q2 2021 earnings call:** "[I]n terms of the drivers, for sub growth going forward, we really see four different elements. First of all is our content slate. As you know, we're spending a lot of money across our variety of franchises in order to create the content that's going to keep consumers coming back . . . . The second one is our general entertainment international growth driven by our Star brand, and we think that's going to continue to fuel growth for our international territories as well as Disney+. The third one is continued market expansion in markets where Disney+ has not yet been launched. . . . But one thing that continues to impress us is the opportunity to have the bundle in the U.S. be even larger."

- **Chapek, Q1 2022 earnings call:** "And so we're bullish on the future of Disney+, both domestically and internationally, driven by not only additional prevalence of titles within our major franchises, but also general entertainment and specifically in the international territories local content."

413. Former employees also confirmed that the Company's top priority following the onset of COVID-19 was Disney+, specifically Disney+'s subscriber numbers and profitability. FE-1 recalled, "*[t]he entire focus was streaming*" because, as a consequence of the pandemic, the streaming division was the only business within Disney that was bringing in revenue. Also, FE-1 noted, *[e]very day it was all hands on deck,* discussing *how will we meet the aggressive targets*"

handed down by Chapek and Daniel. FE-1 also discussed the importance of churn reduction, stating he "tracked churn very closely. It was ***the most important thing. It was a big topic, always***, both at Hulu and Disney+." FE-12 also highlighted the importance of tracking churn within Disney. FE-12 explained that he was on bi-weekly calls with their department where they discussed churn. FE-13, a former Data Engineer within Disney Streaming, similarly noted that the Company was doing a lot of churn management.

414. FE-2 similarly observed that beginning during COVID, "Disney+ became the ***workhorse of the company.*** Everyone wanted to be involved." FE-2 also recalled weekly meetings with the entire executive team where they discussed "increasing subscriber growth and slowing churn." He stated that, "[c]hurn was a key area. When we evaluated a feature, we always considered how it would increase subscriber growth and how it would decrease churn," and churn was in the "***back of our mind every decision that we were making***." FE-2 noted that there was a "***single-minded focus***" on subscriber growth and reduction of churn because the market was evaluating Disney purely based on the number of Disney+ subscribers. He stated "growth from a subscription perspective was ***all anyone wanted to hear about***," and "***all anyone was talking about***." According to FE-2, subscriber growth was always considered when making decisions, and anything he was designing, launching, etc., "had to be [about] that." FE-2 further detailed the importance of Disney+'s expansion into international markets in the aftermath of the pandemic: "The [Disney] Parks were closed. Disney+ was the only revenue engine. The market was evaluating Disney by subscribers only, and the ***only way to increase subscriptions was via international expansion***."

415. Market and analyst commentary confirm that Disney+ was viewed as a crucial part of the Company's business and the primary driver of investor sentiment. For example, following the Company's reorganization, Barclays analysts noted that the "[n]ew structure ***elevates streaming to the company's core***." RBC analysts

similarly observed that "Disney's DTC assets have **become the most important part of the narrative**." Analysts repeatedly emphasized that Disney+ was the main driver of Disney's stock price. In April 2021, J.P. Morgan analysts stated that a "successful DTC business will likely remain the **main driver of future stock performance**." In August 2021, Credit Suisse analysts stated: "The key debates for Disney remain the Company's ability to drive Disney+ penetrations in its core markets beyond early adopters/Disney fans while driving ARPUs to levels that reflect the value of its content." In May 2022, Guggenheim analysts wrote, "Key areas of focus include subscriber and financial results/outlooks for the company's direct-to-consumer services following last quarter's resurgence."

416.   The fact that Disney+ was a core operation of the Company and was crucial to the Company's revenue and growth—and that Defendants touted its importance and the Company's focus on it—supports a strong inference of scienter with respect to their misleading statements on Disney+'s subscriber growth and profitability. At the very least, given the Defendants' intimate knowledge of the importance of Disney+, it was deliberately reckless not to investigate the accuracy of their unequivocal statements regarding Disney+'s subscriber growth and profitability before revealing them to the market.

### C.   Temporal Proximity Between Misstatements and the Corrective Disclosures Supports Scienter

417.   Defendants made several false statements close to when the truth was revealed to investors. For example, on August 10, 2022, Defendants assured investors that Disney+ was on track to reach its subscriber number and profitability targets by 2024. Specifically, during the Q3 2022 earnings call, McCarthy attributed subscriber growth to the launch of an additional 50 international markets and maintained she was "**confident that Disney+ will achieve profitability in fiscal 2024**." Then, less than three months later, Disney announced a massive quarter-end **$1.47 billion loss** in its DTC streaming division, revealing that Defendants' prior

statements were false and misleading. The monumental streaming loss was significantly greater than Disney had indicated or market analysts had expected. For context, this loss was more than *twice* the $630 million in losses Disney reported in the same quarter the year prior. Analysts at MoffettNathanson noted how unexpected the losses were: "***Rarely have we ever been so incorrect in our forecasting of Disney profits***."

418. Even after reporting this massive streaming loss, Chapek and McCarthy continued to tell investors that their Disney+ subscriber number and profitability targets were on track. During an earnings call on November 8, 2022, Chapek told investors that Disney was pleased with Disney+ subscription growth and was "***well situated to leverage our position for long-term profitability and success***." Chapek added: "***[W]e still expect Disney+ to achieve profitability in fiscal 2024***." Then, just weeks later, Disney fired Chapek and Daniel and announced that Iger would be reinstated as CEO. The Company also announced that it would be forced to completely unwind Chapek's growth-at-any-cost scheme in order to redirect Disney+ towards profitability.

419. During a November 28, 2022 town hall meeting, Iger stated: "Instead of chasing subscri[bers] . . . *we have to start chasing profitability*." In the following quarters, Disney "***reset the whole business*** around economics designed to deliver significant, sustained profitability." For example, in February 2023, Disney announced a ***$5.5 billion*** cost-cutting initiative, and in the following quarters, Disney stressed that Disney+'s ability to achieve profitability depended on "our ability to quickly execute on cost rationalization while preserving revenue [and macroeconomic conditions]." Iger also acknowledged: "We're going to reduce costs, both in content and of course, infrastructure." Iger also slashed the budget by more than 35% and announced that Disney "intend[ed] to produce lower volumes of content." Finally, Disney also announced a $1.5 billion impairment related to the removal of over 50 shows and films from Disney+.

420. Notably, following Chapek and Daniel's termination, Disney abandoned the aggressive subscriber targets that had defined their tenure. Reported subscriber growth, once touted nearly every quarter by the Defendants, began to decline. For example, in Q1 2023—the quarter immediately after the $1.47 billion DTC loss was revealed—Disney announced that it would no longer be providing long-term subscriber guidance and reported that Disney+ had *lost subscribers*. Then, in Q2 2023, Disney+ lost another 4 million subscribers; in Q3 2023, Disney+ lost another 11.7 million subscribers. By the end of Q3 2023, Disney+ had 146.1 million subscribers, placing it far below the promised 230-260 million subscribers Defendants had promised by fiscal 2024. Further, according to a *Bloomberg* article published September 14, 2023, Disney "expects to fall *tens of millions of subscribers short* of its last publicly stated 2024 target [of 215-245 million subscribers] for Disney+ streaming service." Analysts at MoffettNathanson have since also commented, "'No other company we've covered has seen that kind of decline. *How did previous management not see this coming?*'"

421. The temporal proximity between the alleged false statements and the revelation of the true facts supports a strong inference of scienter.

**D.    Terminations and Resignations Support Scienter**

422. On November 8, 2022, Disney reported its Q4 2022 earnings, including an announcement of Disney+'s massive streaming losses that partially revealed the fraud. Just thirteen days later, on November 21, 2022, Disney announced that Chapek would be fired as CEO and replaced by Disney's former CEO, Iger. Chapek's termination was sudden and suspiciously timed because it closely followed the Company's November 8th revelations that caused its stock price to decline by 13.2%.

423. Further, as discussed above, Chapek's contract had been renewed only a few months earlier on June 28, 2022, for another *three years*. At the time the contract renewal was announced, the Board publicly praised Chapek's success in

navigating the Company through the pandemic. Then, only a few months later, the Board suddenly changed course and fired Chapek.

424. The news of Chapek's termination shocked analysts. For example, Macquarie Research analysts wrote: "Disney's surprising Sunday evening announcement that it is replacing CEO Bob Chapek with predecessor Bob Iger in our view raises numerous questions as to ***what's going on behind the scenes*** and what Iger can do better." Analysts at Morningstar described the news as a "Sunday Night Stunner," and analysts at Rosenblatt Securities noted that "[t]here's no way to avoid the obvious speculation that Disney's Sept. quarter – which featured higher DTC streaming losses than our and Street models – was a final straw. Yet the suddenness is breath-taking."

425. Chapek's sudden departure was also the result of internal complaints from company executives, including McCarthy. According to the *Wall Street Journal*, after the Company's disastrous Q4 2022 earnings call, McCarthy "told board members that she wasn't happy with the way Mr. Chapek had communicated with investors during the conference call."

426. Then, on November 21, 2022—in the immediate wake of firing Chapek—Disney also fired Daniel. The *Los Angeles Times* reported: "'Kareem's crime was that he was close to Chapek and that he helped design and led an organizational construct that was hated by the creatives.'"

427. Shortly thereafter, Arthur Bochner, the VP of Strategic Communications, was also suddenly fired from his role. Bochner was described as a "key lieutenant" of Chapek. He had worked at Disney for nine years, serving as Chapek's chief of staff from March 2020 to August 2022, then as VP of Strategic Communications. According to *Variety*, "Bochner was behind Chapek's remarks on Disney Q3 earnings call," i.e., the call that "led to [Chapek's] eventual ouster by the Disney board."

428. Finally, within months, McCarthy suddenly resigned from her role. On

June 15, 2023—shortly after the truth was fully revealed—Disney announced that McCarthy was resigning after 23 years of service. Her sudden departure came at the worst time for Disney, as the Company was in the midst of a major restructuring, layoffs, and a search for another CEO to succeed Iger. Analysts at Wells Fargo commented on McCarthy's departure, writing: "DIS's surprise CFO transition adds another wrinkle to an already complex story." The *Wall Street Journal* reported: "The abrupt exit of McCarthy surprised some colleagues and associates."

429.    The inference of scienter is further strengthened by the fact that the three Executive Defendants departed Disney shortly after the Company revealed that it misled investors via its prior statements about Disney+ subscriber growth and profitability.

### E.    Defendants' Compensation and Longevity with Disney Were Tied to the Fraud

430.    Executive Defendants were financially motivated to misrepresent Disney+'s subscriber growth and profitability due to Disney's compensation structure. During the Relevant Period, executive compensation was based on individual performance and the performance of the Company overall. Annual executive compensation was comprised of three components: (i) a guaranteed annual base salary; (ii) eligibility for an annual incentive award ("cash bonus"); and (iii) eligibility for annual equity incentive awards (a combination of stock option awards ("Options"), performance-based restricted stock unit awards ("PBUs"), and time-based restricted stock unit awards ("RSUs")) (together, "equity awards").



431.   From 2020 to 2022, 90% of Chapek's compensation would derive from performance-based pay, based on the Company and stock price performance. The variable portion of Chapek's 2021 and 2022 target compensation consisted of 30% cash bonus and 60% equity awards. The only fixed portion of Chapek's compensation was his base salary, which constituted merely 10% of his earnings.



432.   Defendant McCarthy's compensation was also heavily dependent on Disney's stock price, and thus on the success of Disney+. Her 2021 target

compensation consisted of 16% fixed base salary, 27% cash bonus, and 57% equity awards. In 2022, McCarthy's target compensation consisted of 15% fixed base salary, 25% cash bonus, and 60% equity awards.

433.   Under this executive compensation structure, Chapek and McCarthy's cash bonus was tied directly to the performance of Disney+. At the start of each fiscal year, the Compensation Committee set financial and strategic goals to measure executive and Company performance, and the Committee measured performance against those objectives at the end of the fiscal year. The Committee repeatedly identified the growth of DTC as a "key strategic goal," and awarded bonuses accordingly.

434.   In 2020, the Committee credited Chapek for "quickly [programming] new offerings on our DTC [including Disney+] and linear channels" and for overseeing the launch of Disney+ in several major international markets. The Committee similarly recognized McCarthy for "deliver[ing] service excellence across all segments and lines of business, including supporting the historic launch of Disney+."

435. Again, in 2021, the Committee emphasized the Company's "tremendous subscription growth across all of our DTC platforms (Disney+, Hulu and ESPN+)," the development of new content, and the launch of Disney+ into 35 new countries. The Committee attributed the expansion of Disney+ to Chapek, describing it as one of his "key performance highlights." The Committee also commended McCarthy's role in designing and executing Investor Day 2020, which highlighted Disney+.

436.   Finally, in 2022, the Committee noted that the Company "[s]uccessfully increased subscribers at Disney+ (+39%), Hulu (+8%) and ESPN+ (+42%) during fiscal 2022, while launching DTC platforms [including Disney+] in several key international markets, including 154 different countries and territories." The Committee further identified "accelerating our DTC initiatives" as one of the

"strategic objectives of the Company," and credited McCarthy "manag[ing] the Company's liquidity and credit ratings through the pandemic and DTC investments" as one of her key "Performance Highlights."

437.   Chapek and McCarthy's annual compensation played out as follows: For fiscal 2020, Chapek received $9,502,990 in equity awards and up to 300% of his base salary as a cash bonus. McCarthy received $8,478,884 in equity awards and up to 200% of her base salary as a cash bonus. For fiscal 2021, Chapek received $13,965,478 in equity awards and $14,330,000 as a cash bonus. McCarthy received $11,922,870 in equity awards and $7,680,000 as a cash bonus. For fiscal 2022, Chapek received $14,560,852 in equity awards and $6,750,000 as a cash bonus. McCarthy received $12,310,836 in equity awards and $5,820,000 as a cash bonus.

438.   This incentive structure created a strong financial motivation for Chapek and McCarthy to chase subscriber growth at any cost in order to increase their own compensation. From fiscal 2020 through fiscal 2022, Chapek earned more than $70 million in total compensation, while McCarthy earned over $52 million, as described in the Company's 2023 Proxy Statement as seen in the chart below:

| Name and Position | Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Non-Qualified Deferred Compensation Earnings | All Other Compensation | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| **Robert A. Chapek** Chief Executive Officer | 2022 | $ 2,500,000 | $ — | $ 10,810,832 | $ 3,750,020 | $ 6,750,000 | $ — | $ 372,151 | $ 24,183,003 |
| | 2021 | 2,500,000 | | 10,215,466 | 3,750,012 | 14,330,000 | 1,358,505 | 310,310 | 32,464,293 |
| | 2020 | 1,814,608 | — | 6,129,442 | 3,373,548 | | 2,705,712 | 140,626 | 14,163,936 |
| **Christine M. McCarthy** Senior Executive Vice President and Chief Financial Officer | 2022 | 1,980,000 | — | 8,935,794 | 3,375,042 | 5,820,000 | — | 124,833 | 20,235,669 |
| | 2021 | 1,903,754 | — | 6,922,854 | 5,000,015 | 7,680,000 | 103,152 | 119,440 | 21,729,215 |
| | 2020 | 1,661,815 | — | 4,712,459 | 3,766,425 | — | 761,321 | 94,985 | 10,997,005 |

439.   As for Chapek specifically, even more fundamental in motivating him to engage in fraud was the extraordinary pressure and looming contract expiration

that hung over him like a Damocles sword. As discussed above, the Board granted Chapek an unusually short and stock-price-driven CEO contract. This contract was up for renewal just two years after Chapek ascended to CEO. Then, just one month into his tenure, the pandemic hit, grinding Disney's core operations to a halt. Disney's stock price (along with Chapek's hopes for his contract renewal and lucrative compensation) came crashing down.

440.  Adding to the extraordinary pressure, Chapek's predecessor—the beloved Bob Iger—still hung around, questioning Chapek's decisions and undermining his every move. The *Wall Street Journal* reported that Iger "expressed displeasure with the organizational structure Mr. Chapek put in place to handle content distribution [DMED]." Chapek in turn felt that "Iger never really left Walt Disney" and "complained to deputies he had been undermined from the start." Even after Iger left the Company in 2021, he "made it known to friends and colleagues that he disapproved of changes Mr. Chapek was making, setting off a whisper campaign across Hollywood that never quite allowed Mr. Chapek to escape his predecessor's shadow."

441.  Moreover, Chapek's looming contract expiration risked millions of dollars that he would be awarded with a contract extension. As Chapek knew, if the Board awarded him with a new contract, even if it fired him shortly thereafter, he would still collect millions of dollars under the new contract. Indeed, Chapek received a $30 million contract extension. Just months later, he was fired, yet he still walked away with ***$20 million*** in severance pay (on top of the roughly $24 million Disney had already paid him in 2022).

442.  In short, Chapek's job, reputation, and lucrative compensation were on the line, and the mounting pressure and incentive structure motivated Chapek to do all he could—such as deceiving investors—to beat the pressure and obtain a new contract.

### F.    Suspicious Stock Sales Support Scienter

443.    Defendant McCarthy capitalized on her materially false and misleading statements and omissions that inflated the price of Disney's stock by disposing of personally held shares at artificially inflated prices. Following the December 2020 Investor Day, McCarthy reaped millions of dollars from stock sales. Moreover, McCarthy did so while in possession of material, non-public information: namely, that as a consequence of Chapek's growth-at-any-cost scheme, Disney+ was boosting its subscriber numbers through unsustainable methods at the expense of profitability, making it impossible for Disney+ to reach the subscriber and profitability targets in fiscal 2024.

444.    As negative facts about Disney+ accumulated, McCarthy sold over *122,014* shares of her Disney stock for insider trading proceeds of $17,101,573 and *profits of $11,809,441*.

| Transaction Date | Shares Sold | Share Price | Proceeds |
|---|---|---|---|
| 01/15/2021 | 4,139 | $173.00 | $716,047 |
| 01/20/2021 | 5,000 | $177.24 | $886,200 |
| 01/25/2021 | 25,000 | $172.00 | $4,300,000 |
| 01/12/2022 | 10,000 | $158.60 | $1,586,000 |
| 01/13/2022 | 10,000 | $158.00 | $1,580,000 |
| 01/14/2022 | 10,000 | $158.00 | $1,520,600 |
| 01/18/2022 | 15,342 | $151.54 | $2,324,927 |
| 01/12/2023 | 42,533 | $98.46 | $4,187,799 |

445.    By contrast, McCarthy had sold *none* of her Disney stock for over a year before the Investor Day conference. Two years before the conference, McCarthy sold a total of just $5.7 million of her Disney shares. McCarthy, who had long promoted the idea that Disney executives should hold large portions of Disney stock, began rapidly selling her own shares once the scheme was underway, and before the truth was fully revealed to investors, she significantly reduced her Disney holdings. Yet, just one month after the conference, McCarthy started selling roughly $5 million of her Disney stock per year. In total, McCarthy sold over $17 million,

which is ***300% higher*** than her pre-conference sales during the same amount of time.

## G.    Internal Warnings and Inappropriate Tone at the Top

446.    Before Chapek made the false and misleading statements on November 8, 2022, several senior colleagues repeatedly advised him about the true state of the business and urged him to be transparent with investors about Disney+'s worsening performance. During a late September 2022 Board meeting, Chapek and McCarthy gave an executive presentation to Disney's Board of Directors previewing the Company's fourth quarter 2022 results. During the meeting, McCarthy departed from the prepared remarks and "bluntly told the board the quarter's financials were on pace to be very bad." McCarthy "told the Board that Disney's earnings that quarter would fall dramatically short of Wall Street's consensus estimate of 55 cents per share," and she relayed that this would be the largest miss relative to Wall Street's consensus estimates in a decade. McCarthy blamed the miss on Disney's focus on subscriber growth over profitability and Chapek's restructuring. When colleagues later asked why she had gone off script, McCarthy explained "she hoped her honesty with the board would jar Chapek into realizing his rosy outlook of the business wasn't based in reality."

447.    Those concerns were repeated in the time leading up to the November 8, 2022 call. During an October 2022 executive retreat in Orlando, Chief Communications Officer Kristina Schake and Head of Investor Relations Alexia Quadrani warned Chapek that investors would be upset by the Company's results, describing the coming reaction as potentially "devastating" to the Company. Then, during a meeting on the day of the November 2022 earnings call, Disney's finance team again urged Chapek to acknowledge that the streaming division's net losses had more than doubled from the prior year. Instead of heeding these warnings and publicly acknowledging Disney+'s true financial condition, Chapek dismissed McCarthy, Schake, and Quadrani as "the mean girls" and "Eeyores."

448.    During the November 8, 2022 earnings call, against the advice of his

colleagues, Chapek refused to be honest with investors and instead reaffirmed Disney+'s profitability guidance for the following year. After the call, McCarthy was reportedly "appalled" and told board members that she was unhappy with Chapek's statements to investors. But despite her reported concerns, McCarthy participated in the earnings call and sat complacently as she listened to Chapek's misstatements. In other words, on this call in particular, Chapek and McCarthy knowingly or recklessly withheld information they knew investors would care deeply about.

449. This disregard for internal warnings also reflected the inappropriate tone Chapek and Daniel set at the top. Multiple former employees described a "toxic" corporate culture of (1) extreme pressure to achieve "aggressive" and "unreasonable" streaming goals; (2) restricted access to information regarding Disney+; and (3) disregard for input from senior Disney executives. This inappropriate tone and suspicious management style further supports an inference of scienter.

450. *First*, multiple former employees described that the culture within Disney was "toxic," and there was constant pressure to achieve unreasonable streaming goals. According to FE-1, there was constant pressure to meet "unreasonable" streaming targets. FE-1 recalled that he was under intense pressure to "hit subscriber numbers and revenue targets." FE-1 said, "***[e]very day it was all hands on deck, discussing how will we meet the aggressive targets***" that were handed down by Chapek and Daniel. FE-15 similarly recalled the "all hands on deck" atmosphere. FE-1 explained that the pressure and toxic environment were so extreme that his physician advised him to leave the Company after developing health problems as a result of the stress. FE-9 described Chapek as a bully and someone no one really liked.

451. FE-2 similarly described that the culture "changed palpably" when Iger stepped down, and Chapek and Daniel's leadership created a "toxic culture" that led her/him and other colleagues to leave Disney. FE-2 stated that the "pressure was

extraordinary," and leaving felt like "getting out of a toxic relationship." FE-2 also explained that "Chapek's decision-making wasn't strategic," and instead "[i]t was an iron fist, running into a brick wall." FE-15 similarly recalled that Chapek's decision making was reactive. According to FE-2, Daniel was Chapek's "axe man" and "did exactly what he was told to do by Chapek." FE-15 similarly described Daniel as Chapek's "henchman." FE-2 further lamented that Chapek "took an amazing company with amazing people and ***threw it out the back door like garbage***. He and Kareem Daniel share the majority of the burden." FE-2 said "[y]ou couldn't pay me to work for Disney." He added, "I left a lot of stock on the table when I left. I left a high paying job with a good bonus."

452.  Like many other former employees, FE-5 left Disney because the "people and culture" at Disney were "not conducive to successful business." Regarding Chapek and Daniel, FE-5 stated: "Disney's leadership ***isn't trustworthy***, and they didn't have a good sense of the business. It didn't have an idea of how to manage a streaming business," and "[g]ood leaders acknowledge their blind spots. Disney's leadership didn't." For FE-5, Disney was a "really brutal place to work" and he stated that its "executive and leadership team ***[was] one of the worst teams I ever worked for***."

453.  Media reports further corroborate the corporate culture described by Disney's former employees. According to a *Business Insider* report citing to a "senior Disney insider," by the time Chapek was fired in November 2022, "a group of top Disney creative and business leaders had told the board over the past few months that ***they were considering leaving the company if Chapek. . . . remained in the role***." The *Wall Street Journal* also reported in November 2022 that "Disney executives and investors had been complaining for months to the prior CEO, Robert Iger, about the direction of the company under Mr. Chapek, according to people familiar with the matter. Mr. Iger advised some of these executives to take their concerns to the company's board." A partner at the research firm LightShed Partners

told the media that the "management team and the creatives did not like Chapek nor the management structure he imposed."

454. *Second*, Chapek and other Disney executives restricted access to data and internal information regarding Disney+. FE-2 recalled that top executives at Disney "***closely guarded***" specific data and numbers concerning subscriber growth and churn. FE-6 likewise reported that "***[d]ata was held closely internally***," and "there was no access for the vast majority of teams to data on subscribers. Most of us only got information from earnings reports."

455. FE-7, a senior data analytics executive, explained that he was a part of Disney's Data Governance Team, which established rules governing which Company employees could access data on subscriptions, retention, churn, and engagement. According to FE-7, there "was a lot of documentation" on the approvals sought and given for access to Disney+'s viewer data. Additionally, if an employee requested access to data, they had to attest to the purpose of the data and promise not to disseminate it. FE-7 added that information about Disney streaming was siloed to prevent data from being leaked to the public, including journalists. But, according to FE-7, access was also restricted because "***[c]ertain leaders wanted to keep data close to themselves. Chapek was clear on who could see what***." In fact, FE-7 explained that access to key information and data was so restricted that, at one point, "there was a big campaign to share the data to make it findable."

456. FE-4 similarly noted that once DMED was created, their supervisor "decided to ***lock down access***" to data. Suddenly, the content producers and people in research were "***cut off***" and lost access to the "raw data."

457. *Finally*, multiple former employees corroborated that, under Chapek, the Company disregarded internal warnings from executives regarding Disney+'s financial condition. FE-2 explained that Chapek did not want to hear that his decisions were wrong, even if adverse positions were based on fact. Chapek and Daniel's management style involved disregarding information they did not want to

hear. In FE-2's words, it was "***their way or the highway***," and their leadership was a "***dictatorship***."

458.    According to FE-2, key executives were not consulted before Chapek announced the Disney+ subscriber target at the December 2020 Investor Day. When Chapek announced the new targets, FE-2 thought they were "batshit crazy." FE-2 explained that, if Disney was going to provide those numbers to the market, key executives should have been consulted about the veracity of the subscriber numbers. But FE-2 recalled that her/his colleagues were not consulted. FE-2 also recalled that he and other executives looked at each other after the announcement and asked who had provided the numbers and realized none of them had. FE-2 said, "***I've never worked in a company where corporate financial entities didn't solicit input from the other departments***" before releasing them publicly.

459.    FE-15 similarly explained that the subscriber numbers and profitability goals were created in a vacuum without a lot of insight or input from the people who were more directly involved in the day-to-day. This was because, according to FE-15, Chapek was a leader who issued directives rather than consulted his teams. FE-7 also recalled that after an earnings announcement, the President of Disney+ asked him "***[w]here did that forecast come from?***"

460.    Further, multiple former employees recounted that Chapek and Daniel fully controlled DMED and ignored feedback. For example, FE-2 stated that there was "general dissension from Streaming, that we needed to increase quality and personalization to prevent churn," but Daniel ignored the teams. According to FE-2, Chapek and Daniel were more concerned about quantity instead of quality. Regarding the DMED reorganization, FE-2 said "I didn't talk to anyone who thought it was a good idea. ***The decision was made in a vacuum***. It didn't help us in Streaming in any way." FE-15 believed that there was not a whole lot of love lost between Chapek and the other executives.

461.    Together, these internal warnings from top Disney executives and

former employees' accounts of the inappropriate tone at the top, support a strong inference that Defendants knew—or were at least reckless in disregarding—that their public statements about Disney+'s profitability and subscriber growth were misleading.

### H.    Corporate Scienter

462.    The allegations above also establish a strong inference that Disney as an entity acted with corporate scienter throughout the Relevant Period, as the Executive Defendants, Disney's officers, management, and agents, had actual knowledge of the misrepresentations and omissions of material facts and the scheme set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were made knowingly or recklessly, and without a reasonable basis, for the purpose and effect of concealing the fraudulent scheme from the investing public. By concealing these material facts from investors, Disney maintained and/or increased its artificially inflated common stock prices.

## IX.    ADDITIONAL LOSS CAUSATION ALLEGATIONS

463.    The misrepresentations, omissions, and scheme alleged herein were the proximate cause of the economic loss suffered by Plaintiffs. There was a causal connection between the alleged misrepresentations, omissions, and scheme and the losses (i.e., stock price declines) described herein. *See, e.g., Mineworkers' Pension Scheme v. First Solar Inc.,* 881 F.3d 750 (9th Cir. 2018).

464.    The market for Disney common stock was open, well-developed, and efficient at all relevant times. Throughout the Relevant Period, Disney common stock traded at artificially inflated prices as direct result of Defendants' scheme and their materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiffs purchased or otherwise acquired Disney common stock relying

upon the integrity of the market price for Disney common stock and market information relating to Disney and Disney+.

465.   Defendants' misrepresentations and fraudulent conduct became apparent to the market through three separate corrective events/disclosures. The price of Disney's common stock declined significantly, causing investors and Plaintiffs to suffer losses, in response to each event/disclosure. Each of these corrective events/disclosures concerned or connected to facts misrepresented or concealed by Defendants.

466.   On November 10, 2021, November 8, 2022, and May 10, 2023, when Defendants' prior misrepresentations and fraudulent conduct were partially and fully disclosed to the market, the price of Disney's common stock declined significantly as the prior artificial inflation was removed from the market price. As a result of their acquisition of Disney shares, Plaintiffs suffered economic loss, i.e., damages, under the federal securities laws.

### A.   November 10, 2021: Defendants Disclose A Slowdown in Disney+ Subscriber Growth

467.   After the market closed on November 10, 2021, Disney announced its financial results for the fourth quarter and fiscal year ended October 2, 2021. That day, Disney announced the smallest quarterly gain in subscriber numbers since Disney+'s launch two years prior. Disney disclosed a slowdown in Disney+ subscriber growth, missing Wall Street's expectations by a significant margin. The Company added only 2.1 million subscribers during the quarter, reaching 118.1 million subscribers. This result fell 1.5 million subscribers short of consensus estimates of 119.6 million subscribers, as compiled by Bloomberg. Disney further disclosed that losses would continue longer than expected. Specifically, McCarthy disclosed: "we now expect that Disney+ will reach its peak year of losses in fiscal 2022 instead of fiscal 2021."

468.   As a result of the partial disclosure, Disney's stock price dropped,

closing down $12.34 per share, or 7.1%, on November 11, 2021. In stark contrast, on the same date the S&P 500 Index increased 0.1% and an index of Disney's peers increased by 0.4%.[56]

469.    Analysts and investors were surprised but reassurances by Defendants prevented the stock price from dropping further. Indeed, at the same time that Defendants made their admissions, they downplayed their significance. For instance, during the earnings call after the market closed on November 10, 2021, Chapek told investors "we're confident we are on the right trajectory to achieve the guidance that we provided at last year's Investors Day, reaching between 230 million and 260 million paid Disney+ subscribers globally by the end of fiscal year 2024, and with Disney+ achieving profitability that same year."

470.    McCarthy similarly reassured investors that the Company's prior subscriber growth and profitability forecast remained on track: "we are increasing our overall long-term content expense for Disney+, and . . . we are well positioned to achieve the subscriber target of 230 million to 260 million by fiscal 2024 that we laid out at last year's Investor Day. And we also remain confident in our expectation that Disney+ will achieve profitability in fiscal 2024."

471.    These reassurances worked on analysts. For example, a Morgan Stanley analyst reported, "[w]e continue to believe its [subscriber] guidance is achievable" even though "it will cost more . . . to get there." A Rosenblatt Securities analyst said, "we remain confident Disney+ will comfortably achieve the 230-260M subscriber target and profitability in FY'24."

---

[56] The peer index is an equal-weighted index of the "Media Industry Peers" listed in DIS proxy statements for fiscal 2019 through fiscal 2022, which include: Alphabet, Amazon, Apple, AT&T, Comcast, Discovery/Warner Bros. Discovery, Meta Platforms, Netflix, and Paramount Global.

**B.    November 8, 2022: Defendants Reveal Devastating Financial Results**

472.    On November 8, 2022, Disney issued an after-market press release announcing its financial results for its fourth quarter and fiscal year ended October 1, 2022. That day, due to Executive Defendants' unmitigated Disney+ content spending, Disney reported a monumental quarter-end operating loss of $1.47 billion. This more than doubled the $630 million in losses Disney had reported in the same quarter of the year before.

473.    Through this disclosure, investors began to understand the devastating downstream effects of the Executive Defendants' scheme. Analysts and the market raised concerns about Disney's financial condition and its ability to deliver on the promise to simultaneously deliver massive subscriber growth and profitability. For example, Barclays analysts reported: "we believe Disney may face a choice between its subscriber growth guidance and its streaming breakeven guidance as we believe it may be tough to meet both."

474.    As a result of the disclosure, Disney's stock price dropped $13.15 per share, or 13.2% in a single day on November 9, 2022. In contrast, on the same date, the S&P 500 Index and an index of Disney's peers declined by just 2.1%.

475.    Once again, Defendants prevented the stock price from dropping further by providing reassurances and assuaging investor concerns. During the November 8, 2022 earnings call, Chapek told investors that, despite the massive loss, "*we still expect Disney+ to achieve profitability in fiscal 2024*" and added "Disney+ is well situated to leverage our position for long-term profitability and success." These reassurances kept the price of Disney common stock inflated.

**C.    May 10, 2023: Investors Learn the Full Extent of The Scheme**

476.    Finally, on May 10, 2023, Iger admitted to the extent of Executive Defendants' scheme. That day, Disney reported its Q2 2023 financial results and held an earnings call with analysts. During the earnings call, Iger, who had returned as

CEO, acknowledged that Disney would be radically altering the Disney+ business model. Disney would be shifting its focus away from massive subscriber growth to "rationalize [the] business" and "head in the direction of profitability." Iger explained that it was "a significant transformation to strategically realign Disney for sustained growth and success." As one news source reported, during this earnings call, investors learned that Disney+ "was in worse shape than Iger realized" when he had taken over a CEO following Chapek's termination.

477. Iger revealed to investors that Disney could only achieve profitability if the Company completely changed course. Accordingly, Iger was forced to unwind nearly every aspect of Chapek's growth-at-any-cost plan. *First*, Iger announced that Disney would be cutting content. Iger explained: "it's critical we rationalize the volume of content we're creating and what we're spending to produce our content." Iger also admitted "we made a lot of content that is not necessarily driving sub growth." *Second*, contrary to Chapek's plan to launch in unprofitable international markets to boost subscriber numbers, Iger announced that Disney needed to "recalibrat[e] our investments internationally" by exiting markets that lacked "profitability potential." McCarthy disclosed that Disney was "in the process of reviewing the content on our DTC services to align with the strategic changes . . . you've heard Bob discuss. As a result, ***we will be removing certain content from our streaming platforms and currently expect to take an impairment charge of approximately $1.5 to $1.8 billion***. And going forward, we intend to produce lower volumes of content in alignment with this strategic shift." McCarthy also announced that DTC streaming losses were expected to increase in the following quarter.

478. As a result of these disclosures, Disney's common stock price dropped $8.83 per share, or 8.7% in a single day on May 11, 2023. By contrast, on the same day, the S&P 500 decreased only 0.1%, and Disney's peer index increased by 0.3%.

479. Analysts connected this stock price decline to the sudden shift in messaging and the lowered expectation for subscriber growth. For example, a TD

164

Cowen analyst wrote: "We are lowering our estimates driven mainly by DTC sub losses." Similarly, a Barclays analyst labeled the call a "reset" and wrote "[g]rowth narrative heavy on cost cuts and light on a revenue may not justify current valuation," and noted that the necessary cost-cutting could "result in the Disney+ subscriber base not increasing much from present levels." A UBS analyst noted "management provided more detail on the strategy to rationalize the DTC business" and a J.P. Morgan analyst cited to the outlook for "Lower DTC Subs Long-Term."

480.   In sum, each of the three corrective events/disclosures listed above served to remove the artificial inflation from the price of Disney's common stock and were direct and foreseeable consequences of the revelation of the pertinent truth concealed by Defendants.

## X.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

481.   The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were: (i) historical statements or statements of purportedly current facts and conditions at the time the statements were made; (ii) mixed statements of present and/or historical facts and future intent; and/or (iii) omitted to state material current or historical facts necessary to make the statements not misleading.

482.   Further, to the extent that any of the false or misleading statements alleged herein could be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by the Defendants were not sufficient to insulate them from liability for their materially false and misleading statements.

483.   Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Defendants are liable

for those false and misleading forward-looking statements because at the time each of those statements was made, the speaker knew the statement was false or misleading, did not actually believe the statements, had no reasonable basis for the statements, and/or was aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## XI.    PRESUMPTION OF RELIANCE

484.    Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine. At all relevant times, the market for Disney common stock was an efficient market for the following reasons, among others:

   a.    Disney's common stock met the requirements for listing, and was listed and actively traded on NYSE, a highly efficient and automated market;

   b.    Disney's common stock traded at high weekly volumes;

   c.    Disney filed periodic public reports with the SEC;

   d.    Disney was eligible to and did file registration statements with the SEC on Form S-3;

   e.    Disney regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

   f.    Disney was followed by several securities analysts employed by major brokerage firm(s), who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace; and

g. There was a cause-and-effect relationship between unexpected corporate events or financial releases and movements in Disney's stock price.

485. As a result of the foregoing, the market for Disney's common stock promptly digested current information regarding Disney from all publicly available sources and reflected such information in the price of Disney common stock. Under these circumstances, all of GIC and Union's purchases of Disney common stock between December 10, 2020 and May 10, 2023, resulted in injury to GIC and Union as the stock price was artificially inflated and the presumption of reliance applies.

486. A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Plaintiffs' claims are grounded on material omissions. Because this action involves a failure to disclose material adverse information regarding Disney's business and operations—information that was required to be disclosed—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

## XII.  PLAINTIFFS' CLAIMS ARE TIMELY

487. Plaintiffs' claims are timely. The claims asserted herein under the Exchange Act were first brought in the Disney Securities Class Action captioned in *Local 272 Labor-Management Pension Fund, et al., v. The Walt Disney Company, et al.*, No. 2:23-cv-03661-CBM-AS (C.D. Cal.), within applicable limitations periods. The filing of the initial complaint in the Disney Securities Class Action asserting Exchange Act claims served to toll the statute of limitations for all individual claims of putative class members under the *American Pipe* doctrine. *See American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). Plaintiffs were members of the putative class in the Disney Securities Class Action until the filing of this action and thus benefit from the *American Pipe* doctrine. Plaintiffs' Exchange Act claims are also brought within applicable repose periods, as less than five years

have elapsed since the violations upon which such claims are based.

## XIII.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**Violations of Section 10(b) of the Exchange Act and SEC Rule(s) 10b-5(a) – (c)
(Against All Defendants)**

488.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

489.    This Count is asserted against Defendants Disney, Chapek, McCarthy, and Daniel for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.l0b-5(a)-(c).

490.    Between December 2020 through May 2023, Defendants disseminated, furnished information for inclusion in, or approved the false statements specified above, which they knew, or were reckless in not knowing, were false or misleading in that they contained misrepresentations and/or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

491.    Between December 2020 through May 2023, Defendants carried out a plan, scheme, and course of conduct which was intended to and did: (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of Disney common stock; and (iii) cause Plaintiffs to purchase Disney common stock at artificially inflated prices. In furtherance of this unlawful scheme and course of conduct.

492.    Pursuant to the above wrongful course of conduct, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Disney common stock, in violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) & (c) promulgated thereunder.

493.   By virtue of their ownership and/or positions at Disney, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other investors, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions were committed willfully or with reckless disregard for the truth.

410.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As senior managers and/or directors of Disney, the Executive Defendants had knowledge of the details of Disney's internal affairs.

494.   The Defendants are directly and indirectly liable for the wrongs complained of herein. Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the statements of Disney. As officers and/or directors of a publicly held company, the Executive Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Disney's businesses, operations, future financial condition, and future prospects. As a result of Defendants' misconduct, the market price of Disney's common stock was artificially inflated. Unaware of the adverse facts concerning Disney's business and financial condition which were concealed by Defendants, Plaintiffs purchased or otherwise acquired Disney common stock at artificially inflated prices and in doing so relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants,

and were damaged thereby.

495.   Between December 2020 and May 2023, Disney common stock was traded on an active and efficient market. Plaintiffs, relying on the materially false and misleading statements described herein, which Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Disney common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs known the truth, they would not have purchased or otherwise acquired said Disney common stock, or would not have purchased or otherwise acquired it at the inflated prices paid. At the time of the purchases and/or acquisitions by Plaintiffs, the true value of Disney common stock was substantially lower than the prices paid by Plaintiffs. The market price of Disney common stock declined upon public disclosure of the facts alleged herein to the injury of Plaintiffs.

496.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

497.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective purchases, acquisitions and/or sales of Disney common stock, as the truth about Disney's operations and prospects began to be disclosed to the investing public.

## COUNT II

### Violations of Section 20A of the Exchange Act
### (Against McCarthy)

498.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This count is asserted pursuant to § 20A of the Exchange Act against Defendant McCarthy on behalf of Plaintiffs who were damaged by McCarthy's insider trading.

499.   As detailed herein, McCarthy was in possession of material, nonpublic information concerning Disney. During the Relevant Period, McCarthy sold over $17 million of her Disney stock, including to Plaintiffs, while in possession of material, nonpublic information concerning Disney.

500. McCarthy's sales of Disney common stock were made contemporaneously with Plaintiffs' purchases of the Disney common stock (set forth below). Plaintiffs (unaware of the fraud) made the following purchases contemporaneously with McCarthy's sales:

| McCARTHY'S SALES | | | GIC'S CONTEMPORANEOUS PURCHASES | | |
|---|---|---|---|---|---|
| Date | Amount | Price | Date | Amount | Price |
| 01/15/2021 | 4,139 | $173.00 | 01/19/2021 | 9,409 | $172.47 |
| 01/20/2021 | 5,000 | $177.24 | 01/21/2021 | 74,021 | $172.13 |
| 01/25/2021 | 25,000 | $172.00 | 01/22/2021 | 6,525 | $172.79 |
| | | | 01/25/2021 | 4,570 | $171.27 |
| | | | 01/26/2021 | 4,566 | $170.41 |
| | | | 01/27/2021 | 7,101 | $163.00 |
| | | | | 6,929 | $163.10 |
| | | | 01/28/2021 | 64,141 | $170.53 |
| | | | | 7,246 | $170.69 |
| | | | | 655,224 | $170.78 |
| | | | 01/29/2021 | 308,055 | $168.25 |
| | | | | 4,438 | $168.27 |
| 01/18/2022 | 15,342 | $151.54 | 01/18/2022 | 18,330 | $152.27 |
| 01/12/2023 | 42,533 | $98.46 | 01/12/2023 | 6,377 | $98.46 |

| McCARTHY'S SALES | | | UNION'S CONTEMPORANEOUS PURCHASES | | |
|---|---|---|---|---|---|
| Date | Amount | Price | Date | Amount | Price |
| 01/25/2021 | 25,000 | $172.00 | 01/28/2021 | 382,912 | $170.61 |
| | | | 01/29/2021 | 243,813 | $168.19 |
| 01/18/2022 | 15,342 | $151.54 | 01/18/2022 | 76,209 | $152.55 |

501.   As Disney's CFO, McCarthy owed a duty to Disney and its shareholders to maintain the material, nonpublic information in confidence and not trade on the basis of it.

502.   Plaintiffs purchased shares of Disney's common stock contemporaneously with McCarthy's sales and suffered damages because: (1) in

reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20A of the Exchange Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

## COUNT III

### Violations of §20(a) of the Exchange Act
### Against All Defendants

503.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

504.   This count is asserted against Defendants Disney, Chapek, McCarthy, and Daniel for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

505.   Defendants Chapek, McCarthy, and Daniel acted as controlling persons of Disney within the meaning of Section 20(a) of the Exchange Act, as alleged herein. Defendants participated in and oversaw the operation and management of Disney, and conducted and participated, directly and indirectly, in the conduct of Disney's business affairs.

506.   By reasons of their high-level positions of control and authority as the Company's most senior officers, Defendants Chapek, McCarthy, and Daniel had the authority to influence and control, and did influence and control, the decision-making and the activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. Defendants Chapek, McCarthy, and Daniel were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Disney, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

507.   Defendants Chapek, McCarthy, and Daniel were provided with, or had unlimited access to, copies of the Company's public filings, earnings call scripts, and

other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

508.   Defendants, therefore, were "controlling persons" of Disney within the meaning of §20(a) of the Exchange Act.

509.   Disney had the power to control and influence the Executive Defendants, and other Company executives through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations. By virtue of the foregoing, Disney had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Executive Defendants, including the content of their public statements.

510.   Each of Defendants Chapek, McCarthy, and Daniel spoke to investors on behalf of the Company, including at quarterly earnings calls and at industry and investor conferences. Therefore, each of Defendants Chapek, McCarthy, and Daniel was able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Disney, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein. Moreover, as officers and/or directors of a publicly owned company, the Executive Defendants had a duty to disseminate accurate and truthful information

511.   As set forth above, Disney violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

512.   By virtue of their positions as controlling persons of Disney and as a result of their own aforementioned conduct, Defendants Chapek, McCarthy, and Daniel are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs. As detailed

above, during the respective times, Defendants Chapek, McCarthy, and Daniel served as officers and/or directors of Disney.

513.   As a direct and proximate result of the conduct of Defendants Disney, Chapek, McCarthy, and Daniel, Plaintiffs suffered damages in connection with their purchase or acquisition of Disney common stock.

514.   By reason of the above conduct, Defendants are liable pursuant to §20(a) of the Exchange Act for the violations committed by Disney.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment as follows:

    a.  Awarding compensatory, rescissory or statutory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    b.  Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

    c.  Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XV.  JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: December 8, 2025

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Matthew W. Arrow (Bar No. 338273)
matthew.arrow@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:   (310) 819-3481

-and-

John Rizio-Hamilton (*pro hac vice* forthcoming)
johnr@blbglaw.com
1251 Avenue of the Americas
New York, NY 10020
Tel:   (212) 554-1400
Fax:   (212) 554-1444

*Counsel for Plaintiffs Union Asset Management Holding AG and GIC Private Limited*

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:     (310) 819-3481